Clerk of the Superior Court
*** Electronically Filed ***
A. Marquez, Deputy
9/26/2022 4:19:58 PM
Filing ID 14901093

Christopher H. Bayley (#010764)
Benjamin W. Reeves (#025708)
James G. Florentine (#034058)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone:  602.382.6000
E-Mail: cbayley@swlaw.com
           breeves@swlaw.com
           jflorentine@swlaw.com
*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| NEXT STEP ADVISORS, LLC, a Nevada limited liability company; M. SIPOLT MARKETING, LLC, an Arizona limited liability company; SABERTOOTH INVESTMENTS, LLC, a Delaware limited liability company; and TRUE HARVEST, LLC, an Arizona limited liability company, <br><br> Plaintiffs, <br> v. <br><br> TRUE HARVEST HOLDINGS, INC., a Delaware corporation; and THE GREENROSE HOLDING COMPANY INC. f/k/a GREENROSE ACQUISITION CORP., a Delaware corporation, <br><br> Defendants. | Case No. CV  **CV2022-012671** <br><br> **EMERGENCY APPLICATION FOR APPOINTMENT OF A RECEIVER** |

Plaintiffs Next Step Advisors, LLC ("Next Step"), M. Sipolt Marketing, LLC ("Sipolt"), Sabertooth Investments, LLC ("Sabertooth"), and True Harvest, LLC ("TH LLC", and together with Next Step, Sipolt, and Sabertooth, the "Plaintiffs") respectfully request that this Court appoint a general receiver over Defendants True Harvest Holdings, Inc. ("TH Holdings") and The Greenrose Holding Company Inc. f/k/a Greenrose Acquisition Corp. ("Greenrose", and together with  TH Holdings, the "Defendants").  A proposed form of receivership order is attached as Exhibit A (the "Proposed Receivership Order").   Alternatively, Plaintiffs respectfully request that this Court enter an order, substantially in the form attached as Exhibit B (the "Proposed OSC"), requiring Defendants

to appear and show cause why a receivers should not be appointed.  Plaintiffs support his Application with the *Declaration of Dieter Gable* attached as <u>Exhibit C</u> (the "<u>Decl.</u>"), the following Memorandum of Points and Authorities, and all papers and pleadings of record in this case.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Plaintiffs' interests, including TH LLC's equity interests in Greenrose, are in need of protection that only a receiver over Defendants can provide.  In its Form 10-K for the year ended December 31, 2021, Greenrose[1] — which owns and controls 100% of TH Holdings — tacitly admitted that its management may not be sufficiently experienced to successfully operate Defendants' business.[2]  Soon after the parties closed the APA (as defined below), Defendants also began having financial distress, as evidenced by their failure and inability to satisfy their obligations to Plaintiffs.  In fact, Defendants now appear to be insolvent.

Rather than take proactive and appropriate action to remedy their deteriorating financial condition, Defendants have been plagued by inaction and mismanagement.  For example, Defendants' management is in a state of upheaval and Defendants' insiders — over the objection of Defendants' non-insider equity holders and unsecured creditors — are negotiating with Defendants' senior secured creditor for that creditor to foreclose on all or substantially all of Defendants' assets.  The proposed foreclosure, however, is not actually a foreclosure at all, but instead is a complete capitulation by Defendants for the benefit of only Defendants' senior secured creditor.  Plaintiffs are informed and believe that Defendants' insiders may receive equity in a new entity acquiring Defendants' assets if they

---

[1]     As set forth in Greenrose's Form 10-K filed with the Securities and Exchange Commission for the year ended December 31, 2021, Greenrose is a publicly-traded company.  *See* https://www.sec.gov/ix?doc.

[2]     *See*  https://www.sec.gov/ix?doc=/Archives/edgar/data ("Greenrose's management does not have significant experience managing a public company or complying with public company obligations, and fulfilling these obligations will be expensive, time consuming, and may divert management's attention from the day-to-day operation of its business.").

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

agree to the senior secured creditor's foreclosure. Defendants' actions, inaction, and self-interested dealings place Plaintiffs' interests at risk. This Court's appointment of a receiver over Defendants is thus necessary and appropriate to protect Plaintiffs' interests. Accordingly, Plaintiffs respectfully request that this Court grant this Application and appoint a receiver over Defendants.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    The APA Transaction and Promissory Notes

Prior to the execution of the APA (as defined below), TH LLC operated an indoor cannabis cultivation cannabis cultivation facility located at 4301 W Buckeye Rd., Phoenix, AZ 85043 and supplied cannabis to licensed marijuana dispensaries in Arizona (the "Business"). *See* Decl., ¶ 3. On or about March 12, 2021, TH LLC, as seller, TH Holdings, as buyer, and Greenrose, as parent, entered into that certain "Asset Purchase Agreement" (the "Original APA"), which was later amended on (i) July 2, 2021 (the "First APA Amendment"), (ii) October 28, 2021 (the "Second APA Amendment"), and (iii) December 31, 2021 (the "Third APA Amendment", and together with the Original APA, the First APA Amendment, and Second APA Amendment, the "APA"). *See* Decl., ¶¶ 4-7, Ex. 1-4.

Under the APA, TH Holdings, Greenrose's wholly-owned subsidiary, purchased substantially all of TH LLC's assets, including but not limited to the Business, and assumed certain of TH LLC's liabilities in exchange for consideration in the aggregate total amount of $57.6 million at closing (the "Closing Purchase Price"). *See* Decl., ¶ 14. The Closing Purchase Price was comprised of the following: (i) $12.5 million in cash, (ii) a promissory note in the principal amount of $23 million, (iii) $4.6 million in assumed debt (the "Assumed Obligations"), and (iv) $17.5 million in shares of Greenrose's common stock valued at $3.95 per share. *See* Decl., ¶ 15.

To evidence the $23 million promissory note component of the Closing Purchase Price, on or about December 31, 2021, TH Holdings, as borrower, and TH LLC, as lender, entered into that certain "Convertible Promissory Note" in the principal amount of $23,000,000.00 (the "TH LLC Note"). *See* Decl., ¶ 8, Ex. 5. Under the TH LLC Note, TH

Holdings agreed, among other things, to pay the amounts owing under the TH LLC Note as set forth in § 3(b) of the TH LLC Note. *See* Decl., ¶ 9, Ex. 5 at §§ 2, 3(b).

To evidence the Assumed Obligations under the APA, TH Holdings, as borrower, entered into three promissory notes on or about December 31, 2021 — *i.e.*, the Next Step Note, the Sipolt Note, and the Sabertooth Note (each of which are defined below). *See* Decl., ¶¶ 16, 22, 28, Ex. 6-8. Specifically, TH Holdings, as borrower, and Next Step, as noteholder, entered into that certain "Promissory Note" in the principal amount of $4,070,159.00 (the "Next Step Note"). *See* Decl., ¶ 16, Ex. 6. In addition, TH Holdings, as borrower, and Sipolt, as noteholder, entered into that certain "Promissory Note" in the principal amount of $360,879.00 (the "Sipolt Note"). *See* Decl., ¶ 22, Ex. 7. And, TH Holdings, as borrower, and Sabertooth, as noteholder, entered to that certain "Promissory Note" in the principal amount of $168,962.00 (the "Sabertooth Note", and together with the TH LLC Note, the Next Step Note, and Sipolt Note, the "Notes"). *See* Decl., ¶ 28, Ex. 8. Under the Next Step Note, Sipolt Note, and Sabertooth Note, TH Holdings agreed, among other things, to pay the amounts owing under the each of those notes in 24 equal consecutive monthly installments beginning on January 15, 2022 and concluding on January 15, 2024. *See* Decl., ¶¶ 17, 23, 29, Ex. 6-8 at § 1(a).

## B.    Defendants' Breach the Notes and APA

Beginning in March 2022, TH Holdings breached the Notes.[3] *See* Decl., ¶¶ 19-21, 25-27, 31-33. TH Holdings failure to make any payment when due under each of the Notes constitutes an event of default under that Note. *See* Decl., ¶¶ 20, 26, 32, Ex. 5, § 8(a), Ex. 6-8, ¶ 5(a). After making the first two payments due under the Next Step Note, Sipolt Note, and Sabertooth (*i.e.*, the January 2022 and February 2022 monthly interest payments), TH Holdings has failed to make the remaining monthly installment payments due under those Notes. *See* Decl., ¶¶ 18-19, 24-25, 30-31. Accordingly, TH Holdings defaulted under the

---

[3]    In addition to Defendants' breach of the Notes, Defendants' actions have also harmed Plaintiffs' business plans. *See* Decl., ¶ 36. For example, Defendants prevented the build-out of certain additional rooms at the Business by improperly withholding funds for several months. *See* Decl., ¶ 37.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

Next Step Note, Sipolt Note, and the Sabertooth Note. *See* Decl., ¶ 21, 27, 33.

Additionally, in June 2022, TH Holdings failed to make the quarterly interest payment due under the TH LLC Note. *See* Decl., ¶ 10.[4] Therefore, TH Holdings also is in default under the TH LLC Note. *See* Decl., ¶¶ 12-13, Ex. 5, § 8(a).

Further, under Section 1.08 of the APA, Greenrose irrevocably and unconditionally guaranteed TH Holdings' payment of, among other things, each of the Notes. *See* Decl., ¶ 34, Ex. 1, § 1.08. To date, Greenrose has not paid the amounts due and owing under any of the Notes. *See* Decl., ¶ 35. As such, Greenrose breached the APA. *See* Decl., ¶¶ 34-35.

**C.** **Defendants' Inaction and Mismanagement**

Defendants' failure to satisfy their obligations under the Notes and APA demonstrates that Defendants are in dire financial straits. Indeed, Plaintiffs are informed and believe that Defendants are insolvent. *See* Decl., ¶ 38. Despite Defendants' deteriorating financial condition, Defendants have failed to take appropriate action to rectify the situation they now find themselves in. *See* Decl., ¶ 39. In fact, Defendants implicitly admitted that their management is not sufficiently experienced to successfully operate Defendants' business. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/1790665/000121390022020149/f10k2021_thegreenrose.htm ("Greenrose's management does not have significant experience managing a public company or complying with public company obligations, and fulfilling these obligations will be expensive, time consuming, and may divert management's attention from the day-to-day operation of its business.").

Instead of taking appropriate remedial actions, Defendants' insiders are negotiating a foreclosure on all or substantially all of Defendants' assets by Defendants' senior secured creditor over the objection of Defendants' non-insider equity holders and equity holders. *See* Decl., ¶ 40. Plaintiffs are informed and believe that Defendants' senior secured creditor has offered Defendants' insiders equity in a new entity acquiring Defendants' assets if they

---

[4]    Plaintiffs are informed and believe that TH Holdings also will not make the September 2022 quarterly interest payment due under the TH LLC Note. *See* Decl., ¶ 11.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

agree to the foreclosure. *See* Decl., ¶ 42.

Plaintiffs have attempted to engage Defendants and their management regarding alternatives to Plaintiffs' complete capitulation to the Defendants' senior secured creditor. *See* Decl., ¶ 43. Defendants, however, refuse to meaningfully engage with Plaintiffs. *See* Decl., ¶ 44. Defendants instead appear to be set on handing over the keys to Defendants' business and assets to Defendants' senior secured creditor over the objection of Defendants' non-insider equity holders and unsecured creditors. *See* Decl., ¶ 40. Defendants' actions have placed Plaintiffs' interests, including but not limited to TH LLC's equity interests, at risk. *See* Decl., ¶¶ 45-46.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

"The superior court or a judge thereof may appoint a receiver to protect and preserve property or the rights of parties therein, even if the action includes no other relief." A.R.S. § 12-1241. The legal standard for appointing a receiver is straightforward. The Court must simply "determine that the property or the rights of parties need protection." *Gravel Resources of Arizona v. Hills*, 217 Ariz. 33, 37 (Ct. App. 2007). The Court can appoint a receiver on that basis alone, regardless of whether the applicant can show irreparable harm or lack of a legal remedy. *Id.* ("On its face, A.R.S. § 12-1241 requires no showing of irreparable harm or lack of an adequate legal remedy."). Additionally, this Court may appoint a receiver based on Defendants' insolvency. *See C.F. Trust, Inc. v. First Flight Ltd. P'Ship*, 140 F.Supp.2d 628, 645 (E.D. Va. 2001) ("[A] court of equity is not empowered to appoint a receiver for a corporation, 'absent proof of insolvency, fraud, waste, or improper conduct.'") (quoting *Adelman Assoc. v. Goldstein*, 209 Va. 731, 738 (1969)); *see also Maggiora v. Palo Alto Inc., Inc.*, 249 Cal.App. 2d 706, 712 (Ct. App. 1967) (frail financial condition coupled with threat to business provided grounds for receiver over hotel).

As explained below, this Court should appoint a receiver over Defendants because Plaintiffs' interests unquestionably at risk given Plaintiffs' failure to pay the Notes, insolvency, and inaction in the face of their deteriorating financial condition.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**B.**   **Plaintiffs are Entitled to the Appointment of a Receiver Over Defendants**

Plaintiffs' interests in this case are clearly in need of protection.  For example, TH LLC (i) holds a substantial equity interest in Greenrose and (ii) is a creditor of Greenrose.  *See* Decl., ¶¶ 14-15.  Each of the Plaintiffs are also creditors of TH Holdings — *i.e.*, Greenrose's wholly-owned subsidiary.  *See* Decl., ¶¶ 16, 22, 28.  As explained above, Defendants are in a dire financial position and Defendants' management admittedly may not be sufficiently experienced to operate Defendants' business.  *See* Decl., ¶ 38.[5]  Indeed, Defendants appear to be insolvent and have failed to pay the amounts owing under the Notes or the APA.  *See* Decl., ¶¶ 10, 19, 25, 31 38.[6]

Faced with such financial distress soon after the close of the APA, Defendants' insiders are negotiating a staged foreclosure whereby Defendants' senior secured creditor would foreclose on all or substantially all of Defendants' assets over the objection of Defendants' non-insider equity holders and unsecured creditors.  *See* Decl., ¶¶ 40-41.  Plaintiffs are informed and believe that Defendants' insiders may receive equity in a new entity acquiring Defendants' assets if they agree to Defendants' secured creditor's proposed foreclosure on Defendants' assets.  *See* Decl., ¶ 42.

Plaintiffs have attempted to engage Defendants and their management regarding alternatives to Defendants' capitulation to Defendants' senior secured creditor's proposal to acquire all or substantially all of Defendants' assets.  *See* Decl., ¶ 43.  Defendants, however, have not meaningfully engaged with Plaintiffs and appear to be set on a path that will undoubtedly harm Plaintiffs' interests.  *See* Decl., ¶ 44.  To be sure, Defendants' continued management threatens Plaintiffs' interests, both as Defendants' equity holders and unsecured creditors.  *See* Decl., ¶¶ 45-46.  To protect Plaintiffs' interests, it is necessary for this Court to appoint a receiver over Defendants.

---

[5]   *See also* https://www.sec.gov/ix?doc=/Archives/edgar/data.

[6]   As set forth above, Defendants' insolvency provides an additional basis for this Court to appoint a receiver over Defendants.  *See C.F. Trust, Inc.*, 140 F.Supp.2d at 645.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**C.** **Alternatively, this Court Should Enter an Order to Show Cause**

As demonstrated above, Plaintiffs are entitled to the immediate appointment of a receiver over Defendants pursuant to Ruel 66, Ariz. R. Civ. P., and A.R.S. § 12-1241.  In the alternative, however, Plaintiffs respectfully request that this Court enter an order, substantially in the form as the Proposed OSC attached as Exhibit B, requiring Defendants to appear and show cause why a receiver should not be appointed over Defendants.  To afford Plaintiffs the proper protection they require, this Court should immediately issue an order to show cause why a receiver should not be appointed over Defendants.

**IV.** **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order, substantially in the form as the Proposed Receivership Order attached as Exhibit A, appointing a receiver over the Defendants.  In the alternative, Plaintiffs respectfully request that this Court enter the Proposed OSC, a copy of which is attached as Exhibit B, requiring Defendants to appear and show cause why a receiver should not be appointed over Defendants.

DATED this 26th day of September, 2022.

SNELL & WILMER L.L.P.

By: */s/ James G. Florentine*
  Christopher H. Bayley
  Benjamin W. Reeves
  James G. Florentine
  One Arizona Center
  400 E. Van Buren, Suite 1900
  Phoenix, Arizona 85004-2202
  *Attorneys for Plaintiffs*

4893-8463-8772

# Exhibit A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| NEXT STEP ADVISORS, LLC, a Nevada limited liability company; M. SIPOLT MARKETING, LLC, an Arizona limited liability company; SABERTOOTH INVESTMENTS, LLC, a Delaware limited liability company; and TRUE HARVEST, LLC, an Arizona limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>TRUE HARVEST HOLDINGS, INC., a Delaware corporation; and THE GREENROSE HOLDING COMPANY INC. f/k/a GREENROSE ACQUISITION CORP., a Delaware corporation,<br><br>Defendants. | Case No. CV_____<br><br>**ORDER APPOINTING A RECEIVER** |

Pursuant to Rule 66, Ariz. R. Civ. P., A.R.S. §§ 12-1241 and 12-1242, the Court, upon consideration of Plaintiffs' *Emergency Application for Appointment of a Receiver* (the "Application")[1], and for good cause appearing:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** granting the Application in its entirety.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** as follows:

1.     **APPOINTMENT OF RECEIVER**:  MCA Financial Group, Ltd., by and through its Senior Managing Director, Keith Bierman, is hereby appointed as a general

---

[1]     All capitalized terms not defined herein shall have the same meaning as in the Application.

4887-7044-1525

receiver (the "Receiver") in this action, effective immediately, provided that within five (5) business days of the date of this Order, the Receiver file an oath of receiver and post a bond in the amount of $_____ pursuant to Ariz. R. Civ. P. 66(b)(2). The cost of the bond shall be a reimbursable expense pursuant to Paragraph 3(v) below.

2.      **POSSESSION OF RECEIVER**:   The Receiver shall take immediate possession, custody, and control of all the real, personal, tangible and intangible property owned by True Harvest Holdings, Inc. ("TH Holdings") and The Greenrose Holding Company Inc. f/k/a Greenrose Acquisition Corp. ("Greenrose") (each a "Receivership Entity" and together, the "Receivership Entities") or in which a Receivership Entity has an interest (collectively, the "Property").  The Receiver is authorized and is entitled to exercise all of each Receivership Entity's rights in any and all Property in which a Receivership Entity has an interest.

3.      **DUTIES, RIGHTS, AND POWERS OF THE RECEIVER**:  The Receiver is granted all of the rights and powers available to general receivers at common law and in equity in Arizona, and the following powers, duties, and authorities:

(a)     Possession.  To enter on and take possession of the Property and exercise all of the rights of each Receivership Entity therein;

(b)     General Operation and Management.  To manage, maintain, and preserve the Property for the duration of this receivership in a reasonable, prudent, diligent and efficient manner to maximize its value for the benefit of each Receivership Entity's equity interest holders and creditors.  The Receiver may enter into contracts with third parties to operate, manage, maintain, and preserve the Receivership Entities in the best interest of the Receivership Estate (which means the totality of the Property, accounts, assets, rights, and obligations the Receiver has authority to manage and control in accordance with this Order) (the "Receivership Estate").  The Receiver may, in his business judgment, operate, manage, control, and conduct in the ordinary and usual course of business, and do all things and incur the risks and obligations ordinarily incurred by owners, managers, and operators of similar businesses, and no such risks or obligations so incurred shall be the personal risk or

- 1 -

obligation of Receiver, but shall be a risk or obligation of the Receivership Estate only;

(c)     <u>Going Concern</u>.  To operate the Receivership Entities as going concerns if it is deemed, in the Receiver's business judgment, appropriate to do so;

(d)     <u>Notifications and Limitations</u>.    To notify all local, state and federal governmental agencies (including the Arizona Department of Health Services ("<u>AZDHS</u>")), all vendors and suppliers, and any and all others who provide goods or services to the Receivership Entities of its appointment as Receiver.  No utility may terminate service to the Receivership Entities as a result of non-payment of pre-receivership obligations without prior order of this Court.  No insurance company may cancel its existing current-paid policy as a result of the appointment of the Receiver, without prior order of this Court.  No vendors, third-party contractors, lessors, licensors, buyers, or sellers may cancel, terminate, or annul their contracts and any rights granted thereunder with or to the Receivership Entities as a result of this Order without prior order of this Court;

(e)      <u>Receiver's Agents</u>.  To employ, hire, engage, and retain attorneys, certified public accountants, investigators, consultants, and any other personnel or employees at commercially reasonable rates, which the Receiver deems — in his business judgment — necessary to assist him in the discharge of his duties.  With the parties' consent, any such persons or entity may be affiliates of the Receiver;

(f)     <u>Collections</u>.  To demand, collect and receive all revenues derived from the Property or earned by the Receivership Entities, including all deposits and all proceeds in the possession or name of the Receivership Entities or any of their equity interest holders, principals, affiliates, agents, subsidiaries, servants, or employees, which are derived from the revenues generated by the Receivership Entities (including tax credits or refunds), and to bring and prosecute all proper actions for the:  (i) collection of revenues derived from the Receivership Entities, (ii) removal from the Property of persons not entitled to entry thereon or operation thereof, (iii) protection of the Property, and (iv) damage caused to the Property. The Receiver is authorized to present for payment any checks, promissory notes, money orders or other forms of payment made payable to either of the Receivership Entities or any

of their equity interest holders, principals, affiliates, agents, subsidiaries, servants, or employees, which constitute revenues or proceeds of the Receivership Entities, and to endorse same and collect the proceeds thereof, such proceeds to be used and maintained as elsewhere provided herein;

(g)     <u>Utility Services and Deposits</u>.  To, in the name of the Receivership Estate, continue to utilize the Receivership Entities' utility accounts, if any, that provide services to the Receivership Entities; or transfer the Receivership Entities' existing utility accounts to the name of the Receivership Estate; or to open new utility accounts in the name of the Receivership Estate to provide services to the Receivership Entities.  The Receiver shall be entitled to utilize any of the Receivership Entities' utility deposits or transfer any utility deposits relating to the Receivership Entities to the Receivership Estate.  No third party is authorized to combine the accounts of the Receivership Estate with the accounts of any other Receivership Estate in which this Receiver is appointed without prior order from this Court;

(h)     <u>Insurance</u>.  To use commercially reasonable efforts to confirm that the Property and persons employed by the Receivership Entities are adequately insured, to promptly report any evidence or findings to the contrary to the parties and to the Court, and to maintain adequate insurance over the Receivership Entities and their employees to the same extent and in the same manner as they had heretofore been insured, or as in the judgment of Receiver may seem fit and proper and to cause all presently existing policies to be amended by adding the Receiver and/or the Receivership Estate as an additional insured(s) as soon as reasonably possible.  The Receiver may, as to any insurance claims, make proof of loss, intervene in, or assert a claim, adjust and compromise any insurance claims, and collect and receive any insurance proceeds.  All such insurance policies shall name the Receiver, the Receivership Estate, and any management company retained by Receiver as a loss payee with respect to all casualty policies;

(i)     <u>Books, Records, and Accounts</u>.  To take possession and control of all of the books, records, correspondence, and other accounting documents of the Receivership

4887-7044-1525

Entities, whether paper or electronic, which relate to, refer to, or account for the assets, revenues, proceeds, and/or liabilities of the Receivership Entities, whether in the possession and control of the Receivership Entities, parties to this action, or in possession of their equity interest holders, principals, affiliates, agents, accountants, subsidiaries, servants, or employees, and to take possession of all of Receivership Entities' bank and deposit accounts used by or in connection with the Receivership Entities. The Receivership Entities, if they have not already done so, shall promptly provide the Receiver with the tax identification number(s) utilized by Receivership Entities for the operation of the Receivership Entities. The Receiver shall be entitled to utilize the aforementioned tax identification number(s) during his operation of the Receivership Entities. The Receiver shall have no responsibility for filing federal or state income or property tax returns related to the Receivership Entities, but may do so if he deems it appropriate to do so. All banks and financial institutions, upon presentation of a copy of this Order, shall provide copies of any requested records regarding any such accounts used in connection with the Receivership Entities to the Receiver or his agent;

(j)     Contracts.   To continue in effect, amend, cancel, or cure any contracts presently existing and relating to the Receivership Entities. The Receiver may assume, assign, or reject a contract in the Receiver's business judgment. The Receiver may enter into, modify and/or reject contracts affecting any part or all of the Receivership Entities, and may exercise Receivership Entities' rights existing under such contracts, including but not limited to filing suit thereon, if necessary. In furtherance of Paragraphs 4 and 8 below, absent further order from this Court, no third-party shall terminate a contract by virtue of the mere appointment of the Receiver;

(k)     Leasing. The Receiver shall use commercially reasonable efforts to enter into such leases as Receiver deems to be in the best interest of the Receivership Entities, if any. Prior to entering into any leases, Receiver shall provide ten (10) days written notification to the parties of the terms of the proposed lease prior to entering into the same, so that the parties may make a written objection with the Receiver, if any. If an objection is made by

- 4 -

4887-7044-1525

the parties, and the Receiver does not elect to voluntarily withdraw the proposed lease, then the Receiver may bring the issue to the Court for consideration;

(l)     Bank Accounts.  To issue demands for the freezing and turnover of funds upon any financial institution, which the Receiver has determined is a depository of funds belonging to, or arising from, the Property, whether such accounts be titled in the name of the Receivership Entities or not, and to, if necessary, indemnify the institution upon whom such demand is made on behalf of the Receivership Estate.  Effective as soon as possible after entry of this Order, the Receiver shall establish and maintain a separate operating account(s) (the "Operating Account") for each Receivership Entity into which the receiver shall deposit all receipts from each Receivership Entity and from which the Receiver shall disburse regularly and punctually, all amounts due and payable as reasonable, necessary and proper expenses incurred by the Receiver in the ownership, operation, management, protection, and conservation of the Receivership Entities, including such operating expenses which were incurred but not yet paid for the period immediately preceding the date on which the Receiver was appointed, all subject to the terms of this Order;

(m)     Payment of Receivership and Property Expenses.  To pay and discharge out of the funds coming into his hands all the current and on-going expenses of the receivership and the current and on-going costs and expenses of operation and maintenance of the Receivership Entities incurred at any time from and after the date of entry of this Order, including but not limited to property taxes assessed against the Receivership Entities; the Receiver shall have the power to advance funds from the Receivership Estate to keep current any liens encumbering the Property.  All expenses paid by the Receiver must be reasonable and are subject to final approval by the Court;

(n)     Payment of Business Expenses.  To expend funds to purchase equipment, materials, supplies, fuel, and services as the Receiver reasonably deems necessary and advisable in the ordinary course of business to assist him in performing his duties hereunder and to pay therefore the ordinary and usual rates and prices out of the funds that may come into the possession of the Receiver;

4887-7044-1525

(o)     <u>Payment of Pre-Receivership Debts</u>.  Except as deemed by the Receiver to be necessary to protect and preserve the Receivership Entity and without further order of this Court, the Receiver may not pay and discharge out of the funds coming into the Receiver's hands any outstanding unsecured debt that the Receivership Entities incurred prior to the entry of this Order.  However, the Receiver, in the exercise of its business judgment and without further order of this Court, may pay outstanding secured debt out of the funds coming into the Receiver's hands that the Receivership Entities incurred prior to the entry of this Order;

(p)     <u>Permits and Licenses</u>.  To apply, obtain, and pay any reasonable fees for any lawful license, permit or other governmental approval relating to the Receivership Entities; to confirm the existence of and exercise the privileges of any existing license or permit or the operation thereof related to the Receivership Entities, and do all things necessary to protect and maintain such licenses, permits and approvals, including, but not limited to, taking such license in the name of the Receiver personally, or Receivership Estate, or his nominee.  The Receiver may, in the name of the Receivership Estate, continue to utilize all of the Receivership Entities' permits and licenses related to the Receivership Entities, or transfer the Receivership Entities' permits and licenses related to the Receivership Entities to the name of the Receivership Estate, or apply for new permits and licenses related to the Receivership Entities in the name of the Receivership Estate.  Absent further order from this Court, the mere appointment of the Receiver shall not constitute a breach or default under any licenses, approvals, or permits presently affecting the Property.  Other than a governmental agency (such as the AZDHS) that is authorized to do so by other law, no third-party may adversely affect or interfere with the Receivership Entities' rights under any existing licenses, permits, certificates, approvals to operate, dispensary registration certificates, dispensary agent cards, or similar authorizations without prior approval of this Court;

(q)     <u>Receiver's Reports</u>.  From time to time so long as either Receivership Entity shall remain in its possession or care, the Receiver shall prepare, file with the Court, and

4887-7044-1525

serve on all interested parties, a report of the condition and operation of the Receivership Entities, which includes profit-loss statements, current rent roll, balance sheets, and revenue receipts and disbursements on a cash reporting basis, and other relevant operational issues that occurred during the preceding month(s).  These interim reports shall include an itemization of the Receiver's fees and expenses of the Receivership Estate, including fees and costs of accountants and attorneys authorized by the Court, incurred for each reporting period in the operation and administration of the Receivership Estate.  The Receiver shall follow accounting standards typical for similar businesses, and may enlist the aid of accountants for preparation of the Receiver's reports to the Court;

(r)     Payment of Receiver.  The Receiver shall be compensated for its duties as Receiver under this Order at the following rates:

(i)     Senior Managing Director:     $550/hour;

(ii)    Managing Director:            $450/hour;

(iii)   Director:                     $395/hour;

(iv)    Associate:                    $295/hour;

(v)     Paraprofessional:            $125/hour.

(s)     Receiver's Expenses.  Subject to Paragraph 3(r) above, the Receiver may be reimbursed for all fees and expenses incurred by the Receiver that benefit the Receivership Estate from the revenue from the Receivership Entities, or through the use of Receiver's certificates or through borrowing money on behalf of the Receivership Entities on commercially reasonable terms.  In no event shall the Receiver be obligated to advance its own funds for the payment of such expenses.  The Receiver, its consultants, agents, employees, legal counsel, and professionals may be paid on a periodic basis.  However, all fees paid on an interim basis are subject to final approval by the Court in accordance with paragraph 3(v) below and must be reasonable;

(t)     Monthly Budget.  Within forty-five (45) days of the filing of this Order, the Receiver shall prepare a comprehensive monthly budget (the "Budget") providing for all fees and costs expected to be incurred by the Receiver in the performance of its duties

- 7 -

4887-7044-1525

prescribed herein, as well as income expected to be generated from operation of the Receivership Entities.  The Receiver shall revise the Budget as needed, updating for actual costs as information becomes available.  The Receiver shall immediately inform the parties if monthly fees and costs are expected to exceed the appropriate budgeted amount, or if income from operations will be insufficient to compensate the Receiver for fees and costs incurred;

(u)    Expense Limit.  Notwithstanding anything in this Order to the contrary, the Receiver shall not incur or expend fees or expenses in excess of $10,000.00 of the monthly amount set forth in the Budget for the Property without obtaining prior written approval of the Plaintiffs or this Court;

(v)    Final Statement of Account.  Within sixty (60) days of the termination of the Receivership Estate, the Receiver shall file with the Court a "Final Report and Accounting" or similar report, which sets forth any and all fees and expenses claimed by the Receiver. If no objection thereto is filed and served on or within ten (10) days following service thereof, such Final Report and Accounting may be paid, the Receiver may be discharged, and the Receiver's bond may be exonerated.  If an objection is timely filed and served, such Final Statement of Account shall not be paid absent further order of this Court.  In the event objections are timely made to such fees and expenses, those specific fees and expenses objected to will be paid within ten (10) days of an agreement among the parties or the entry of an order by this Court adjudicating the matter;

(w)    Disclosure.  The Receiver shall disclose to all parties any financial relationship between the Receiver and any company or person he hires to assist in the management of the Receivership Estate;

(x)    Property Name and Description.  The Receiver is authorized to operate the Receivership Entities under any existing name or trade name and utilize any existing intellectual property that is part of the Receivership Entities;

(y)    Litigation.  The Receiver may, in his discretion, intervene in, initiate, prosecute, defend, abandon back to prior management, and/or resolve any legal action

- 8 -

4887-7044-1525

related to the Receivership Entities, including, without limitation, those brought by or against the Receivership Entities, whether currently pending or filed in the future. The Receiver, in his discretion, may apply to this Court to consolidate or transfer any claim or suit to this Court. No judgment creditor may execute a judgment against any of the Property or Receivership Entities without first obtaining approval from this Court; and

(z)     General Powers.  To do any acts which the Receiver, in his sole discretion and business judgment, deems appropriate or desirable to protect the value of the Receivership Entities.  To use such measures, legal or equitable, as the Receiver deems desirable, necessary or appropriate in his business judgment to protect and preserve the value of the Receivership Entities; and to generally do such other things as may be necessary or incidental to the foregoing specific powers, directions and general authorities and to take actions relating to the Receivership Entities beyond the scope contemplated by the provisions set forth above, provided the Receiver first obtains the approval from this Court for any actions beyond the scope contemplated herein.

4.     **NON-INTERFERENCE WITH RECEIVER**:  Absent further order from this Court, all creditors, vendors, lessors, licensors, medical marijuana dispensary registration certificate holders, or other contractors of the Receivership Entities, all persons or entities with actual knowledge of this Order (including, without limitation, the parties to this action), and the officers, directors, affiliates, agents, subsidiaries, servants, and employees (current or former) of the Receivership Entities, are enjoined from:

(a)     Interfering with the Receiver, directly or indirectly, in the management and operation of the Receivership Entities or business operations of the Receivership Entities;

(b)     Interfering with the Receiver, directly or indirectly, in the collection of revenues derived from the Receivership Entities;

(c)     Collecting or attempting to collect from the Property or Receivership Entities;

(d)     Extending, dispersing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in or disposing of the whole or any part of the Property without the prior written consent of the Receiver and this Court;

(e)     Doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Receivership Entities or Property (including the revenues or proceeds thereof);

(f)     Doing any act which directly or indirectly interferes in any manner with the discharge of the Receiver's duties under this Order and the operation and management of the Receivership Entities; and

(g)     Interfering, directly or indirectly, with the Receivership Entities' rights under any existing licenses, permits, certificates, approvals to operate, dispensary registration certificates, dispensary agent cards, or similar authorizations.

5.     **TURNOVER**:  To the extent it has not done so already, the Receivership Entities and their equity interest holders, officers, directors, principals, affiliates, agents, subsidiaries, parents, servants, employees, contractors and all other persons or entity in possession thereof, including but not limited to financial institutions, local, city, county, and state governmental agencies, quasi-governmental agencies and utilities, and all other persons with actual or constructive knowledge of this Order and their agents and employees, shall immediately:

(a)     Turn over to the Receiver possession of the Property, including the records, books of account, ledgers and all business records for the Receivership Entities, wherever located and in whatever mode maintained (including, without limitation, information contained on computers, as well as all banking records, statements and canceled checks);

(b)     Turn over to the Receiver all bank accounts used in connection with the Receivership Entities and arrange for the Receiver to have sole signature authority over such accounts;

(c)     Turn over to the Receiver all documents which constitute or pertain to all licenses, permits, development plans, surveys, reports, or governmental approvals relating to the Receivership Entities;

4887-7044-1525

(d)     Turn over to the Receiver all documents which constitute or pertain to insurance policies, whether currently in effect or lapsed, which relate to the Receivership Entities;

(e)     Turn over to the Receiver all contracts, leases and subleases, royalty agreements, licenses, assignments or other agreements of any kind whatsoever, whether currently in effect or lapsed, which relate to the Receivership Entities;

(f)     Turn over to the Receiver all documents of any kind pertaining to any and all toxic chemicals or hazardous material, if any, ever brought, used and/or remaining in the possession of the Receivership Entities, including, without limitation, all reports, surveys, inspections, checklists, proposals, orders, citations, fines, warnings and notices;

(g)     Turn over to the Receiver all revenues or proceeds derived from the Receivership Entities; and

(h)     Turnover to the Receiver all passwords needed to access all records and files maintained on any computers, servers, or other electronic devices that belong to the Receivership Entities, or any other computers, servers, or other electronic devices on which information related to the Receivership Entity is stored.

6.     **BANKRUPTCY**:  If either Receivership Entity files a bankruptcy case, or if a case is filed against them during the receivership, the Receiver shall have the following duties:

(a)     The Receiver shall contact the party who obtained the appointment of the Receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the Receiver's obligation to turn over the Property (11 U.S.C. § 543).  If the party has no intention to make such a motion, the Receiver shall turn over the property to the appropriate entity – either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession – and otherwise comply with 11 U.S.C. § 543;

(b)     Unless otherwise ordered by the Bankruptcy Court, the Receiver will remain in possession, custody, and control of the Property pending resolution by the

bankruptcy court of any issues under 11 U.S.C. § 543(d).  The Receiver's authority to preserve the Property shall be limited as follows:  (1) the Receiver may continue to collect rents and other income derived from the Property; (2) the Receiver may make only those disbursements necessary to preserve and protect the Property; (3) the Receiver shall not execute any new leases, sale agreements, or other long-term contracts; and (4) the Receiver shall do nothing that would effect a material change in the circumstances of the Property; and

(c)     The Receiver may petition this Court to retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

7.     **DISCHARGE**:  Immediately upon the liquidation of the Property or sale of the Property or dissolution of the Receivership Entities, the Receiver shall provide notice to this Court, and upon such notice relinquish control of the Property and be discharged from his duties under this Order with the exception of the obligation to submit and obtain approval of the Final Report and Accounting.

8.     **RECEIVERSHIP ESTATE**:

(a)     <u>Litigation Stay</u>.  No person or entity shall file suit against the Receiver, or take other legal action against the Receiver or the Receivership Entities or Property, with the exception of this action, without an order of this Court permitting the suit or action; provided, however, no prior Court order is required to enforce the provisions of this Order or any other order of this Court in this action.  In any event, no such suit shall be brought against the Receiver personally, but only against the Receivership Estate.

(b)     <u>Limitation of Liability</u>.  The Receivership Estate, the Receiver, and its employees, agents, attorneys and all professionals and management companies retained by the Receiver shall have no liability for any obligations, or debts incurred by the parties to this action.  The Receiver and his employees, agents, attorneys, and all professionals and management companies retained by the Receiver shall have no

4887-7044-1525

personal liability, and they shall have no claim asserted against them relating to the Receiver's duties under this Order, without prior authority from this Court as stated in Paragraph 8(a) above.  In any event, no suit shall be maintained against the Receiver unless the Receiver has acted outside the scope of his authority and committed fraud or gross negligence in the administration of his duties.  The Receiver is acting solely in his capacity as a Receiver and the debts of the Receiver are solely the debts of the Receivership Estate.

(c)     Indemnification of Receiver.  The Receiver's liability for any action taken in the course of his duties shall be limited to the Receivership Estate.  The Receivership Estate shall indemnify and hold harmless the Receiver, and any affiliate, member, officer or agent of the Receiver from any claims, liability, loss, cost or expense (including reasonable attorneys' fees and costs) arising out of this Receivership, unless the Receiver has acted outside the scope of his authority and committed fraud or gross negligence in the administration of his duties.

9.     **CONTACTING THE RECEIVER**:  Individuals or Entity interested in the Property, including but without limitation, all lessors, lessees, customers, principals, investors, suppliers, and creditors, may contact the Receiver directly by and through the following individual:  Keith Bierman, MCA Financial Group, Ltd., 4909 N. 44th Street, Phoenix, AZ 85018; (602)710-2500; kbierman@mca-financial.com.  Notice by email shall be sufficient for service of process of any documents or pleadings filed by the Receiver.

10.     **NOTICE TO THE PARTIES:**  Mailing copies of pleadings, reports, and motions filed by the Receiver, Plaintiffs, and/or Defendants in this action shall constitute valid service on all parties for notice purposes.

/ / /

/ / /

/ / /

/ / /

/ / /

- 13 -

11. **ADDITIONAL DUTIES**.  The Plaintiffs, Defendants, Receiver, or any third-party affected by this Order may at any time apply to this Court for any further or other instructions and powers necessary to enable the Receiver to perform his duties properly.

SO ORDERED this _____ day of _____, 2022.


_____
Judge, Maricopa County Superior Court

- 14 -

# Exhibit B

1

2

3

4

5

6

7

8

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| NEXT STEP ADVISORS, LLC, a Nevada limited liability company; M. SIPOLT MARKETING, LLC, an Arizona limited liability company; SABERTOOTH INVESTMENTS, LLC, a Delaware limited liability company; and TRUE HARVEST, LLC, an Arizona limited liability company, | Case No. CV_____ |
| | **ORDER TO SHOW CAUSE** |
| Plaintiffs, | |
| v. | |
| TRUE HARVEST HOLDINGS, INC., a Delaware corporation; and THE GREENROSE HOLDING COMPANY INC. f/k/a GREENROSE ACQUISITION CORP., a Delaware corporation, | |
| Defendants. | |

Upon consideration of Plaintiffs' *Emergency Application for Appointment of a Receiver* (the "Application")[1], and for good cause appearing:

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that:

1.      Defendants are hereby ordered and directed to appear before this Court in Courtroom No. _____, East Court Building, 101 W. Jefferson, Phoenix, Arizona, 85003 on the _____ day of _____, 2022, at _____ (the "Order to Show Cause Hearing"), to show cause why a receiver should not be appointed over Defendants;

---

[1]      All capitalized terms not defined herein shall have the same meaning as in the Application.

4868-9552-6965

2.     In the event that Defendants fail to appear at the Order to Show Cause Hearing, or fail to show sufficient cause why a receiver should not be appointed, the Court will enter an order appointing a receiver over Defendants at such hearing;

3.     Plaintiffs are directed to serve a copy of this Order on Defendants as expeditiously as possible; and

4.     Defendants are directed to file and serve any objection to the Application on Plaintiffs on no less than two business day prior to the hearing.

SO ORDERED this _____ day of _____, 2022.


_____
Judge, Maricopa County Superior Court

- 1 -

# Exhibit C

1   Christopher H. Bayley (#010764)
2   Benjamin W. Reeves (#025708)
    James G. Florentine (#034058)
3   SNELL & WILMER L.L.P.
    One Arizona Center
4   400 E. Van Buren, Suite 1900
    Phoenix, Arizona 85004-2202
5   Telephone: 602.382.6000
    E-Mail: cbayley@swlaw.com
6           breeves@swlaw.com
            jflorentine@swlaw.com
7   *Attorneys for Plaintiffs*

8              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9                **IN AND FOR THE COUNTY OF MARICOPA**

10  NEXT STEP ADVISORS, LLC, a Nevada           Case No. CV_____
    limited liability company; M. SIPOLT
11  MARKETING, LLC, an Arizona limited          **DECLARATION OF DIETER**
    liability company; SABERTOOTH              **GABLE**
12  INVESTMENTS, LLC, a Delaware limited
    liability company; and TRUE HARVEST,
13  LLC, an Arizona limited liability company,

14                    Plaintiffs,

15         v.

16  TRUE HARVEST HOLDINGS, INC., a
    Delaware corporation; and THE
17  GREENROSE HOLDING COMPANY
    INC. f/k/a GREENROSE ACQUISITION
18  CORP., a Delaware corporation,

19                    Defendants.

20         I, Dieter Gable, state on personal knowledge that the following is true and correct:

21         1.    I am the Manager of Plaintiff Next Step Advisors, LLC and a principal of

22  Plaintiff True Harvest, LLC.

23         2.    I make this declaration in support of the *Emergency Application for

24  Appointment of a Receiver* (the "Application")[1] filed contemporaneously herewith.

25         3.    Prior to the execution of the APA (as defined below), TH LLC operated an

26  indoor cannabis cultivation cannabis cultivation facility located at 4301 W Buckeye Rd.,

27  Phoenix, AZ 85043 and supplied cannabis to licensed marijuana dispensaries in Arizona

28  ────────────────
    [1]    All capitalized terms not defined herein shall have the same meaning as in the
    Application.

(the "Business").

4.    On or about March 12, 2021, TH LLC, as seller, TH Holdings, as buyer, and Greenrose, as parent, entered into that certain "Asset Purchase Agreement" (the "Original APA"). A true and correct copy of the Original APA is attached as Exhibit 1.

5.    On or about July 2, 2021, TH LLC, TH Holdings, and Greenrose amended the Original APA when they entered into the "Amendment No. 1 to Asset Purchase Agreement" (the "First APA Amendment"). A true and correct copy of the First APA Amendment is attached as Exhibit 2.

6.    On or about October 28, 2021, TH LLC, TH Holdings, and Greenrose further amended the Original APA when they entered into that certain "Amendment No. 2 to Asset Purchase Agreement" (the "Second APA Amendment"). A true and correct copy of the Second APA Amendment is attached as Exhibit 3.

7.    On or about December 31, 2021, TH LLC, TH Holdings, and Greenrose further amended the Original APA when they entered into that certain "Amendment No. 3 to Asset Purchase Agreement" (the "Third APA Amendment", and together with the Original APA, the First APA Amendment, and Second APA Amendment, the "APA"). A true and correct copy of the Third APA Amendment is attached as Exhibit 4.

8.    Also on or about December 31, 2021, TH Holdings, as borrower, and TH LLC, as lender, entered into that certain "Convertible Promissory Note" in the principal amount of $23,000,000.00 (the "TH LLC Note"). A true and correct copy of the TH LLC Note is attached as Exhibit 5.

9.    Pursuant to the TH LLC Note, TH Holdings agreed, among other things, to pay the amounts owing under the TH LLC Note as set forth in § 3(b) of the TH LLC Note. *See* Ex. 5 at §§ 2, 3(b).

10.    In June 2022, TH Holdings failed to make the quarterly interest payment due under the TH LLC Note.

11.    Plaintiffs are informed and believe that TH Holdings also will not make the September 2022 quarterly interest payment due under the TH LLC Note.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

12.     TH Holdings' failure to make any payment when due under the TH LLC Note constitutes an event of default under the TH LLC Note. *See* Ex. 5 at § 8(a).

13.     As a result of TH Holdings' failure to make the June 2022 quarterly interest payment due under the TH LLC Note, TH Holdings is in default under the TH LLC Note. *See* Ex. 5 at § 8(a).

14.     Pursuant to the APA, TH Holdings, Greenrose's wholly-owned subsidiary, purchased substantially all of TH LLC's assets, including but not limited to the Business, and assumed certain of TH LLC's liabilities in exchange for consideration in the aggregate total amount of $57.6 million at closing (the "Closing Purchase Price").

15.     The Closing Purchase Price under the APA was comprised of the following: (i) $12.5 million in cash, (ii) the TH LLC Note (as defined below) in the principal amount of $23 million, (iii) $4.6 million in assumed debt, and (iv) $17.5 million in shares of Greenrose's common stock valued at $3.95 per share.

16.     On or about December 31, 2021, TH Holdings, as borrower, and Next Step, as noteholder, entered into that certain "Promissory Note" in the principal amount of $4,070,159.00 (the "Next Step Note"). A true and correct copy of the Next Step Note is attached as Exhibit 6.

17.     Pursuant to the Next Step Note, TH Holdings agreed, among other things, to pay the amounts owing under the Next Step Note in 24 equal consecutive monthly installments beginning on January 15, 2022 and concluding on January 15, 2024. *See* Ex. 6 at § 1(a).

18.     TH Holdings made the first two payments owed under the Next Step Note — *i.e.*, the January 2022 and February 2022 payments owed under the Next Step Note.

19.     Beginning in March 2022, TH Holdings has failed to make the monthly installment payments due under the Next Step Note.

20.     TH Holdings' failure to make any payment when due under the Next Step Note constitutes an event of default under the Next Step Note. *See* Ex. 6 at § 5(a).

21.     As a result of TH Holdings' failure to make the monthly installment payments

due under the Next Step Note in March 2022 and thereafter, TH Holdings is in default under the Next Step Note. *See* Ex. 6 at § 5(a).

22.     Also on or about December 31, 2021,  TH Holdings, as borrower, and Sipolt, as noteholder, entered into that certain "Promissory Note" in the principal amount of $360,879.00 (the "Sipolt Note").  A true and correct copy of the Sipolt Note is attached as Exhibit 7.

23.     Pursuant to the Sipolt Note, TH Holdings agreed, among other things, to pay the amounts owing under the Sipolt Note in 24 equal consecutive monthly installments beginning on January 15, 2022 at concluding on January 15, 2024. *See* Ex. 7 at § 1(a).

24.     TH Holdings made the first two payments owed under the Sipolt Note — *i.e.*, the January 2022 and February 2022 payments owed under the Sipolt Note.

25.     Beginning in March 2022, TH Holdings has failed to make the monthly installment payments due under the Sipolt Note.

26.     TH Holdings' failure to make any payment when due under the Sipolt Note constitutes an event of default under the Sipolt Note. *See* Ex. 7 at § 5(a).

27.     As a result of TH Holdings' failure to make the monthly installment payments due under the Sipolt Note in March 2022 and thereafter, TH Holdings is in default under the Sipolt Note. *See* Ex. 7 at § 5(a).

28.     Also on or about December 31, 2021, TH Holdings, as borrower, and Sabertooth, as noteholder, entered to that certain "Promissory Note" in the principal amount of $168,962.00 (the "Sabertooth Note", and together with the Next Step Note, Sipolt Note, and the TH LLC Note, the "Notes").  A true and correct copy of the Sabertooth Note is attached as Exhibit 8.

29.     Pursuant to the Sabertooth Note, TH Holdings agreed, among other things, to pay the amounts owing under the Sabertooth Note in 24 equal consecutive monthly installments beginning on January 15, 2022 and concluding on January 15, 2024. *See* Ex. 8 at § 1(a).

30.     TH Holdings made the first two payments owed under the Sabertooth Note

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1    — *i.e.*, the January 2022 and February 2022 payments owed under the Sabertooth Note.

2    31.    Beginning in March 2022, TH Holdings has failed to make the monthly

3    installment payments due under the Sabertooth Note.

4    32.    TH Holdings' failure to make any payment when due under the Sabertooth

5    Note constitutes an event of default under the Sabertooth Note. *See* Ex. 8 at § 5(a).

6    33.    As a result of TH Holdings' failure to make the monthly installment payments

7    due under the Sabertooth Note in March 2022 and thereafter, TH Holdings is in default

8    under the Sabertooth Note. *See* Ex. 8 at § 5(a).

9    34.    Pursuant to Section 1.08 of the APA, Greenrose irrevocably and

10    unconditionally guaranteed TH Holdings' payment of, among other things, each of the

11    Notes. *See* Ex. 1 at § 1.08.

12    35.    To date, Greenrose has not paid the amounts due and owing under any of the

13    Notes.

14    36.    In addition to Defendants' failure to pay the Notes, Defendants' actions have

15    also harmed Plaintiffs' business plans.

16    37.    For example, Defendants prevented the build-out of certain additional rooms

17    at the Business by improperly withholding funds for several months.

18    38.    I am informed and believe that Defendants are insolvent.

19    39.    Despite Defendants' deteriorating financial condition, Defendants have failed

20    to take appropriate action.

21    40.    Over Plaintiffs' objection, Defendants' insiders are negotiating a foreclosure

22    whereby Defendants' senior secured creditor would foreclose on all or substantially all of

23    Defendants' assets.

24    41.    The proposed foreclosure is not actually a foreclosure at all, but instead is a

25    complete capitulation by Defendants for the benefit of only Defendants' senior secured

26    creditor.

27    42.    I am informed and believe that Defendants' insiders may receive equity in a

28    new entity acquiring Defendants' assets if they agree to Defendants' secured creditor's

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   proposed foreclosure on Defendants' assets.

2        43.    Plaintiffs have attempted to engage Defendants and their management

3   regarding alternatives to Defendants' senior secured creditor's proposal to acquire all or

4   substantially all of Defendants' assets.

5        44.    Defendants have not meaningfully engaged with Plaintiffs regarding

6   alternatives to Defendants' senior secured creditor's proposal to acquire all or substantially

7   all of Defendants' assets.

8        45.    Defendants' inaction and mismanagement has placed Plaintiffs interests at

9   risk.

10       46.    Defendants' continued management threatens Plaintiffs' interests, both as

11  equity holders in Greenrose and as Defendants' unsecured creditors.

12       I declare under penalty of perjury that the foregoing is true and correct.

13       Executed on September 26, 2022.

14

15       By: _____

16              Dieter Gable

17

4858-2264-1461

18

19

20

21

22

23

24

25

26

27

28

*Snell & Wilmer*
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

# Exhibit 1

EX-10.1 5 ea137829ex10-1_greenroseacq.htm ASSET PURCHASE AGREEMENT DATED AS OF MARCH 12, 2021, BY AND AMONG TRUE HARVEST, LLC, GREENROSE ACQUISITION CORP. AND TRUE HARVEST HOLDINGS, INC

**Exhibit 10.1**

**EXECUTION COPY**

## ASSET PURCHASE AGREEMENT

between

**True Harvest, LLC,**

**Greenrose Acquisition Corp.**

and

**True Harvest Holdings, Inc.**

dated as of

**March 12, 2021**

---

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of March 12, 2021, is entered into between True Harvest, LLC, an Arizona limited liability company ("**Seller**"), Greenrose Acquisition Corp, a Delaware Corporation ("**Parent**"), and True Harvest Holdings, Inc., a Delaware corporation ("**Buyer**").

### RECITALS

WHEREAS, Seller (i) operates an indoor cannabis cultivation facility located at 4301 W Buckeye Rd., Phoenix, AZ 85043 and (ii) supplies cannabis to licensed marijuana dispensaries in Arizona (collectively, the "**Business**");

WHEREAS Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities (as defined herein) subject to the terms and conditions set forth herein; and

WHEREAS, Buyer, in addition to other covenants, agrees to hire the Transferred Employees (as defined below), effective as of the Closing (as defined herein), on the terms and conditions set forth herein and the offer letter issued by Buyer to each of the Transferred Employees.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE

**Section 1.01 Purchase and Sale of Assets**. Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("**Encumbrance**"), all of Seller's right, title and interest in, to and under all of the assets, properties, and rights of every kind and nature, whether real, personal, or mixed, tangible or intangible (including goodwill), wherever located (other than the Excluded Assets) that are used or held for use in connection with the Business (collectively, the "**Purchased Assets**"), including, without limitation, the assets set forth on Schedule 1.01 of the Disclosure Schedules (as defined below).

**Section 1.02 Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "**Excluded Assets**"): (a) any working capital of Seller, including cash, cash equivalents and accounts receivables, (b) all benefit plans of Seller and all assets related to any such benefit plans and (c) any other assets identified on <u>Schedule 1.02</u> of the Disclosure Schedules (the "**Excluded Assets**").

---

1

---

**Section 1.03 Assumption of Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following liabilities and obligations of Seller (collectively, the "**Assumed Liabilities**"): (a) the obligations of Seller under the Assigned Contracts that (i) arise after the Closing, (ii) relate to periods following the Closing, and (iii) are to be paid or performed at any time after the Closing, (b) the obligations and liabilities set forth on <u>Schedule 1.03</u> of the Disclosure Schedules and (c) all other liabilities arising out of Buyer's operation of the Business after the Closing. In no event shall Buyer be responsible for or have assumed any liability of Seller relating to any breach, default or violation by Seller on or prior to the Closing. Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, or otherwise, whether currently existing or hereinafter created and whether or not related to the Business or the Purchased Assets ("**Excluded Liabilities**"). Without limiting the foregoing, Excluded Liabilities shall include any liabilities or obligations (A) relating to a breach or default by Seller under any Assigned Contract (as defined herein) prior to the Closing; (B) all Taxes (as defined below), fees, levies, duties, tariffs and other governmental impositions or charges with respect to Tax periods (or portions thereof) ending on or prior to the Closing; (C) under any environmental, health or safety laws or regulations arising on or prior to the Closing; (D) with respect to periods on or before the Closing, under or with respect to, any employee pension benefit plan, employee welfare benefit plan, or any other plan, program, policy, practice or other arrangement providing for compensation, severance, termination pay, deferred compensation, performance award, equity or equity-based awards, fringe benefits, vacation pay, sickness, disability or death benefit plan, medical or life insurance plan or other employee benefits or remuneration of any kind; (E) with respect to any current or former employee, director, member, manager, stockholder, partner, agent or independent contractor of Seller, other than with respect to Transferred Employees, for periods ending on or prior to the Closing; (F) arising out of, or relating to, any conduct or alleged conduct of any employee or independent contractor of Seller, other than Transferred Employees, for periods ending on or prior to the Closing; (G) to Seller's equity owners or their affiliates; (H) except as set forth on <u>Schedule 1.03</u> of the Disclosure Schedules, with respect to any loans or guaranties of Seller; (I) arising out of, or relating to, any litigation, investigation or other proceeding pending on the Closing Date (as defined herein) or commenced after the Closing Date to the extent arising out of, or relating to, any act or omission of Seller or any event circumstance, condition, breach or default occurring on or prior to the Closing; (J) arising out of, or resulting from, Seller's compliance or noncompliance with any legal or regulatory requirement or governmental order; (K) relating to, or resulting from, Seller's Intellectual Property (as defined herein) to the extent arising on or prior to the Closing; (L) based upon Seller's acts or omissions occurring after the Closing; (M) arising from the failure to send any notice, make any filing, obtain any consent or approval required to be sent, made, filed or obtained by Seller; or (N) that do not relate to the Business.

**Section 1.04 The Purchase Price and Earnout**. The purchase price to be paid by the Buyer to Seller for the Purchased Assets shall be Fifty Million and 00/100 Dollars ($50,000,000) (the "**Initial Payment Amount**" and together with the Earnout Payment, the "**Purchase Price**") payable in the following manner:

      (a)      Twenty-One Million Seven Hundred Fifty Thousand and 00/100 Dollars ($21,750,000) in cash (the "**Initial Cash Amount**"), by wire transfer of immediately available funds in accordance with the wire instructions and other directions set forth on <u>Schedule 1.04(a)</u> of the Disclosure Schedules;

---

2

---

      (b)      Twenty-Five Million and 00/100 Dollars ($25,000,000) evidenced by a senior secured promissory note issued by Buyer to Seller secured by the Purchased Assets in the form attached hereto as <u>Exhibit A</u> ("**Secured Note**"); and

      (c)      Three Million Two Hundred Fifty Thousand and 00/100 Dollars ($3,250,000) which represents the amount of the assumed debt set forth on <u>Schedule 1.03</u>, which shall be assumed by delivering to Seller an Assignment and Assumption Agreement pursuant to <u>Section 2.02(a)(ii)</u>.

**Section 1.05 Earnout Payment**.

(a)     Subject to the terms of this Section 1.05, Buyer will pay contingent consideration to Seller (the "**Earnout Payment**") of up to a maximum of Thirty-Five Million and 00/100 Dollars ($35,000,000) (the "**Maximum Earnout Amount**") based on the Business attaining, within thirty-six (36) months after the Closing Date (the "**36 Month Price Point**"), a certain price point per pound of cannabis flower ("**flower**") as compared to total flower production, irrespective of the final form in which such flower is sold. The Earnout Payment, if any, shall be evidenced by a promissory note substantially in the form of Exhibit H attached hereto (the "**Earnout Note**"). The Earnout Note shall bear interest as an annual rate of 8% per annum, shall be fully amortized, and have a maturity date of twenty-four (24) months after issuance.

(b)     The 36 Month Price Point will be equal to the average of the Weighted Average Annual Price Points for the three (3) years following the Closing Date. The "**Weighted Average Annual Price Point**" equals revenue of the Business for the three (3) year period following the Closing Date divided by total weight of flower product produced and sold by Buyer (as listed in Biotrack or equivalent tracking system) during the three (3) year period following the Closing Date, provided, that in the event any flower product is lost or otherwise destroyed, then such lost or destroyed products shall not be included in the calculation of Weighted Average Annual Price Point.

(c)     The percentage of the Maximum Earnout Amount payable by Buyer to Seller as the Earnout Payment will be determined in accordance with the following table:

| | 36 Month Price Point | |
| --- | --- | --- |
| **Percentage of Earnout** | **Flower Production of <17,500 pounds/yr.** | **Flower Production of >17,500 pounds/yr.** |
| 0% | <$2,199 | <$2,199 |
| 20% | $2,200-$2,399 | $2,200-$2,199 |
| 50% | $2,400-$2,699 | $2,200-$2,499 |
| 80% | $2,700-$2,999 | $2,500-$2,799 |
| 100% | $3,000+ | $2,800+ |

3

(d)     On or before the fifteenth (15th) day of the first calendar month after each quarter end, Buyer shall report to Seller (i) the average price points for the preceding quarter calculated by taking the total revenue for the preceding quarter divided by total weight of flower product produced in the preceding quarter as listed in Biotrack or equivalent tracking system and (ii) the average price point since the Closing Date calculated by taking the total revenue since the Closing Date divided by the total weight of the flower product produced since the Closing Date.

(e)     On or before the fifteenth (15th) day following the three (3) year anniversary of the Closing Date, Buyer shall deliver to Seller a statement of the 36 Month Price Point and associated Earnout Payment ("**Earnout Payment Calculation**"), which statement shall be accompanied by supporting documentation including information related to revenue recognition and production values for the period elapsed since the Closing Date.

(f)     Seller shall have thirty (30) days after Buyer's delivery of the Earnout Payment Calculation to review the Earnout Payment Calculation (the "**Earnout Review Period**"). During the Earnout Review Period, Seller and its Representatives shall have the right to inspect Buyer's books and records during normal business hours at the Buyer's offices, subject to the confidentiality obligations of Section 5.06 hereof, upon reasonable prior notice and solely for purposes reasonably related to verifying the accuracy of the Earnout Payment Calculation. Prior to the expiration of the Earnout Review Period, Seller may in good faith dispute the Earnout Payment Calculation ("**Earnout Dispute**"), by delivering a written notice of dispute to Buyer setting forth in detail the nature of the dispute (an "**Earnout Dispute Notice**"). Seller and Buyer shall negotiate in good faith to resolve such dispute within thirty (30) days after delivery of the Earnout Dispute Notice. If the parties cannot resolve such dispute within such thirty (30) day period, then such dispute shall be handled pursuant to the provisions of Section 9.11. In the event that Seller fails to deliver the Earnout Dispute Notice within the Earnout Review Period, then the Earnout Payment Calculation shall be deemed final and conclusive. Buyer shall pay to Seller on or before ten (10) days following the resolution of the Earnout Dispute the Earnout Payment determined in accordance with such dispute resolution (if any).

(g)     In the event that Seller does not deliver the Earnout Dispute Notice, Buyer shall pay to Seller on or before ten (10) days following the earlier of (i) the expiration of the Earnout Review Period or (ii) the date upon which Seller provides Buyer with written notices of its acceptance of the Earnout Payment Calculation, the Earnout Payment reflected on the Earnout Payment Calculation (if any) by wire transfer of immediately available funds accordance with the wire instructions and other directions set forth on

Schedule 1.04(a) of the Disclosure Schedules or as otherwise instructed in writing by Seller to Buyer.

4

(h)     Following the Closing until the date that is three (3) years following the Closing Date, Buyer shall (i) operate the Business in a manner that is consistent with the manner in which Seller operated the Business in the two (2) years prior to the Closing Date; (ii) continue to maintain separate books and records for the Business; (iii) not directly or indirectly, take any actions in bad faith to intentionally avoid or reduce any Earnout Payment (including, without limitation, disposing of all or any portion of the assets of the Company outside the ordinary course of business, diverting revenues away from the Business to any of its Affiliates, or artificially reducing production of products or reducing the product price); (iv) not materially change its accounting practices and policies, including with respect to deferral of revenue and acceptance of customer deposits; (v) not materially change the metrics or requirements for flower product weight from those used in the Biotrack system as of the Closing Date; (vi) not offer customer discounts in any given year in exchange for larger payments in post-earnout years; and (vii) not sell product in exchange for payment other than for cash consideration.

(i)     In the event that after the Closing Date (i) there occurs a sale or other disposition of all or substantially all of the assets of Buyer or the Business, or a merger, consolidation, recapitalization or other transaction in which any person or entity who is not an owner of an interest in Buyer on the Closing Date becomes the beneficial owner, directly or indirectly, of fifty percent (50%) or more of the combined voting power of all interests in Buyer or (ii) Buyer materially breaches any of the covenants set forth in Section 1.05(h) (each, a "**Triggering Event**"), an amount equal to the Maximum Earnout Amount shall be immediately due and payable on and as of the date of the Triggering Event.

(j)     Buyer's and Parent's obligation to pay the Earnout Payment shall be secured by the assets of the Business pursuant to a Security Agreement in the form attached hereto as Exhibit B (the "**Security Agreement**").

(k)     Buyer and Seller understand and agree that (i) the contingent rights to receive any Earnout Payment hereunder are not transferable, except by operation of law and do not constitute an equity or ownership interest in Buyer or the Business, (ii) Seller shall not have any rights as a securityholder of Buyer or the Business as a result of Seller's contingent right to receive any Earnout Payment hereunder, and (iii) no interest is payable with respect to any Earnout Payments.

(l)     Any payments made pursuant to Section 1.05 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

**Section 1.06 Allocation of Purchase Price**. Seller and Buyer agree to allocate the Purchase Price and other items treated as consideration for the Purchased Assets for Tax purposes, among the Purchased Assets for all purposes (including Tax and financial accounting) in a manner consistent with the methodology set forth on Schedule 1.06 (the "**Purchase Price Allocation**"). Each party agrees that it will (i) be bound by the Purchase Price Allocation for the purposes of determining any Taxes, (ii) report for Tax purposes the transactions consummated pursuant to this Agreement in a manner consistent with the Purchase Price Allocation (including without limitation, if applicable, the filing of Internal Revenue Service Form 8594), and (iii) not take a position for Tax purposes that is inconsistent with the Purchase Price Allocation on any Tax return or in any proceeding before any Tax authority except with the prior written consent of the other party. In the event that the Purchase Price Allocation is disputed by any Tax authority, the party receiving notice of such dispute will promptly notify the other party, provided that the failure of the party receiving such notice of dispute to promptly notify the other party shall not constitute a breach of this provision unless such other party is actually prejudiced by such failure.

5

**Section 1.07 Withholding Tax**. Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any applicable Tax law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.08 Parent Guaranty**. To induce Seller to enter into this Agreement, Parent hereby absolutely, irrevocably and unconditionally guarantees to Seller, the performance of Buyer's obligations pursuant to Section 1.04 and Section 1.05 (the "**Guaranteed Obligations**"). The guarantee pursuant to this Section 1.08 is absolute, irrevocable and unconditional and shall not be impaired, discharged or terminated by any act or omission by Buyer or Parent that may affect the enforceability of this guarantee. If Parent makes a payment or performs an action in full satisfaction of any

Guaranteed Obligation, such satisfaction shall be deemed to be a satisfaction of such obligation in full by Buyer for purposes of this Agreement. At the Closing, Parent shall have all necessary power and authority to execute and deliver this Agreement and to perform the Guaranteed Obligations hereunder.

**ARTICLE II**
**CLOSING**

**Section 2.01 Closing**. Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely via the exchange of documents and signatures no later than three (3) business days after the satisfaction or, to the extent permitted hereunder, waiver of all conditions set forth in <u>Article VI</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted hereunder, waiver of all such conditions), unless this Agreement has been terminated pursuant to its terms or unless another time or date is agreed to in writing by the parties hereto (the day on which the Closing takes place being the "**Closing Date**").

**Section 2.02 Closing Deliverables**.

    (a)    At the Closing, Seller shall deliver to Buyer the following:

        (i)    a bill of sale in the form of <u>Exhibit C</u> hereto (the "**Bill of Sale**") duly executed by Seller, transferring the Purchased Assets to Buyer;

        (ii)    an assignment and assumption agreement in the form of <u>Exhibit D</u> hereto (the "**Assignment and Assumption Agreement**") duly executed by Seller, effecting the assignment to and assumption by Buyer of the Assumed Liabilities;

6

        (iii)    an assignment in the form of <u>Exhibit E</u> hereto (the "**Intellectual Property Assignments**") duly executed by Seller, transferring all of Seller's right, title and interest in and to the trademark registrations and applications, patents and patent applications, copyright registrations and applications and domain name registrations included in the Purchased Assets /Purchased IP (as defined herein) to Buyer;

        (iv)    a Non-Competition Agreement in the form of <u>Exhibit F</u> hereto (the "**Noncompetition Agreement**") executed and delivered by each of the individuals listed on <u>Schedule 2.02</u> of the Disclosure Schedules;

        (v)    copies of all consents, approvals, waivers, notices and authorizations referred to on <u>Schedule 3.02</u> of the Disclosure Schedules;

        (vi)    confirmation of payment, and if applicable termination of any liens, for amounts owed on the Purchased Assets;

        (vii)    a copy, certified by the Secretary of Seller to be true, complete and correct as of the Closing Date, of the articles of organization and operating agreement of Seller (the "**Organizational Documents**") and copies of resolutions of the members and manager of Seller authorizing and approving this Agreement, the documents and instruments related hereto and the transactions contemplated hereby and thereby;

        (viii)    a lease assignment and assumption agreement, in the form attached hereto as <u>Exhibit G</u> (the "**Lease Assignment and Assumption Agreement**") duly executed by Seller and Michael Macchiaroli, assigning Seller's rights under that certain Lease, dated as of July 25, 2017, by and between MSCP, L.L.C. (the "**Landlord**") and Seller (the "**Lease**"), which shall, among other things, include express language releasing Michael Macchiaroli from his obligations as Guarantor under the Lease;

        (ix)    a copy of the Security Agreement, duly executed by Seller;

        (x)    a certificate duly executed by Seller in a form reasonably acceptable to Buyer certifying that Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2; and

        (xi)    such other customary instruments of transfer, assumption, filings or documents as Buyer has requested in writing to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Initial Cash Amount by wire transfer of immediately available funds in accordance with the wire instructions and other directions set forth on <u>Schedule 1.04(b)</u>;

---

7

---

(ii)    the Secured Note duly executed by Buyer;

(iii)   a copy of the Security Agreement, duly executed by Buyer and Parent;

(iv)    the Assignment and Assumption Agreement duly executed by Buyer;

(v)     the Non-Competition Agreement duly executed by Buyer;

(vi)    the Lease Assignment and Assumption Agreement, duly executed by Landlord; and

(vii)   copies of all consents and authorizations referred to in <u>Schedule 4.02</u> of the Disclosure Schedules.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as otherwise set forth in a disclosure schedule of even date herewith which is executed and delivered by Seller (the "**Disclosure Schedules**"), Seller represents and warrants to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date hereof. For purposes of this <u>Article III</u>, "Seller's knowledge," "knowledge of Seller" and any similar phrases shall mean the actual or constructive knowledge of Dieter Gable, Chris Watson and Michael Macchiaroli, after due inquiry ("knowledge" for the avoidance of doubt shall include such inquiry that a prudent businessperson would have made in order to gain full understanding and determination of the accuracy of such fact or matter).

**Section 3.01 Organization and Authority of Seller; Enforceability**. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Arizona. Seller has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms except (i) to the extent that enforceability may be subject to, and limited by, applicable bankruptcy, insolvency, reorganization, moratorium, receivership or other laws affecting the enforcement of creditors' rights generally and (ii) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought (the "**Enforceability Exceptions**").

---

8

---

**Section 3.02 No Conflicts; Consents**. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the Organizational Documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller, the Business or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets, except in the cases of clauses (b) or (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect. Except as set forth in <u>Schedule 3.02</u> of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the

consummation of the transactions contemplated hereby.

**Section 3.03 Title to Purchased Assets**. Except as set forth in <u>Schedule 3.03</u> of the Disclosure Schedules, Seller owns and has good and valid title to the Purchased Assets, free and clear of Encumbrances other than Permitted Encumbrances. "**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; and (d) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business.

**Section 3.04 Condition of Assets**. The tangible personal property included in the Purchased Assets are in good condition and are adequate for the uses to which they are being put, and none of such tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

**Section 3.05 Inventory**. All inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories included in the Purchased Assets consist of a quality and quantity usable and salable in the ordinary course of business.

**Section 3.06 Intellectual Property**.

(a)    "**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), and all divisions, continuations, continuations-in-part, reissues, extensions, reexamination and renewals thereof, (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, domain name registrations and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing; (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing; (d) industrial designs, trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein; (e) computer programs, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; and (f) all other intellectual or industrial property and proprietary rights; together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to the foregoing, and (ii) any and all claims and causes of action with respect to the foregoing, whether accruing before, on, or after the date hereof/accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof.

9

(b)    <u>Schedule 3.06(b)</u> of the Disclosure Schedules lists all (i) registrations or applications for registration, (ii) material common law trademarks and (iii) material software created by or for Seller, within the Intellectual Property included in the Purchased Assets ("**Purchased IP**"). Seller owns or has adequate, valid and enforceable rights to use all the Purchased IP, free and clear of all Encumbrances. Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP, or restricting the licensing thereof to any person or entity. With respect to the registered Intellectual Property listed on <u>Schedule 3.06(b)</u> of the Disclosure Schedules, (i) all such Intellectual Property is valid, subsisting and in full force and effect; and (ii) Seller has paid all maintenance fees and made all filings required to maintain Seller's ownership thereof. For all such registered Intellectual Property, <u>Schedule 3.06(b)</u> of the Disclosure Schedules lists (i) the jurisdiction where the application or registration is located; (ii) the application or registration number; (iii) the application or registration date; and (iv) the application expiration dates.

(c)    To Seller's knowledge, Seller's prior and current use of the Purchased IP has not and does not infringe, violate, dilute or misappropriate the Intellectual Property of any person or entity and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness or use of the Purchased IP. To Seller's knowledge, no person or entity is infringing, misappropriating, diluting or otherwise violating any of the Purchased IP, and neither Seller nor any affiliate of Seller has made or asserted any claim, demand or notice against any person or entity alleging any such infringement, misappropriation, dilution or other violation.

**Section 3.07 Assigned Contracts**. <u>Schedule 3.07</u> of the Disclosure Schedules includes each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Seller in accordance with its terms

and is in full force and effect and may be assigned to Buyer as contemplated hereby. None of Seller or, to Seller's knowledge, any other party thereto is in material breach of or material default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. To Seller's knowledge, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assigned Contract have been made available to Buyer. There are no disputes pending or, to Seller's knowledge, threatened under any Assigned Contract.

10

---

**Section 3.08 Permits**. <u>Schedule 3.08</u> of the Disclosure Schedules lists all material permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets (the "**Seller Permits**"). The Seller Permits are valid and in full force and effect. All fees and charges with respect to such Seller Permits as of the date hereof have been paid in full. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Seller Permit.

**Section 3.09 Non-foreign Status**. Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.10 Compliance With Laws**. Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Business or the Purchased Assets except where the failure to be in compliance would not have a material adverse effect, provided, that to the extent that federal laws impose restrictions, standards, requirements, penalties or conditions with respect to the trafficking or sale of cannabis related products inconsistent with applicable state or local laws, the term "applicable law" shall refer only to such state or local laws, and shall expressly exclude such conflicting federal laws.

**Section 3.11 Legal Proceedings**. There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.12 Taxes**. Except as set forth on <u>Schedule 3.12</u> of the Disclosure Schedules, all Taxes due and owing by Seller have been, or will be, timely paid. Except as set forth on <u>Schedule 3.12</u> of the Disclosure Schedules, no extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax returns required to be filed by Seller for any Tax periods prior to Closing have been, or will be, timely filed. Such Tax returns are, or will be, true, complete and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other Taxes, fees, assessment, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.13 Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

11

---

**Section 3.14 Employees**. <u>Schedule 3.14</u> of the Disclosure Schedules contains a true, correct and complete list of all employees of Seller for which Buyer has agreed to make offers of employment. None of the employees are subject to any collective bargaining, union or labor contract and all of the employees are at-will employees. Seller has complied, in all material respects, with all applicable laws with respect to its employees, including under Seller's employee benefit plans, and there are no pending or, to the knowledge of Seller, threatened claims against Seller or its employees (in their respective capacities as such) or affiliates by any of the employees listed on <u>Schedule 3.14</u>. of the Disclosure Schedules

**Section 3.15 Description of Leased Real Property**. <u>Schedule 3.15</u> of the Disclosure Schedules contains a correct legal description, street address and Tax parcel identification number of all tracts, parcels and subdivided lots in which Seller has a leasehold interest and an accurate description (by location, name of lessor, date of lease and term expiry date) of all real property leases.

**Section 3.16 Compliance with OFAC**. None of Seller, or any director, manager, officer, agent, employee or affiliate of Seller is a Person (as defined in the Securities Act) that is, or is owned or controlled by a Person that is, currently the subject or target of any sanctions administered or

enforced by the U.S. government (including, without limitation, the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the United Nations Security Council, or other relevant sanctions authority (collectively, "**Sanctions**"). Seller has not engaged in and is not now engaged in any dealings or transactions with any Person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any country or territory that is the subject or the target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan, and Syria.

**Section 3.17 No Other Representations and Warranties**. Except for the representations and warranties contained in this <u>Article III</u> (including the related portions of the Disclosure Schedules), neither Seller nor any other person or entity has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its agents and representatives (including any information, documents or material made available to Buyer in the Data Room hosted on DropBox, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PARENT AND BUYER

Parent and Buyer jointly and severally represent and warrant to Seller that the statements contained in this <u>Article IV</u>, are true and correct as of the date hereof as follows:

**Section 4.01 Organization and Authority of Buyer; Enforceability**. Each of Parent and Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer is a wholly-owned subsidiary of Parent. Each of Parent and Buyer has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by each of Parent and Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Parent or Buyer as applicable. This Agreement and the documents to be delivered hereunder to which Parent or Buyer is a party have been duly executed and delivered by such party, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of such party enforceable against such party in accordance with their respective terms, subject to the Enforceability Exceptions.

12

**Section 4.02 No Conflicts; Consents**. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer or Parent; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. Except as set forth in <u>Schedule 4.02</u> of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 4.03 Solvency**. After the Closing and after giving effect to this Agreement and the other transactions contemplated hereby, each of Parent and Buyer expects and believes in good faith that it will not be insolvent (either because its financial condition will be such that the sum of its debts is greater than the fair value of its assets or because the present fair salable value of its assets would be less than the amount required to pay its probable liability on debts as they become absolute and matured).

**Section 4.04 Legal Proceedings**. There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.05 Brokers**. Except as set forth on <u>Schedule 4.05</u> of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.06 SEC Reports**. Parent, since the initial public offering, has timely filed all forms, reports, schedules, statements, registration statements, prospectuses and other documents required to be filed or furnished by Parent with the SEC under the Securities Act of 1933, as amended (the "**Securities Act**") and/or the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), together with any amendments, restatements or supplements thereto (all such filing, the "**SEC Reports**"). The SEC Reports (x) were prepared in all material respects in accordance with the requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations thereunder and (y) did not, as of their

respective effective dates (in the case of SEC Reports that are registration statements filed pursuant to the requirements of the Securities Act) and at the time they were filed with the SEC (in the case of all other SEC Reports) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. As of the date hereof, there are no material outstanding or unresolved comments in comment letters from the SEC staff with respect to Parent or the SEC Reports. As of the date hereof, (i) none of the SEC Reports is the subject of ongoing SEC review or outstanding SEC comments and (ii) neither the SEC nor any other governmental authority is conducting any investigation or review of any SEC Report.

13

**Section 4.07 Trust Account**. Parent has made available to the Company a true, correct and complete copy of the fully executed Investment Management Trust Agreement (the "**Trust Agreement**"), dated as of February 11, 2020, by and between Parent and Continental Stock Transfer & Trust Company, a New York corporation (the "**Trustee**"). Parent has at least One Hundred Seventy-Two Million Five Hundred Thousand and 00/100 Dollars ($172,500,000) in the account established by Parent for the benefit of certain stockholders of Parent (the "**Trust Account**"), with such funds invested in government securities or money market funds meeting certain conditions pursuant to the Trust Agreement. The Trust Agreement is in full force and effect and is a legal, valid and binding obligation of Parent and, to Parent's knowledge, the Trustee, enforceable in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Trust Agreement has not been terminated, repudiated, rescinded, amended or supplemented or modified, in any respect, and no such termination, repudiation, rescission, amendment, supplement or modification is contemplated. There are no side letters and (except for the Trust Agreement) there are no agreements, contracts, arrangements or understandings, whether written or oral, with the Trustee or any other person that would (i) cause the description of the Trust Agreement in the SEC Reports to be inaccurate or (ii) entitle any person (other than holders of Parent common stock, par value $0.0001 per share (the "**Parent Common Stock**" who have elected to redeem their Parent Common Stock in accordance with the Parent's charter documents) to any portion of the proceeds in the Trust Account. Except in connection with a Business Combination (as defined below) consummated in accordance with all rules and regulations applicable to Parent, none of the funds held in the Trust Account may be released, except to pay income and franchise taxes from any interest earned in the Trust Account and to redeem Parent Common Stock in accordance with the provisions of Parent's charter documents. There is no Action pending or threatened with respect to the Trust Account.

**Section 4.08 Independent Investigation**. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article III of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other person or entity has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article III of this Agreement (including the related portions of the Disclosure Schedules).

14

**Section 4.09 No Other Representations and Warranties**. Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), none of Parent, Buyer, or any other person or entity has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Parent or Buyer, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its agents as to the future revenue, profitability or success of Buyer, or any representation or warranty arising from statute or otherwise in law.

**ARTICLE V**
**COVENANTS**

**Section 5.01 Employees and Employment**.

(a)     Effective as of the Closing, Seller shall terminate the employment of each of the employees listed on Schedule 3.14 of the Disclosure Schedules and pay all amounts due to such employees as of the Closing including salaries, benefits and severance, if any, owed to such employees at the time of termination. Buyer has or will offer employment to all of the employees of Seller set

forth on Schedule 3.14 of the Disclosure Schedules for employment to be effective on the Closing (the employees of Seller who accept such employment and commence employment on the Closing, the "**Transferred Employees**"). The employees of Seller who are not offered employment with or who do not accept employment with Buyer shall be referred to herein as "**Non-Transferred Employees.**" Seller hereby consents to the hiring of such employees by Buyer and waives, with respect to the employment by Buyer of such employees, any claims or rights Seller may have against Buyer or any such employee under any non-competition, confidentiality or employment agreement. Buyer shall be liable and hold Seller harmless for any claims relating to the employment of any Transferred Employee arising after the Closing to the extent not attributable to their employment prior to the Closing.

(b)     After the Closing, Buyer shall be solely responsible for the payment of all wages, salaries and other compensation and employee benefits (including any vacation pay, severance pay, notice pay, insurance, supplemental pension, deferred compensation, bonuses, retirement and any other benefits, premiums, claims and related costs) to any of the Transferred Employees relating to or arising out of their employment with Buyer or any of its affiliates.

(c)     For the avoidance of doubt and notwithstanding anything in this Agreement, the United States Internal Revenue Code of 1986, as amended (the "**Code**"), Employee Retirement Income Security Act of 1974, as amended, or the treasury regulations promulgated under the Code, including any temporary regulations. ("**Treasury Regulations**") to the contrary, if Seller and any entity that is considered a single employer with Seller under Section 414 of the Code cease to sponsor all employee benefit plans that are group health plans in connection with the transactions contemplated by this Agreement, Seller and Buyer hereby agree that the any "M&A qualified beneficiaries" as defined in Treasury Regulation Section 54.4890B-9, Q&A-4, shall be eligible to receive group health plan continuation or conversion coverage required under Section 4980B of the Code (the "**Required COBRA Coverage**") under a group health plan of Buyer and that Seller shall have no liability whatsoever for providing the Required COBRA Coverage. To facilitate the provision of the Required COBRA Coverage to the "M&A qualified beneficiaries" and to provide insured group medical coverage to the Transferred Employees, Buyer shall establish an insured group medical plan that provides health and welfare benefits that are substantially similar, in the aggregate, to the benefits provided by Seller immediately prior to Closing. To prevent any gaps in health care coverage, the insured group health plan of Buyer shall be effective no later than the Closing Date and both the Non-Transferred Employees who are "M&A qualified beneficiaries" and Transferred Employees shall be eligible to participate in such plan immediately following the Closing.

(d)     Notwithstanding anything in this Agreement to the contrary, no Transferred Employee, and no other employee or contractor of Seller, shall be deemed to be a third-party beneficiary of this Agreement.

15

---

**Section 5.02 Public Announcements**.

(a)     The parties agree that no public release, filing or announcement concerning this Agreement or the Transaction Documents (as defined below) or the transactions contemplated hereby or thereby shall be issued by any party or any of their respective affiliates without the prior written consent (not be unreasonably withheld, conditioned or delayed) of Parent, Buyer and Seller, except as such release or announcement may be required by applicable laws or the rules or regulations of any securities exchange, in which case the applicable party shall use commercially reasonable efforts to allow Parent, Buyer and Seller reasonable time to comment on, and arrange for any required filing with respect to, such release or announcement in advance of such issuance.

(b)     Parent and Seller shall mutually agree upon and, as promptly as practicable after the execution of this Agreement, issue a press release announcing the execution of this Agreement (the "**Signing Press Release**"). Promptly after the issuance of the Signing Press Release (but in any event within four (4) business days after the execution of this Agreement), Parent shall file a current report on Form 8-K (the "**Signing Filing**") with the Signing Press Release and a description of this Agreement as required by applicable laws, which Seller shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing (with Seller reviewing, commenting upon and approving such Signing Filing in any event no later than the third (3rd) business day after the execution of this Agreement). Parent and Seller shall mutually agree upon and, as promptly as practicable after the Closing, issue a press release announcing the consummation of the transactions contemplated by this Agreement (the "**Closing Press Release**"). Promptly after the issuance of the Closing Press Release (but in any event within four (4) business days after the Closing), Parent shall file a current report on Form 8-K (the "**Closing Filing**") with the Closing Press Release and a description of the Closing as required by applicable laws which Seller shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing (with the Selling Securityholders' Representative commenting upon and approving such Closing Filing in any event no later than the third (3rd)

business day after the Closing). In connection with the preparation of the Signing Press Release, the Signing Filing, the Closing Filing, the Closing Press Release, or any other report, statement, filing notice or application made by or on behalf of a party to any governmental authority or other third party in connection with the transactions contemplated hereby, each party shall, upon request by any other party, furnish the parties with all information concerning themselves, their respective directors, officers and equity holders as may be necessary in connection with the preparation of such report, statement, filing notice or application, and such other matters as may be reasonably necessary or advisable in connection with the transactions contemplated hereby.

16

**Section 5.03 Bulk Sales Laws**. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction ("**Bulk Sales Laws**") that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 5.04 Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne by Seller when due. Seller shall, at its own expense, timely file any Tax return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.05 Further Assurances**. Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

**Section 5.06 Confidentiality**. From and after the Closing, Seller shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective directors, officers, employees, consultants, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller, can show that such information: (a) is generally available to and known by the public through no fault of Seller, its affiliates or their respective Representatives, (b) is lawfully acquired by Seller, its affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation or (c) as reasonably necessary to protect and preserve Seller's rights under this Agreement or the Secured Note. If Seller, its affiliates, or any of their respective Representatives are compelled to disclose any information by governmental order or law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. Each party acknowledges that the Multi-Party Nondisclosure Agreement, dated as of November 23, 2020 by and among Seller, Buyer and the other parties thereto shall remain in full force and effect until the Closing.

17

**Section 5.07 Interim Operations of the Business**. Prior to the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall operate the Business in good faith in the ordinary course of business, using reasonable efforts to maintain and preserve intact the current Business and operations and to preserve the rights, goodwill and relationships of its employees, customers, lenders, vendors, and others having relationships with the Business.

**Section 5.08 Government Approvals.** Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all governmental authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.

**Section 5.09 Customer and Other Business Relationships**. After the Closing, for a period of three (3) months, Seller will cooperate with Buyer in Buyer's efforts to continue and maintain those business relationships of Seller existing prior to the Closing and relating to the Business, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others; such cooperation not to exceed twenty (20) hours per week of services provided by employees or affiliates of Seller. Seller will satisfy the Excluded Liabilities in a manner that is not detrimental to the Business or the relationships. Seller will refer to Buyer all inquiries relating to the Business.

**Section 5.10 Retention of and Access to Records**. After the Closing Date, Buyer shall retain for a period consistent with Buyer's record-retention

policies and practices those records of Seller delivered to Buyer. Buyer also shall provide Seller and their representatives reasonable access thereto, during normal business hours and on at least three (3) days' prior written notice, to enable them to prepare financial statements or Tax returns or deal with Tax audits. After the Closing Date, Seller shall provide Buyer and its Representatives reasonable access to records that are Excluded Assets, during normal business hours and on at least three (3) days' prior written notice, for any reasonable business purpose specified by Buyer in such notice.

18

**Section 5.11 Proxy Statement; Parent Stockholders' Meeting**.

(a)      As promptly as reasonably practicable after the date of this Agreement, Parent shall, in consultation with Seller, prepare and file with the SEC a preliminary proxy statement (the "**Proxy Statement**") relating to the transactions contemplated by this Agreement to be used for soliciting proxies from Parent's stockholders to obtain the requisite approval of the transactions contemplated hereby and the other matters to be voted on at a meeting of the Parent's stockholders to be called and held for such purpose (the "**Parent Stockholders' Meeting**") and to provide Parent's stockholders an opportunity in accordance with Parent's organizational documents to have their securities redeemed (the "**Redemption**"). Parent or Buyer, as applicable, shall notify Seller promptly upon the receipt of any comments from the SEC or its staff and of any request by the SEC or its staff or any other governmental authority for amendments or supplements to the Proxy Statement or any other SEC Reports required by the transactions contemplated hereby or for additional information. As promptly as practicable after receipt thereof, Parent or Buyer, as applicable, shall provide Seller and its counsel with copies of all written correspondence between Parent, Buyer or any of their representatives, on the one hand, and the SEC, or its staff or other government officials, on the other hand, with respect to the Proxy Statement or any other SEC Reports required by the transactions contemplated by this Agreement. Parent and Buyer shall permit Seller and its counsel to review the Proxy Statement and any exhibits, amendments or supplements thereto and shall consult with Seller and its advisors, in good faith, concerning any comments from the SEC with respect thereto, and shall reasonably consider and take into account the reasonable suggestions, comments or opinions of Seller and its advisors, and shall not file the Proxy Statement or any exhibits, amendments or supplements thereto or any response letters to any comments from the SEC without the prior written consent of Seller, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that Parent or Buyer, as applicable, shall be permitted to make such filing or response in the absence of such consent if the basis of Seller's failure to consent is Seller's unwillingness to permit the inclusion in such filing or response of information that, based on the advice of outside counsel to Buyer, is required by the SEC and United States securities laws to be included therein. Whenever any event occurs which would reasonably be expected to result in the Proxy Statement containing any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, Parent, Buyer or Seller, as the case may be, shall promptly inform the other parties of such occurrence and cooperate in filing with the SEC or its staff or any other government officials, and/or mailing to stockholders of Parent, an amendment or supplement to the Proxy Statement.

(b)      The Proxy Statement will be sent to Parent's stockholders as soon as practicable following the date on which the SEC has confirmed that it has no further comments on the Proxy Statement (but in any event, within five (5) Business Days following such date) for the purpose of soliciting proxies from its stockholders to vote at the Parent Stockholders' Meeting in favor of: (i) the adoption of this Agreement and the approval of the transactions contemplated hereby; (ii) approval of amendments to Parent's organizational documents; (iii) approval of any other transactions expected to close in connection with the Closing hereof; (iv) approval of such other actions as Parent and Buyer deem necessary; and (v) the adjournment of the Parent Stockholders' Meeting (the matters described in clauses (i) through (v), shall be referred to as the "**Voting Matters**" and approval of the Voting Matters by the stockholders of Parent at the Parent Stockholders' Meeting or any postponement or adjournment thereof shall be referred to as the "**Parent Stockholder Approval**"). Parent shall keep Seller reasonably informed regarding all matters relating to the Voting Matters and the Parent Stockholders' Meeting, including by promptly furnishing any voting or proxy solicitation reports received by Parent in respect of such matters and similar updates regarding the Redemption.

19

(c)      Seller shall provide Parent and Buyer, as promptly as reasonably practicable, with such information concerning Seller as may be necessary for the Proxy Statement and the other required SEC Reports to comply with all applicable provisions of and rules under the Securities Act, the Exchange Act and other applicable law in connection with the preparation, filing and distribution of the

Proxy Statement, the solicitation of proxies thereunder, the calling and holding of the Parent Stockholders' Meeting and the preparation and filing of any other required SEC Reports.

(d) Subject to the fiduciary duties of its board of directors (i) Parent shall include in the Proxy Statement the unanimous recommendation of its board of directors that its stockholders vote in favor of the adoption of this Agreement and the approval of the transactions contemplated hereby, and shall otherwise take all lawful action to solicit and obtain the Parent Stockholder Approval and (ii) neither Parent's board of directors nor any committee thereof shall withdraw or modify, or publicly propose or resolve to withdraw or modify in a manner adverse to Seller, the recommendation of Parent's board of directors that the stockholders of Parent vote in favor of the Voting Matters.

**Section 5.12 Further Assurances**. The parties shall cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated hereunder and hereby. Without limiting the foregoing, prior to the filing of the Proxy Statement Seller shall deliver to Parent all financial statements required to be included in the Proxy Statement under the applicable rules and regulations of the SEC, unaudited financial statements for any subsequent periods and such other financial information required to be included in the Proxy Statement or subsequent filings with the Securities and Exchange Commission.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**Section 6.01 Conditions to Obligations of All Parties**. The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) This Agreement will have been duly adopted through the receipt of the Parent Stockholder Approval.

(b) No injunction or restraining order shall have been issued by any governmental authority, and be in effect, that restrains or prohibits any transaction contemplated hereby.

(c) No governmental authority having jurisdiction over any party hereto shall have enacted, issued, promulgated, enforced, or entered any laws or orders, whether temporary, preliminary, or permanent, that make illegal, enjoin, or otherwise prohibit consummation of the transactions contemplated herein.

20

(d) All consents, approvals and other authorizations of any governmental authority set forth in <u>Schedule 3.02</u> of the Disclosure Schedules or <u>Schedule 4.02</u> of the Disclosure Schedules and required to consummate the transactions contemplated herein shall have been obtained, free of any condition that would reasonably be expected to have a material adverse effect on any party.

**Section 6.02** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of Seller contained in <u>Article III</u> shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect.

(b) Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other deliverables pursuant to <u>Section 2.02(a)</u> (and together with the deliverables in <u>Section 2.02(b)(ii)-(v)</u>, the "**Transaction Documents**") to be performed or complied with by it prior to or on the Closing Date.

(c) Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in <u>Section 2.02(a)</u>.

(d) Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in <u>Section 6.02(a)</u> and <u>Section 6.02(b)</u> have been satisfied.

(e)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the manager of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(f)     Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

21

(g)     If after giving effect to the completion of the Redemption and any financings undertaken by Parent in connection with the Closing, Parent shall have net tangible assets of less than Seventy Million Dollars ($70,000,000).

(h)     Since the date of this Agreement, Seller shall not have suffered a Material Adverse Effect.

For purposes hereof, a Material Adverse Effect means a change, effect, event, occurrence or circumstance, whether known or unknown, that is, individually or in the aggregate, materially adverse to the business, condition (financial or other), operations, results of operations, Purchased Assets, taken as a whole; *provided, however*, that in no event shall any of the following be deemed, either alone or in combination, to constitute, nor shall any of the following be taken into account in determining whether there has been, a Material Adverse Effect (except to the extent, in the case of clauses (i) and (ii) below, they have a disproportionate effect on Seller, taken as a whole, as compared to the other companies in the industry in which Seller operates): (i) changes in conditions in the U.S. or global economy, capital or financial markets generally, including, without limitation, changes in interest or exchange rates, (ii) changes in legal, tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which Seller conducts business, (iii) the negotiation, execution, announcement or performance of this Agreement or the transactions contemplated hereby or the consummation of the transactions contemplated by this Agreement, including, without limitation, the impact thereof on relationships, contractual or otherwise, with customers, suppliers, distributors, landlords, tenants, lenders, investors or employees, (iv) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism that do not disproportionately affect Seller, (v) any pandemic, epidemic or any publicly declared health emergency; (vi) any action taken by Seller at the request of Parent or (vii) any failure to meet internal or published projections, estimates or forecasts of revenues, earnings, or other measures of financial or operating performance for any period (provided that the underlying changes, events, circumstances, conditions or effects that contributed to such failure may be being taken into account in determining whether such failure has resulted in a Material Adverse Effect).

**Section 6.03 Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in <u>Article IV</u> shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

22

(c)     Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in <u>Section 2.02(b)</u>.

(d)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in <u>Section 6.03(a)</u> and <u>Section 6.03(b)</u> have been satisfied.

(e)     Seller shall have received certificates of the Secretary or an Assistant Secretary (or equivalent officer) of each of Parent and Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Parent or Buyer as applicable authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

# ARTICLE VII
# INDEMNIFICATION

**Section 7.01 Survival**. All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing for a period of eighteen (18) months provided, however, that claims based on the representations and warranties set forth in Section 3.01, Section 3.02, Section 3.03, Section 4.01, Section 4.02 and Section 4.05 (collectively, the "**Fundamental Representations**") shall survive the Closing and shall continue for a period of six (6) years plus thirty (30) days.

**Section 7.02 Indemnification by Seller**. Seller shall defend, indemnify and hold harmless Parent, and its affiliates (including Buyer) and their respective equity holders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including reasonable attorneys' fees and documented disbursements ("**Losses**") arising from or relating to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder; or

(c)     any Excluded Asset or Excluded Liability.

**Section 7.03 Indemnification By Buyer**. Buyer and Parent shall jointly and severally defend, indemnify and hold harmless Seller, its affiliates and their respective equity holders, directors, officers and employees from and against all Losses, arising from or relating to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer or Parent contained in this Agreement or any document to be delivered hereunder;

23

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer or Parent pursuant to this Agreement or any document to be delivered hereunder; or

(c)     any Assumed Liability.

**Section 7.04 Indemnification Procedures**.

(a)     The party making a claim under this Article VII is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this Article VII is referred to as the "**Indemnifying Party**".

(b)     Whenever an Action made or brought by any person who is not party to this Agreement (a "**Third-Party Claim**") shall arise for indemnification hereunder, the Indemnified Party shall promptly provide written notice of such Third-Party Claim to the Indemnifying Party. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. In connection with any Third-Party Claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action and the Indemnified Party shall cooperate in good faith in such defense. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to this Section 7.04, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to,

settling such Action, after giving notice of it to the Indemnified Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed). Seller, Buyer and Parent shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available (subject to the provisions of Section 5.06) records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

24

(c)     Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as provided in this Section 7.04(c). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 7.04(b), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(d)     Any claim by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30)-day period, the Indemnifying Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30)-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

25

**Section 7.05 No Claim Against Trust Account**. Reference is made to the final prospectus of Parent, dated as of February 10, 2020, and filed with the SEC (File No. 333-235724) on February 10, 2020 (the "Prospectus"). Except as otherwise described in the Prospectus, monies from the Trust Account may be disbursed only: (a) to the public stockholders in the event they elect to redeem their Parent shares in connection with the consummation of Parent's initial business combination (the "**Business Combination**"), (b) to the public stockholders if Parent fails to consummate a Business Combination within eighteen (18) months after the closing of the IPO (which time period may be extended as described in the Prospectus), (c) with respect to any interest earned on the amounts held in the Trust Account, as necessary to pay income or other tax obligations, or (d) to Parent after or concurrently with the consummation of a Business Combination. For and in consideration of Parent entering into this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this Agreement, neither the Company nor any of its affiliates do

now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Agreement or any proposed or actual business relationship between Parent or its Representatives, on the one hand, and Seller or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the ("**Released Claims**"). Unless specifically permitted by applicable law, Seller on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that Seller or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with Parent or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with Parent or its affiliates). Seller agrees and acknowledges that such irrevocable wavier is material to this Agreement and specifically relied upon by Parent and its affiliates to induce Parent to enter into this Agreement, and Seller further intends and understands such waiver to be valid, binding and enforceable against Seller and each of its affiliates under applicable law. To the extent Seller or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to Parent or its Representatives, which proceeding seeks, in whole or in part, monetary relief against Parent or its Representatives, Seller hereby acknowledges and agrees that the sole remedy of Seller and its affiliates shall be against funds held outside of the Trust Account and that such claim shall not permit Seller or its affiliates (or any person claiming on any of their behalf or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein. In the event Seller or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to Parent or its Representatives, which proceeding seeks, in whole or in part, relief against the Trust Account (including any distributions therefrom) or Parent's public stockholders, whether in the form of money damages or injunctive relief, Parent and its Representatives, as applicable, shall be entitled to recover from Seller and its affiliates the associated legal fees and costs in connection with any such action, in the event Parent or its Representatives, as applicable, prevails in such action or proceeding.

26

**Section 7.06 Certain Limitations**. The indemnification provided for in <u>Section 7.02</u> and <u>Section 7.03</u> shall be subject to the following limitations:

(a)  The amount of any and all indemnifiable Losses shall be determined net of any amounts actually recovered by the Indemnified Party under insurance policies or other collateral sources (such as contractual indemnities of any Indemnified Party which are contained outside of this Agreement) with respect to such Losses (net of any costs of recovery, insurance deductibles, chargebacks and to the extent reasonably quantifiable, increases in insurance premiums resulting from such insurance claim).

(b)  Neither party shall be liable for any Losses pursuant to <u>Section 7.02</u> unless and until the aggregate amount of such Losses pursuant to <u>Section 7.02</u> exceeds One Hundred Thousand and 00/100 Dollars ($100,000) (the "**Deductible**"); <u>provided</u> that if the aggregate amount of such Losses (limited as provided in <u>Section 7.06</u>) pursuant to <u>Section 7.02</u> equals or exceeds the Deductible, the Indemnified Party shall be entitled to recover those Losses beginning from the first dollar of such Losses, subject to the limitations in <u>Section 7.05(c)</u>; provided, however, that the Deductible shall not apply to, and such party shall be responsible for one hundred percent (100%) of, Losses attributable to any outstanding Taxes or litigation disclosed on the Disclosure Schedules.

(c)  The aggregate amount of all Losses for which Seller shall be liable pursuant to <u>Section 7.02</u>, shall not exceed Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000).

(d)  Notwithstanding the foregoing, the limitations set forth in <u>Section 7.06(b)</u> and <u>7.06(c)</u> shall not apply to Losses based upon, arising out of, with respect or, or by reason of any inaccuracy in or breach of any Fundamental Representation made by Seller.

**Section 7.07 Payment of Indemnification**. Parent and Buyer agree that for any indemnification payment owed by Seller to Buyer, such amounts shall (i) first be settled by offset against amounts otherwise payable to Seller pursuant to the Secured Note as provided in <u>Section 7.08</u>, and (ii) second, if there are insufficient amounts to make indemnification payments from the Secured Note, then within five (5) days of receipt of notice from Parent setting forth the shortfall between the amounts payable pursuant to the Secured Note and the indemnification payment (the "**Shortfall**"), Seller shall cause to be wired to Parent or Buyer, as instructed by Parent, an amount equal to the Shortfall. In the event Seller shall fail to pay the Shortfall as set forth in this <u>Section 7.07</u>, the amount of any Shortfall shall bear interest from and including the applicable due date at a rate of eight percent (8%) per annum. Such interest shall be calculated daily on the basis of a 365-day year and the actual number of days elapsed. Any indemnification payment owed by Buyer to Seller shall be paid by Buyer or Parent within five (5) days of receipt of notice from Seller containing a final, non-appealable judgment setting forth the indemnification amount by wire transfer using the wire instructions and other directions set forth on <u>Schedule 1.04(a)</u> of the Disclosure Schedules, or such other wire instructions as Seller may be provide to Buyer.

27

**Section 7.08 Offset Against Promissory Note**. In the event that Seller becomes obligated to Parent pursuant to an indemnification claim made by Parent against Seller under this Article VII or under any other sections of this Agreement, Parent shall have the right to make offset against amounts due Parent under the Secured Note, provided, however, that Seller can avoid any such offset, at Seller's election, by making payment to Parent in cash of the full amount owed to Parent within five (5) days after receiving written notice from Parent that Parent intends to make such offset (the "**Offset Notice**"). Notwithstanding the foregoing, prior to Parent making an offset against amounts due from Seller under the Secured Note, Parent shall first deliver an Offset Notice to Seller at least fifteen (15) days prior to the effective date of any offset, which notice shall state the effective date of such offset and provide a summary of the reasons why such offset is being made. During the ten (10) day period commencing on the date the Offset Notice is delivered to Seller (the "**Objection Period**"), Seller shall be given the reasonable opportunity by Parent if appropriate under the facts and circumstances, to make a reasonable attempt to cure the situation giving rise to the offset claim and to state, in a writing delivered to Parent prior to the end of the Objection Period, the reasons why Seller objects to such offset (the "**Offset Objection Notice**"). Parent, in its reasonable discretion, may also agree to have its representatives meet with Seller's representatives, during the Objection Period, to further discuss Seller's reasons set forth in the Offset Objection Notice. At the end of Objection Period, Parent, in its sole discretion, may: (1) either accept or partially accept such reasons, and modify or reverse its decision to cause an offset to be made, or (2) reject such reasons and proceed with making the offset as of the effective date set forth in the Offset Notice but in any event will give Seller a response, provided, however, that in the event Parent makes an offset to which Seller has timely objected by delivery of an Offset Objection Notice to Parent within the Objection Period, any such offset may be disputed by Seller in an action commenced under Section 9.11 hereof, with such offset confirmed, modified or reversed in accordance with the dispute resolution procedures set forth in Section 9.11 hereof.

**Section 7.09 Tax Treatment of Indemnification Payments**. All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise agreed in writing by the parties.

**Section 7.10 Effect of Investigation**. Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

**Section 7.11 Exclusive Remedies**. Following the Closing, the provisions of this Article VII shall be the parties' exclusive remedy for any and all claims relating to the subject matter of this Agreement or any of the other documents to be delivered hereunder, except for claims arising from intentional fraud, criminal activity or willful misconduct by the other party and claims for specific performance or other equitable remedies.

28

---

**ARTICLE VIII
TERMINATION**

**Section 8.01 Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer by written notice to Seller if:

(i)      Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure cannot be cured by Seller by August 31, 2021 (the "**Drop Dead Date**"); or

(ii)      any of the conditions set forth in Section 6.01 or Section 6.02 shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)      by Seller by written notice to Buyer if:

(i)      Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement

that would give rise to the failure of any of the conditions specified in <u>Article VI</u> and such breach, inaccuracy or failure cannot be cured by Buyer by the Drop Dead Date; or

    (ii)    any of the conditions set forth in <u>Section 6.01</u> or <u>Section 6.03</u> shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Seller in the event that:

    (i)    there shall be any law or order that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited;

    (ii)    any governmental authority shall have issued an injunction, restraining order or any other order restraining or enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable.

**Section 8.02 Effect of Termination**. In the event of the termination of this Agreement in accordance with this <u>Article VIII</u>, this Agreement shall forthwith become void and there shall be no liability of any party hereto except:

(a)    as set forth in this <u>Article VIII</u>, <u>Section 5.06</u> and <u>Article IX</u>; and

(b)    that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

29

---

# ARTICLE IX
# MISCELLANEOUS

**Section 9.01 Expenses**. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 9.02 Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 7.02</u>):

If to Seller: **True Harvest, LLC**

    10768 E Acoma Dr.
    Scottsdale, AZ 85255
    Attention: Dieter Gable and Michael Macchiaroli
    Email: dgable@tbconsulting.com; cpwatson6@gmail.com; m.macc76@gmail.com

    With a copy (which shall not constitute notice) to:

    **Snell & Wilmer L.L.P.**
    350 South Grand Ave.
    Suite 3100
    Los Angeles, CA 90071
    Attention: Joshua A. Schneiderman;
    Christopher H. Bayley
    E-mail: jschneiderman@swlaw.com; cbayley@swlaw.com

If to Buyer: **Greenrose Acquisition Corp.**

    111 Broadway
    Amityville, NY 11701

Attention: William F. Harley III
E-mail: mickey@greenrosecorp.com

With a copy (which shall not constitute notice) to:

**Tarter Krinsky & Drogin LLP**
1350 Broadway
11th Floor
New York, NY 10018
Attention: Guy N. Molinari
Email: gmolinari@tarterkrinsky.com

---

30

---

**Section 9.03 Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.04 Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 9.05 Entire Agreement**. This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.06 Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.07 No Third-party Beneficiaries**. Except as provided in Article VII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.08 Amendment and Modification**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 9.09 Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10 Governing Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction).

---

31

---

**Section 9.11 Dispute Resolution**. Any dispute, claim, or controversy arising out of or relating to this Agreement, or the performance, breach, validity, interpretation, application, or termination thereof ("**Dispute**") whether based on contract, tort, statute or other legal or equitable theory (including any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of this Agreement including this section) shall be settled by mediation and consultations between the parties initiated upon the written notice (the "**Mediation Notice**") of any party.

In the event of failure of such mediation and consultations to settle such Dispute in a manner acceptable to all parties within thirty (30) days following the Mediation Notice, then any such Dispute shall be finally resolved by arbitration initiated upon the written notice of any party. The arbitration shall be conducted in accordance with this Agreement and the then current American Arbitration Association Commercial Arbitration Rules (the "**AAA Rules**") applying the Expedited Procedures of such AAA Rules, and judgment on the award may be entered in any court having jurisdiction thereof.

**Section 9.12 Waiver of Trial by Jury**. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**Section 9.13 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.14 Cannabis**. The parties recognize that cannabis manufacturing and distribution, and cannabis businesses, are illegal under federal law, but are permitted under Arizona law if in compliance with Arizona statutes and regulations. The parties agree not to raise any defense or make any argument against, the enforceability or performance of this Agreement based on the illegality of cannabis under federal law, or the law of any other state.

[SIGNATURE PAGE FOLLOWS]

32

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER

TRUE HARVEST, LLC

By:     /s/ Michael Macchiaroli
Name: Michael Macchiaroli
Title:  Manager

PARENT

GREENROSE ACQUISITION CORP.

By:     /s/ William F. Harley III
Name: William F. Harley III
Title:  Chief Executive Officer

BUYER

TRUE HARVEST HOLDINGS, INC.

By:     /s/ William F. Harley III
Name: William F. Harley III
Title:  Chief Executive Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

---

**EXHIBIT A**

(Secured Note)

---

SECURED PROMISSORY NOTE

$25,000,000 _____, 2021

1. <u>FUNDAMENTAL PROVISIONS</u>.

The following terms will be used as defined terms in this Secured Promissory Note (as it may be amended, modified, extended and renewed from time to time, the "<u>Note</u>") and certain of the other Loan Documents (as hereinafter defined):

"<u>Borrower</u>" shall mean True Harvest Holdings, Inc., a Delaware corporation.

"<u>Default Interest Rate</u>" shall mean 10.00% per annum above the Interest Rate.

"<u>Guaranteed Obligations</u>" shall mean as defined in the Purchase Agreement.

"<u>Guaranty</u>" shall mean Parent's guaranty of the Guaranteed Obligations pursuant to Section 1.08 of the Purchase Agreement.

"<u>Indebtedness</u>" shall mean, with respect to any Person, without duplication, (a) any obligation of such Person for borrowed money, including, without limitation, (i) any obligation of such Person evidenced by bonds, debentures, notes or other similar debt instruments and (ii) any obligation for borrowed money which is non-recourse to the credit of such Person but which is secured by a Lien on any asset of such Person, (b) any obligation of such Person on account of deposits or advances, (c) any obligation of such Person for the deferred purchase price of any property or services, except trade accounts payable, (d) any obligation of such Person as lessee under a capitalized lease, (e) any indebtedness of another Person secured by a Lien on any asset of such first Person, whether or not such Indebtedness is assumed by such first Person, (f) all guaranties of such Person, and (g) all other items that are liabilities on a balance sheet of such Person prepared in accordance with GAAP. For all purposes of this Agreement, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer.

"<u>Interest Rate</u>" shall mean a fixed rate of interest at all times equal to 8.00% per annum.

"<u>Lender</u>" shall mean True Harvest, LLC, an Arizona limited liability company.

"<u>Lien</u>" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"<u>Loan</u>" shall mean the seller carryback loan from Lender to Borrower in the Loan Amount and evidenced by this Note.

"<u>Loan Amount</u>" shall mean $25,000,000, subject to reduction for Parent's right to offset pursuant to Section 7.08 of the Purchase Agreement.

"Loan Documents" shall mean, collectively, this Note, the Security Agreement, any and all UCC financing statements perfecting Lender's security interests in any collateral for the Loan, and any other documents evidencing the Loan or securing the repayment of the Note.

"Maturity Date" shall mean the date that is three (3) years from the date of issuance of this Note.

"Parent" shall mean Greenrose Acquisition Corp., a Delaware corporation.

"Purchase Agreement" shall mean that certain Asset Purchase Agreement dated March 12, 2021, by and between Lender, as seller, Parent, and Borrower, as buyer.

"Secured Obligations" shall mean, collectively, all of the liabilities and obligations of Borrower and Parent under the Purchase Agreement and the Loan Documents, including, without limitation, all of the obligations of Borrower to pay the Purchase Price (as defined in the Purchase Agreement) and all of the Guaranteed Obligations.

"Security Agreement" shall mean that certain Security Agreement dated _____, 2021, by Borrower and Parent for the benefit of Lender.

2. PROMISE TO PAY. For value received, Borrower promises to pay, in accordance with Paragraph 3(b) below, to the order of Lender at such place as the holder hereof may from time to time designate in writing, the Loan Amount, together with accrued interest from the date of disbursement on the unpaid principal balance at the Interest Rate. Lender and Borrower that this Note is the "Secured Note" under the Purchase Agreement.

3. INTEREST; PAYMENTS.

(a) Absent an Event of Default hereunder or under any of the Loan Documents, each advance made hereunder shall bear interest at the Interest Rate in effect from time to time.

(b) Commencing on _____, 2021, and continuing on the corresponding day of each calendar quarter thereafter, Borrower shall make consecutive quarterly payments of all accrued, unpaid interest. On the Maturity Date, Borrower shall make a final "balloon" payment of all unpaid principal, accrued unpaid interest, and any other amounts due hereunder due and payable.

4. PREPAYMENT. Borrower may prepay the Loan, in whole or in part, at any time without penalty or premium. If Borrower prepays the Loan in full, Borrower shall simultaneously with such prepayment pay all accrued unpaid interest on the principal amount prepaid.

5. LAWFUL MONEY. Principal and interest are payable in lawful money of the United States of America.

6. APPLICATION OF PAYMENTS/DEFAULT INTEREST.

(a) Absent the occurrence of an Event of Default hereunder or under any of the other Loan Documents, any payments received by the holder hereof pursuant to the terms hereof shall be applied first to the payment of all interest accrued to the date of such payment, next to principal, and the balance, if any, to the payment of sums, other than principal and interest, due Lender pursuant to the Loan Documents. Any payments received by the holder hereof after the occurrence of an Event of Default hereunder or under any of the Loan Documents, shall be applied to the amounts specified in this Paragraph 6(a) in such order as the holder hereof may, in its reasonable discretion, elect.

(b) If any payment of interest and/or principal is not received by the holder hereof when such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to Paragraph 9 hereof and the other Loan Documents, the amount due and unpaid (including, without limitation, the late charge, if any) shall bear interest at the Default Interest Rate, computed from the date on which the amount was due and payable until paid, regardless of any notice and cure periods.

7. SECURITY. This Note is secured by the Security Agreement and the Pledge Agreement, each of which creates a lien on the property described therein.

8. EVENT OF DEFAULT. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note and the other Loan Documents:

(a) Failure by Borrower or Parent to pay any monetary amount when due under any Loan Document.

(b) Failure by Borrower or Parent to pay any monetary amount (i) within ten (10) days of when due and payable, if such amount is due with respect to an employee contract or other arrangement for the payment of employees of Borrower or Parent, (ii) within ten (10) days of when due and payable, if such amount is due with respect to a regular monthly, quarterly or annual payment of rent, and (iii) within thirty (30) days of when due and payable, with respect utility payments.

(c) Failure by Borrower or Parent to comply with any term or condition applicable to Borrower or Parent under any Loan Document and the expiration of thirty (30) days after written notice of such failure by Lender to Borrower.

(d) Any representation or warranty by Borrower or Parent in any Loan Document is materially false, incorrect, or misleading as of the date made.

(e) Any final, non-appealable adverse decision, report or material penalty resulting from an inspection of Borrower's operations or facility by any governmental authority.

(f) Borrower or Parent (i) is unable or admits in writing its inability to pay its respective monetary obligations as they become due, (ii) makes a general assignment for the benefit of creditors, or (iii) applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, or other custodian for itself or its property or any part thereof, or in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is appointed for it or its property or any part thereof, and such appointment is not discharged within sixty (60) days.

(g) Commencement of any case under the Bankruptcy Code, Title 11 of the United States Code, or commencement of any other bankruptcy arrangement, reorganization, receivership, custodianship, or similar proceeding under any federal, state, or foreign law by or against Borrower or Parent and with respect to any such case or proceeding that is involuntary, such case or proceeding is not dismissed with prejudice within sixty (60) days of the filing thereof.

(h) Commencement of any action or proceeding which seeks as one of its remedies the dissolution of Borrower or Parent.

(i) One or more final, non-appealable judgments from a court or before any governmental commission, board or authority which result in adverse determination against the Borrower in excess of Two Million ($2,000,000) in the aggregate.

(j) The failure to timely pay rent, utilities or employee wages.

(k) All or any material part of the property of Borrower or Parent is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within thirty (30) days of the date thereof.

(l) The occurrence of any default under any other Loan Document, including, without limitation, any default in any agreement, obligation or instrument between Borrower or Parent and any affiliate of Lender, which continues beyond any applicable notice and cure period.

9. REMEDIES. Upon the occurrence of an Event of Default, then at the option of Lender, the entire balance of principal together with all accrued interest thereon, and all other amounts payable by Borrower under the Loan Documents shall, without demand or notice, immediately become due and payable. Upon the occurrence of an Event of Default (and so long as such Event of Default shall continue), all amounts due and payable by Borrower under the Loan Documents shall bear interest at the Default Interest Rate, subject to the limitations contained in Paragraph 14 hereof. No delay or omission on the part of the holder hereof in exercising any right under this Note or under any of the other Loan Documents hereof shall operate as a waiver of such right.

10. WAIVER. Borrower, endorsers, guarantors, and sureties of this Note hereby waive diligence, demand for payment, presentment for payment, protest, notice of nonpayment, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and notice of nonpayment, and all other notices or demands of any kind (except notices specifically provided for in the Loan Documents) and expressly agree that, without in any way affecting the liability of Borrower, endorsers, guarantors, or sureties, the holder hereof may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify the Loan Documents, accept additional security, release any Person liable, and release any security or guaranty. Borrower, endorsers, guarantors, and sureties waive, to the full extent permitted by law, the right to plead any and all statutes of limitations as a defense.

11. <u>CHANGE, DISCHARGE, TERMINATION, OR WAIVER</u>. No provision of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought. No failure on the part of the holder hereof to exercise and no delay by the holder hereof in exercising any right or remedy under this Note or under the law shall operate as a waiver thereof.

---

12. <u>ATTORNEYS' FEES</u>. If this Note is not paid when due or if any Event of Default occurs, Borrower promises to pay all reasonable and documented costs of enforcement and collection and preparation therefor, including but not limited to, reasonable attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)).

13. <u>SEVERABILITY</u>. If any provision of this Note is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.

14. <u>INTEREST RATE LIMITATION</u>. Borrower hereby agrees to pay an effective rate of interest that is the sum of the interest rate provided for herein, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan, including, any other fees to be paid by Borrower pursuant to the provisions of the Loan Documents. Lender and Borrower agree that none of the terms and provisions contained herein or in any of the Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the State of Arizona. In such event, if any holder of this Note shall collect monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of the maximum rate permitted to be charged by the laws of the State of Arizona, all such sums deemed to constitute interest in excess of such maximum rate shall, at the option of the holder, be credited to the payment of other amounts payable under the Loan Documents or returned to Borrower.

15. <u>NUMBER AND GENDER</u>. In this Note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa.

16. <u>HEADINGS</u>. Headings at the beginning of each numbered section of this Note are intended solely for convenience and are not part of this Note.

17. <u>INTEGRATION</u>. The Loan Documents contain the complete understanding and agreement of the holder hereof and Borrower and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

18. <u>BINDING EFFECT</u>. The Loan Documents will be binding upon, and inure to the benefit of, the holder hereof, Borrower, and their respective successors and assigns. Borrower may not delegate its obligations under the Loan Documents.

19. <u>SURVIVAL</u>. The representations, warranties, and covenants of the Borrower in the Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loan.

20. <u>GOVERNING LAW; JURISDICTION</u>.

(a) THIS NOTE HAS BEEN DELIVERED IN ARIZONA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES.

---

(b) Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender or any affiliate of the Lender in any way relating to this Note or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Arizona sitting in Maricopa County, and of the United States District Court of the District of Arizona , and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such Arizona State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may

be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note or in any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Note or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

21. <u>JURY WAIVER</u>. BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

22. <u>TIME OF THE ESSENCE</u>. Time is of the essence with regard to each provision of the Loan Documents as to which time is a factor.

[SIGNATURE PAGE FOLLOWS]

---

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first written above.

True Harvest Holdings, Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

---

**EXHIBIT B**

(Security Agreement)

---

SECURITY AGREEMENT

This SECURITY AGREEMENT ("<u>Agreement</u>"), dated as of _____, 2021, is between True Harvest Holdings, Inc., a Delaware corporation ("<u>Debtor</u>"), and Greenrose Acquisition Corp., a Delaware corporation ("<u>Parent</u>"), and True Harvest, LLC, an Arizona limited liability company (together with its successors and assigns, the "<u>Secured Party</u>").

WHEREAS, Debtor has executed that certain Secured Promissory Note dated as of even date herewith (as it may be amended, modified, extended, restated, in whole or in part, and renewed from time to time, the "<u>Closing Note</u>") payable to the order of Secured Party, as lender, pursuant to which the Secured Party has made a loan (the "<u>Closing Loan</u>") to Debtor in the original principal amount of $25,000,000 and Debtor may issue a Secured Promissory Note (as it may be amended, modified, extended, restated, in whole or in part, and renewed from time to time, the "<u>Earnout Note</u>," and together with the Closing Note, the "<u>Notes</u>") payable to the order of Secured Party, evidencing Debtor's obligation to pay the Earnout Payment (as defined in that certain Asset Purchase Agreement dated as of the date hereof by and among Debtor, Parent and Secured Party, the "<u>Asset Purchase Agreement</u>," capitalized but undefined terms used in this Agreement shall have the meaning set forth in the Asset Purchase Agreement) in the original principal amount of up to $35,000,000 (the "<u>Earnout Loan</u>," and together with the Closing Loan, the "<u>Loans</u>").

WHEREAS, it is a condition precedent to Secured Party, as seller, entering into the Purchase Agreement, and to Secured Party's making

the Loans to the Debtor under the Notes that the Debtor execute and deliver to the Secured Party a security agreement in substantially the form hereof; and

WHEREAS, the Debtor wishes to grant a security interest in favor of the Secured Party as herein provided;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

2. <u>Definitions</u>. All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Notes. The term "<u>State</u>," as used herein, means the State of Arizona.

3. <u>Grant of Security Interest</u>. The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Secured Obligations, a security interest in the Collateral, as described on <u>Exhibit A</u> attached hereto and made a part hereof.

4. <u>Authorization to File Financing Statements</u>. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization and any organizational identification number issued to the Debtor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon the Secured Party's request. The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

5. <u>Other Actions</u>. To further the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in the Collateral, and without limitation on the Debtor's other obligations in this Agreement, the Debtor agrees, in each case at the Debtor's expense, to take the following actions with respect to the following Collateral:

5.1 <u>Other Actions as to Any and All Collateral</u>. Each of the Parent and the Debtor further agrees, at the request and option of the Secured Party, to take any and all other actions the Secured Party may determine to be necessary for the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral, including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that the Parent or the Debtor's signature thereon is required therefor, (b) causing the Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party waivers, consents and approvals in form and substance satisfactory to Secured Party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Secured Party, and (f) taking all actions under any earlier versions of the Uniform Commercial Code or under any other law, as reasonably determined by the Secured Party to be applicable in any relevant Uniform Commercial Code or other jurisdiction, including any foreign jurisdiction.

6. <u>Perishable Items</u>. The Debtor agrees and acknowledges that to the extent Debtor is deemed to have a right in any portion of the Collateral that contains perishable commodities, and that, in the Event of Default, if such Collateral is found to have perished then the Secure Party will be entitled to monetary damages and claims against the Debtor with respect to such Collateral.

7. <u>Representations and Warranties of Debtor</u>. The Debtor represents and warrants to the Secured Party as follows: (a) Debtor's exact legal name is that indicated on <u>Schedule 1</u> hereto and on the signature page hereof, (b) Debtor is an organization of the type set forth in <u>Schedule 1</u> hereto, (c) <u>Schedule 1</u> hereto accurately sets forth the Debtor's chief executive office, as well as the Debtor's mailing address, if different, and (d) all other information set forth on <u>Schedule 1</u> hereto pertaining to the Debtor is accurate and complete.

8. <u>Covenants Concerning Debtor's Legal Status</u>. The Debtor covenants with the Secured Party as follows: (a) without providing at least thirty (30) days prior written notice to the Secured Party, the Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address, and (b) the Debtor will not change its type of organization, jurisdiction of organization or other legal structure.

9. <u>Representations and Warranties Concerning Collateral, etc.</u> Each of the Parent and the Debtor further represents and warrants to the Secured Party as follows: (a) the Debtor is the owner of the Collateral, free from any right or claim or any person or any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement or any security interest existing on the Collateral prior to Debtor's purchase of such Collateral pursuant to the Purchase Agreement, (b) [intentionally omitted], (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral, (d) the Debtor holds no commercial tort claim, and (e) the Debtor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (f) all other information provided by Debtor pertaining to the Collateral is accurate and complete.

10. <u>Covenants Concerning Collateral, etc.</u> Each of the Parent and the Debtor further covenants with the Secured Party as follows: (a) except for the security interest herein granted, the Debtor shall be the owner of the Collateral free from any right or claim of any other person, lien, security interest or other encumbrance, and the Parent and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party, (b) neither the Parent nor the Debtor shall pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or encumbrance in the Collateral in favor of any person, other than the Secured Party, (c) the Parent and the Debtor will keep the Collateral in good order and repair (ordinary wear and tear excepted) and will not use the same in violation of law or any policy of insurance thereon, (d) the Parent and the Debtor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located, (e) the Parent and the Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (f) the Parent and the Debtor will continue to operate the Debtor's business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (g) neither the Parent nor the Debtor will sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for (i) sales of inventory in the ordinary course of business, and (ii) sales or other dispositions of obsolescent items of equipment consistent with past practices.

11. <u>Remedies upon an Event of Default</u>. Prior to selling or otherwise disposing of the Collateral to any third-party person or entity, the Secured Party shall give the Parent and the Debtor at least sixty (60) days after the occurrence of an Event of Default to pay off all of the Secured Obligations, including any penalties and interest thereon. In the event that the Parent and Debtor fully pay off such Secured Obligations (including penalties and interest thereon) within such sixty (60) day period, then the Secured Party shall promptly return the Collateral to the Debtor and shall take such actions as are reasonably necessary to release any liens on the Collateral. In the event that the Debtor or Parent do not make any such payment within such sixty (60) day period, then the Secured Party shall be permitted to take any actions it deems reasonably necessary with respect to the Collateral. For the avoidance of doubt, this <u>Section 10</u> does not limit the right of the Secured Party to exercise its rights set forth in this Agreement, including, but not limited to, the right to appoint a receiver with respect to the Collateral, the right to take possession of the Collateral pursuant to <u>Section 15</u> and the right to exercise its foreclosure rights pursuant to the UCC.

---

12. <u>Collateral Protection Expenses; Preservation of Collateral</u>.

12.1 <u>Expenses Incurred by Secured Party</u>. In the Secured Party's discretion, if the Debtor or Parent fails to do so, the Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, maintain any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums. Each of the Parent and the Debtor agrees to reimburse the Secured Party on demand for reasonable expenditures so made. The Secured Party shall have no obligation to the Parent or the Debtor to make any such expenditures, nor shall the making thereof be construed as the waiver or cure of any Event of Default.

12.2 <u>Secured Party's Obligations and Duties</u>. Anything herein to the contrary notwithstanding, the Debtor shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of

the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times. The Secured Party's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as the Secured Party deals with similar property for its own account.

13. <u>Securities and Deposits</u>. The Secured Party may, at any time following and during the continuance of an Event of Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Secured Obligations. Whether or not any Secured Obligations are due, the Secured Party may, following and during the continuance of an Event of Default, demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Secured Obligations, any deposits or other sums at any time credited by or due from the Secured Party to the Debtor may at any time be applied to or set off against any of the Secured Obligations.

14. <u>Notification to Account Debtors and Other Persons Obligated on Collateral</u>. If an Event of Default shall have occurred and be continuing, the Debtor shall, at the request and option of the Secured Party, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party or to any financial institution designated by the Secured Party as the Secured Party's agent therefor, and the Secured Party may itself, if an Event of Default shall have occurred and be continuing, upon notice to the Debtor, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, the Parent and the Debtor shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Parent or the Debtor as trustee for the Secured Party without commingling the same with other funds of the Parent and the Debtor and shall turn the same over to the Secured Party in the identical form received, together with any necessary endorsements or assignments. The Secured Party shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by the Secured Party to the Secured Obligations, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

15. <u>Power of Attorney</u>.

15.1 <u>Appointment and Powers of Secured Party</u>. Each of the Debtor and Parent hereby irrevocably constitutes and appoints the Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of the Debtor or Parent or in the Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Debtor or Parent, without notice to or assent by the Debtor or Parent, to do the following:

(a) upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State and as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Debtor's expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary or useful to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein, in order to effect the intent of this Agreement, all at least as fully and effectively as the Debtor might do, including, without limitation, (i) the filing and prosecuting of registration and transfer applications with the appropriate federal, state, local or other agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (ii) upon written notice to the Debtor, the exercise of voting rights with respect to voting securities, which rights may be exercised, if the Secured Party so elects, with a view to causing the liquidation of assets of the issuer of any such securities, and (iii) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral;

(b) to the extent that the Debtor's authorization given in <u>Section 3</u> is not sufficient, to file such financing statements with respect

hereto, with or without the Debtor's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Secured Party may deem appropriate and to execute in the Debtor's name such financing statements and amendments thereto and continuation statements which may require the Debtor's signature; and

(c) upon the occurrence and during the continuance of an Event of Default, generally to exercise any self-help remedies with respect to any of the Collateral, and to take any and all such actions as the Secured Party deems necessary or useful to protect and preserve the Collateral and the Secured Party's security interest therein, including, but not limited to, having the right to immediately access the Debtor's premises in order to secure and preserve the Collateral.

15.2 <u>Ratification by Debtor</u>. To the extent permitted by law, each of the Debtor and Parent hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

15.3 <u>No Duty on Secured Party</u>. The powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Debtor for any act or failure to act, except for the Secured Party's own gross negligence or willful misconduct.

16. <u>Rights and Remedies</u>.

16.1 If an Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Debtor have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State and any additional rights and remedies which may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Secured Party may, so far as the Parent or the Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom. The Secured Party may in its discretion require the Parent and the Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of the Debtor's principal office(s) or at such other locations as the Secured Party may reasonably designate. In addition, each of the Debtor and Parent waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

16.2 If an Event of Default shall have occurred and be continuing, and in addition to any other rights and remedies, as a matter of right and without notice to Debtor or anyone claiming under Debtor, and without regard to the then value of the Collateral or the interest of Debtor therein, or the solvency of Debtor, Secured Party may seek the appointment of a receiver for Debtor and/or the Collateral. Each of the Parent and the Debtor waives any right to a hearing or notice of hearing prior to the appointment of a receiver and irrevocably consents to such appointment. Such receiver shall have all of the usual powers and duties of receivers in like or similar cases and all of the powers and duties of Secured Party in case of entry as provided above and shall continue as such and exercise all such powers until the later of the date of confirmation of sale of the Collateral or the date of expiration of any redemption period, unless such receivership is sooner terminated. All expenses incurred by the receiver or its agents, including obligations to repay funds borrowed by the receiver, shall constitute a part of the Secured Obligations. Any revenues collected by the receiver shall be applied first to the expenses of the receivership, including reasonable attorneys' fees incurred by the receiver and Secured Party, together with interest thereon at the Default Interest Rate from the date incurred until paid, and the balance shall be applied toward the Secured Obligations or in such other manner as the court may direct.

---

17. <u>Standards for Exercising Rights and Remedies</u>. To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, each of the Parent and the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (f) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (g) to dispose of assets in wholesale rather than retail markets, (h) to disclaim disposition warranties, (i) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (j) to

the extent deemed appropriate by the Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral. Each of the Parent and the Debtor acknowledges that the purpose of this <u>Section 16</u> is to provide non-exhaustive indications of what actions or omissions by the Secured Party would fulfill the Secured Party's duties under the Uniform Commercial Code or other law of the State or any other relevant jurisdiction in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this <u>Section 16</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 16</u> shall be construed to grant any rights to the Parent or the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this <u>Section 16</u>.

18. <u>No Waiver by Secured Party, etc.</u> The Secured Party shall not be deemed to have waived any of its rights or remedies in respect of the Secured Obligations or the Collateral unless such waiver shall be in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of the Secured Party with respect to the Secured Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Secured Party deems expedient.

19. <u>Suretyship Waivers by Debtor</u>. Each of the Parent and the Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Secured Obligations and the Collateral, each of the Parent and the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in <u>Section 11.2</u>. Each of the Parent and the Debtor further waives any and all other suretyship defenses.

20. <u>Marshaling</u>. The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each of the Parent and the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each of the Parent and the Debtor hereby irrevocably waives the benefits of all such laws.

21. <u>Proceeds of Dispositions; Expenses</u>. The Parent and Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving or enforcing the Secured Party's rights and remedies under or in respect of any of the Secured Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of the Collateral shall, to the extent actually received in cash, be applied to the payment of the Secured Obligations in such order or preference as the Secured Party may determine proper allowance and provision being made for any Secured Obligations not then due. Upon the final payment and satisfaction in full of all of the Secured Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Parent and the Debtor. In the absence of final payment and satisfaction in full of all of the Secured Obligations, the Parent and the Debtor shall remain liable for any deficiency.

22. <u>Overdue Amounts</u>. Until paid, all amounts due and payable by the Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the default rate of interest provided in the Notes.

23. <u>Reporting</u>.

23.1 Subject to the Secured Party having entered into a confidentiality agreement in the form attached hereto as <u>Exhibit B</u> (such agreement, a "**Confidentiality Agreement**"), Parent and Debtor shall provide Secured Party with such financial statements and reports as Secured Party may reasonably request from time to time that Parent prepares in its ordinary course of business and that relate to Debtor and/or the Collateral.

23.2 Promptly but in any event no later than five (5) days after the end of each month, Debtor shall submit to Secured Party an email confirmation that all rent, utilities and employee wages have been paid for the preceding month.

23.3 No later than five (5) days after discovery, Debtor shall submit to Secured Party a written notice of all actions, suits or proceedings filed or threatened against or affecting Debtor in any court or before any governmental commission, board, or authority which, if adversely determined (i) may result in a judgment, adverse determination, or other detriment against Debtor in excess of Two Hundred Fifty Thousand Dollars ($250,000).

23.4 Immediately after discovery, Debtor shall submit to Secured Party a written notice of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of its payment.

23.5 Promptly but in any event no later than five (5) days after receipt of notice of a material violation by any governmental authority.

23.6 Promptly but in any event no later than forty-eight (48) hours after receipt of a failed inspection, deficiency report or other citation from the Arizona Department of Health and Safety or any other governmental authority.

24. Books and Records; Inspections.

24.1 Books and Records; Inspection. Parent and Debtor shall keep complete and accurate books and records with respect to the Collateral and Debtor's business and financial condition and any other matters that the Secured Party may request, in accordance with GAAP. Upon reasonable notice of no less than forty-eight (48) hours, and subject to the Secured Party having entered into a Confidentiality Agreement, Parent and Debtor shall at any reasonable time and from time to time permit the Secured Party or any representative of the Secured Party to audit, examine and make copies of any of Parent or Debtor's books and records, and visit and inspect the Collateral and other assets of Debtor, and to discuss the business, affairs, finances, insurance, accounts and Collateral of Parent and Debtor with any of Parent or Debtor's shareholders, officers, directors employees and other agents and with Debtor's independent accountants. The parties agree that upon (i) the occurrence and continuation of an Event of Default or (ii) the failure by the Debtor to abide by its reporting obligations in Section 22, but, in each case, subject to the parties having entered into a Confidentiality Agreement, Secured Party, or any representative of the Secured Party, shall not be required to provide prior notice to take the actions set forth in this Section 23.1.

24.2 Authorization to Debtor's Agents to Make Disclosures to the Secured Party. Each of the Parent and the Debtor authorizes all accountants and other Persons acting as its agent to disclose and deliver to the Secured Party's employees, accountants, attorneys and other Persons acting as its agent, at the Parent and Debtor's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Debtor and the Collateral.

24.3 Collateral Exams and Inspections. Each of the Parent and the Debtor shall permit the Secured Party or its designee(s), from time to time in the Secured Party's sole discretion and expense, to conduct an audit and examination of the Collateral or any other property of the Debtor.

25. CHOICE OF LAW; SUBMISSION TO JURISDICTION. THIS AGREEMENT HAS BEEN DELIVERED IN ARIZONA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA. THE COURTS OF ARIZONA, FEDERAL OR STATE, SHALL HAVE EXCLUSIVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS AGREEMENT. BY EXECUTING THIS AGREEMENT, THE UNDERSIGNED SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF ARIZONA.

26. Miscellaneous. The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Debtor and its respective successors and assigns, and shall inure to the benefit of the Secured Party and its successors and assigns.

27. Severability. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Debtor acknowledges receipt of a copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, intending to be legally bound, the parties caused this Agreement to be duly executed as of the date first above written.

DEBTOR

True Harvest Holdings, Inc.. a Delaware corporation

By: _____
Name: _____
Title: _____

SECURED PARTY

True Harvest, LLC, an Arizona limited liability company

By: _____
Name: Michael Macchiaroli
Title:  Manager

---

### EXHIBIT A

#### Collateral Description

The "Collateral" consists of all of the following described property, whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all cash and non-cash proceeds (including insurance proceeds and any title and Uniform Commercial Code insurance proceeds) and products thereof, and, in the case of tangible property, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith, excluding, however, any and all "consumer goods," as defined in the Uniform Commercial Code of Arizona: All of Debtor's right, title, and interest in:

(a) all types of property included within the term "equipment" as defined by the Uniform Commercial Code of Arizona (except titled motor vehicles), including machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment;

(b) all inventory, including all goods held for sale, raw materials, work in process and materials or supplies used or consumed in Debtor's business;

(c) all farm products;

(d) all documents; general intangibles (including payment intangibles); accounts; contract rights; chattel paper and instruments (including promissory notes); money; securities; investment properties; deposit accounts; supporting obligations; letters of credit and letter of credit rights; commercial tort claims; and records, software and information contained in computer media (such as databases, source and object codes and information therein), together with any equipment and software to create, utilize, maintain or process any such records or data on electronic media;

(e) any and all plans and specifications, designs, drawings and other matters prepared for any construction on any real property owned by or leased to Debtor or regarding any improvements and any and all construction contracts, design agreements, engineering agreements and other agreements related to the construction of any such improvements;

(f) trade names, trademarks, servicemarks, logos and goodwill; and

(g) to the extent constituting collateral with respect to which a security interest may be created pursuant to Article 9 of the UCC, amounts paid as rents, fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties.

<u>SCHEDULE 1</u>

<u>Debtor Information</u>

The exact legal name of the Debtor as that name appears on its certificate of formation: True Harvest Holdings, Inc.

The following is the location of the chief executive and a mailing address for the Debtor: _____

The following is the type of organization of the Debtor: Corporation

The following is the jurisdiction of the Debtor's organization: Delaware

---

**<u>EXHIBIT C</u>**

(Bill of Sale)

---

**<u>BILL OF SALE</u>**

THIS BILL OF SALE is made and entered into as of ____, 2021 by True Harvest, LLC, an Arizona limited liability company ("**Seller**"), in favor of True Harvest Holdings, Inc., a Delaware corporation ("**Buyer**").

In consideration of a total purchase price of $50,000,000, the receipt and sufficiency of which hereby are acknowledged, Seller sells, assigns, transfers, conveys and delivers to Buyer, all of Seller's right, title, and interest in and to the assets set forth in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "**Assets**").

Seller shall deliver any and all other instruments or documents required to be delivered pursuant to, or necessary or proper in order to give effect to, the provisions of this Bill of Sale, including, without limitation, all instruments of transfer as may be necessary or desirable to transfer title to all of the Seller's rights in and to the Assets and to consummate the transactions contemplated by this Bill of Sale; provided such delivery shall be at no additional cost or expense to Seller. When reasonably requested by Buyer, Seller agrees to cooperate with Buyer in connection with any disputes or litigation involving ownership or use of the Assets that may arise after the date hereof.

This Bill of Sale shall also constitute an assignment of Seller's entire right, title, and interest in any Assets for which an assignment is necessary or appropriate to transfer such right, title, and interest.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Arizona without giving effect to any conflicts of law provisions.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale as of the date first written above.

SELLER:
TRUE HARVEST, LLC

By: _____
Name:

Title:

_____

**EXHIBIT A**

**ASSETS**

_____

**EXHIBIT D**

(Assignment and Assumption)

_____

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "**Assignment and Assumption Agreement**") is entered into as of [_____], 2021, by and between True Harvest Holdings, Inc. Greenrose Acquisition, a Delaware corporation ("**Buyer**"), and True Harvest, LLC, an Arizona LLC ("**Seller**"). Capitalized terms used herein but not otherwise defined have the respective meanings given to such terms in that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of March 12, 2021, by and between Buyer and Seller.

### RECITALS

WHEREAS, Buyer and Seller entered into the Purchase Agreement;

WHEREAS, Pursuant to the terms and subject to the conditions of the Purchase Agreement, Buyer has agreed to purchase, and Seller has agreed to sell, the Purchased Assets, other than the Excluded Assets, and assume the Assumed Liabilities;

WHEREAS, Buyer and Seller now desire to carry out the intent and purpose of the Purchase Agreement by, among other things, the execution and delivery of this Assignment and Assumption Agreement;

NOW, THEREFORE, in consideration of the mutual promises contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENT

1. Pursuant to the Purchase Agreement and in accordance with the terms thereof, as of the date hereof, Buyer hereby assumes and becomes responsible for, and hereafter shall pay, perform and discharge as and when due, the Assumed Liabilities. Buyer is not assuming any other liability or obligation of Seller (including the Excluded Liabilities), all of which shall be retained by Seller and remain the sole responsibility of Seller.

2. Each party hereto shall, at the reasonable request of the other, execute and deliver, or cause to be executed and delivered, such additional instruments and take such further actions as may be reasonably necessary to carry out the transactions contemplated by this Assignment and Assumption Agreement.

3. This Assignment and Assumption Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

4. This Assignment and Assumption Agreement is being executed solely to give effect to the transactions contemplated by the Purchase Agreement. Nothing in this Assignment and Assumption Agreement, express or implied, is intended to, or shall be construed to, modify, expand or limit in any way the terms of the Purchase Agreement. To the extent that any provision of this Assignment and Assumption Agreement conflicts or is inconsistent with the terms of the Purchase Agreement, the Purchase Agreement shall govern.

5. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment and Assumption Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment and Assumption Agreement.

6. If any term or provision of this Assignment and Assumption Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Assignment and Assumption Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

7. This Assignment and Assumption Agreement may not be amended, modified, supplemented or waived, except in writing signed by both Buyer and Seller.

8. This Assignment and Assumption Agreement shall be governed by and construed in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction).

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF**, Buyer has caused its duly authorized representative to execute this Assignment and Assumption Agreement effective as of the day and year first above written.

TRUE HARVEST HOLDINGS, INC.

By: _____
Name:
Title:

TRUE HARVEST, LLC

By: _____
Name:
Title:

**EXHIBIT E**

(Intellectual Property Assignments)

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT is made and entered into effective as of ___, 2021 (the "Effective Date").

WHEREAS, True Harvest, LLC an Arizona limited liability company, having an address 4301 West Buckeye Rd, Phoenix, AZ 85043 ("Assignor"), is the owner of all right, title, and interest in and to the following registered trademarks:

| Mark | Registration No. | Registration Date |
|------|------------------|-------------------|
|      |                  |                   |

"the True Harvest Marks"; and

WHEREAS, TRUE HARVEST HOLDINGS, INC., a Delaware corporation, having an address at 111 Broadway, Amityville, New York 11701 ("Assignee"), is desirous of acquiring the True Harvest Marks and all the goodwill associated therewith;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee, all of Assignor's right, title and interest in and to the True Harvest Marks, together with the goodwill of the business symbolized thereby and/or associated therewith.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has caused this Trademark Assignment to be executed by its duly authorized officer as of the Effective Date first written above.

TRUE HARVEST, LLC

By: _____
Name: _____
Title:

## EXHIBIT F

(Non-Competition Agreement)

OMITTED

## EXHIBIT G

(Lease Assignment and Assumption Agreement)

**LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT**

This LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Lease Assignment and Assumption Agreement") is made by and between True Harvest, LLC, an Arizona limited liability company ("Assignor"), and True Harvest Holdings, Inc., a Delaware limited liability company ("Assignee"). The effective date of this Lease Assignment and Assumption Agreement is _____, 2021 (the "Effective Date"). The assignment and assumption of the Industrial Lease dated July 25, 2017 (the "Lease") by and between MSCP, L.L.C., an Arizona limited liability company, as landlord ("Landlord"), and Assignor, as tenant, for certain premises known as 4301 W. Buckeye Road, Phoenix, Arizona 85043 (also known as Building A with a designated address of 4315 W. Buckeye Road), as more specifically described in the Lease, as contemplated by this Lease Assignment and Assumption Agreement shall occur on the Effective Date. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Lease.

WHEREAS, (i) Assignor has agreed to assign, transfer, convey and deliver to Assignee all of Assignor's right, title and interest in and to the Lease, and Assignee has agreed to acquire, accept and take assignment and delivery of such Lease; and (ii) Assignor desires that Assignee assume, and Assignee has agreed to assume from Assignor, the Lease effective as of the Effective Date, and in each case to the extent that the Lease is transferrable.

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants herein, and intending to be legally bound hereby the parties hereto agree as follows:

1. Assignment of Assets. For value received, the sufficiency of which is hereby acknowledged, Assignor hereby assigns, transfers, conveys and delivers to Assignee, and Assignee hereby acquires, accepts and takes assignment and delivery from Assignor of all of Assignor's rights, title and interest in and to the Lease.

2. Assumption of Assumed Liabilities. Assignee hereby agrees to assume and perform all of the obligations, liabilities, covenants, duties and agreements of Assignor arising under the Lease from and after the Effective Date.

3. Representations of Assignor. Assignor represents that:

(a) Assignor has not received notice from Landlord that Assignor is in breach or default under the Lease;

(b) To Assignor's knowledge, neither Assignor nor Landlord is in breach of the Lease;

(c) Assignor has paid all amounts due under the Lease through the Effective Date; and

(d) To Assignor's knowledge, the consent of Landlord is not required for the assignment of the Lease by Assignor to Assignee.

4. Further Actions. Each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action and do, or cause to be done, all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Lease Assignment and Assumption Agreement and to consummate and make effective the transactions contemplated hereby.

5. Successors and Assigns. This Lease Assignment and Assumption Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns.

6. Amendments. No amendment or modification to any terms of this Lease Assignment and Assumption Agreement, waiver of the obligations or liabilities of Assignor or Assignee hereunder, or termination of this Lease Assignment and Assumption Agreement, shall be valid unless in writing and signed by Assignor and Assignee.

7. Governing Law. This Lease Assignment and Assumption Agreement shall be governed by, and construed in accordance with, the laws of the Arizona applicable to Contracts executed in and to be performed in that state (without giving effect to its conflict of laws principles).

8. Counterparts. This Lease Assignment and Assumption Agreement may be executed and delivered (including by email or facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

*[Remainder of the page intentionally left blank]*

---

IN WITNESS WHEREOF, the parties hereto have caused this Lease Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**ASSIGNOR:**

True Harvest, LLC,
an Arizona limited liability company

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

True Harvest Holdings, Inc.,
a Delaware corporation

By: _____
Name: _____
Title: _____

---

**EXHIBIT H**

(Earnout Note)

---

SECURED PROMISSORY NOTE

[$35,000,000] _____, 202__

1. <u>FUNDAMENTAL PROVISIONS</u>.

The following terms will be used as defined terms in this Secured Promissory Note (as it may be amended, modified, extended and renewed from time to time, the "<u>Note</u>") and certain of the other Loan Documents (as hereinafter defined):

"<u>Borrower</u>" shall mean True Harvest Holdings, Inc., a Delaware corporation.

"<u>Default Interest Rate</u>" shall mean 10.00% per annum above the Interest Rate.

"<u>Guaranteed Obligations</u>" shall mean as defined in the Purchase Agreement.

"<u>Guaranty</u>" shall mean Parent's guaranty of the Guaranteed Obligations pursuant to Section 1.08 of the Purchase Agreement.

"Indebtedness" shall mean, with respect to any Person, without duplication, (a) any obligation of such Person for borrowed money, including, without limitation, (i) any obligation of such Person evidenced by bonds, debentures, notes or other similar debt instruments and (ii) any obligation for borrowed money which is non-recourse to the credit of such Person but which is secured by a Lien on any asset of such Person, (b) any obligation of such Person on account of deposits or advances, (c) any obligation of such Person for the deferred purchase price of any property or services, except trade accounts payable, (d) any obligation of such Person as lessee under a capitalized lease, (e) any indebtedness of another Person secured by a Lien on any asset of such first Person, whether or not such Indebtedness is assumed by such first Person, (f) all guaranties of such Person, and (g) all other items that are liabilities on a balance sheet of such Person prepared in accordance with GAAP. For all purposes of this Agreement, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer.

"Interest Rate" shall mean a fixed rate of interest at all times equal to 8.00% per annum.

"Lender" shall mean True Harvest, LLC, an Arizona limited liability company.

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"Loan" shall mean the Earnout Payment evidenced by this Note.

"Loan Amount" shall mean [$35,000,000].

"Loan Documents" shall mean, collectively, this Note, the Security Agreement, any and all UCC financing statements perfecting Lender's security interests in any collateral for the Loan, and any other documents evidencing the Loan or securing the repayment of the Note.

---

"Maturity Date" shall mean the date that is twenty-four (24) months after issuance of this Note.

"Parent" shall mean Greenrose Acquisition Corp., a Delaware corporation.

"Purchase Agreement" shall mean that certain Asset Purchase Agreement dated March 12, 2021, by and between Lender, as seller, Parent, and Borrower, as buyer.

"Secured Obligations" shall mean, collectively, all of the liabilities and obligations of Borrower and Parent under the Purchase Agreement and the Loan Documents, including, without limitation, all of the obligations of Borrower to pay the Earnout Payment (as defined in the Purchase Agreement) and all of the Guaranteed Obligations.

"Security Agreement" shall mean that certain Security Agreement dated _____, 2021, by Borrower and Parent for the benefit of Lender.

2. PROMISE TO PAY. For value received, Borrower promises to pay, in accordance with Paragraph 3(b) below, to the order of Lender at such place as the holder hereof may from time to time designate in writing, the Loan Amount, together with accrued interest from the date of disbursement on the unpaid principal balance at the Interest Rate. Lender and Borrower that this Note is the "Secured Note" under the Purchase Agreement.

3. INTEREST; PAYMENTS.

(a) Absent an Event of Default hereunder or under any of the Loan Documents, the Loan Amount shall bear interest at the Interest Rate in effect from time to time.

(b) Commencing on the one (1) month anniversary of the issuance of this Note and continuing on the corresponding day of each month thereafter through the Maturity Date, Borrower shall make consecutive monthly payments of principal and accrued, unpaid interest based upon a twenty-four (24) month amortization schedule.

4. PREPAYMENT. Borrower may prepay the Loan, in whole or in part, at any time without penalty or premium. If Borrower prepays the Loan in full, Borrower shall simultaneously with such prepayment pay all accrued unpaid interest on the principal amount prepaid.

5. <u>LAWFUL MONEY</u>. Principal and interest are payable in lawful money of the United States of America.

6. <u>APPLICATION OF PAYMENTS/DEFAULT INTEREST</u>.

(a) Absent the occurrence of an Event of Default hereunder or under any of the other Loan Documents, any payments received by the holder hereof pursuant to the terms hereof shall be applied first to the payment of all interest accrued to the date of such payment, next to principal, and the balance, if any, to the payment of sums, other than principal and interest, due Lender pursuant to the Loan Documents. Any payments received by the holder hereof after the occurrence of an Event of Default hereunder or under any of the Loan Documents, shall be applied to the amounts specified in this <u>Paragraph 6(a)</u> in such order as the holder hereof may, in its reasonable discretion, elect.

(b) If any payment of interest and/or principal is not received by the holder hereof when such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to <u>Paragraph 9</u> hereof and the other Loan Documents, the amount due and unpaid (including, without limitation, the late charge, if any) shall bear interest at the Default Interest Rate, computed from the date on which the amount was due and payable until paid, regardless of any notice and cure periods.

7. <u>SECURITY</u>. This Note is secured by the Security Agreement, which creates a lien on the property described therein.

8. <u>EVENT OF DEFAULT</u>. The occurrence of any one or more of the following shall constitute an "<u>Event of Default</u>" under this Note and the other Loan Documents:

(a) Failure by Borrower or Parent to pay any monetary amount when due under any Loan Document.

(b) Failure by Borrower or Parent to pay any monetary amount (i) within ten (10) days of when due and payable, if such amount is due with respect to an employee contract or other arrangement for the payment of employees of Borrower or Parent, (ii) within ten (10) days of when due and payable, if such amount is due with respect to a regular monthly, quarterly or annual payment of rent, and (iii) within thirty (30) days of when due and payable, with respect utility payments.

(c) Failure by Borrower or Parent to comply with any term or condition applicable to Borrower or Parent under any Loan Document and the expiration of thirty (30) days after written notice of such failure by Lender to Borrower.

(d) Any representation or warranty by Borrower or Parent in any Loan Document is materially false, incorrect, or misleading as of the date made.

(e) Any final, non-appealable adverse decision, report or material penalty resulting from an inspection of Borrower's operations or facility by any governmental authority.

(f) Borrower or Parent (i) is unable or admits in writing its inability to pay its respective monetary obligations as they become due, (ii) makes a general assignment for the benefit of creditors, or (iii) applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, or other custodian for itself or its property or any part thereof, or in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is appointed for it or its property or any part thereof, and such appointment is not discharged within sixty (60) days.

(g) Commencement of any case under the Bankruptcy Code, Title 11 of the United States Code, or commencement of any other bankruptcy arrangement, reorganization, receivership, custodianship, or similar proceeding under any federal, state, or foreign law by or against Borrower or Parent and with respect to any such case or proceeding that is involuntary, such case or proceeding is not dismissed with prejudice within sixty (60) days of the filing thereof.

(h) Commencement of any action or proceeding which seeks as one of its remedies the dissolution of Borrower or Parent.

(i) One or more final, non-appealable judgments from a court or before any governmental commission, board or authority which

result in adverse determination against the Borrower in excess of Two Million ($2,000,000) in the aggregate.

(j) The failure to timely pay rent, utilities or employee wages.

(k) All or any material part of the property of Borrower or Parent is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within thirty (30) days of the date thereof.

(l) The occurrence of any default under any other Loan Document, including, without limitation, any default in any agreement, obligation or instrument between Borrower or Parent and any affiliate of Lender, which continues beyond any applicable notice and cure period.

9. <u>REMEDIES</u>. Upon the occurrence of an Event of Default, then at the option of Lender, the entire balance of principal together with all accrued interest thereon, and all other amounts payable by Borrower under the Loan Documents shall, without demand or notice, immediately become due and payable. Upon the occurrence of an Event of Default (and so long as such Event of Default shall continue), all amounts due and payable by Borrower under the Loan Documents shall bear interest at the Default Interest Rate, subject to the limitations contained in <u>Paragraph 14</u> hereof. No delay or omission on the part of the holder hereof in exercising any right under this Note or under any of the other Loan Documents hereof shall operate as a waiver of such right.

10. <u>WAIVER</u>. Borrower, endorsers, guarantors, and sureties of this Note hereby waive diligence, demand for payment, presentment for payment, protest, notice of nonpayment, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and notice of nonpayment, and all other notices or demands of any kind (except notices specifically provided for in the Loan Documents) and expressly agree that, without in any way affecting the liability of Borrower, endorsers, guarantors, or sureties, the holder hereof may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify the Loan Documents, accept additional security, release any Person liable, and release any security or guaranty. Borrower, endorsers, guarantors, and sureties waive, to the full extent permitted by law, the right to plead any and all statutes of limitations as a defense.

11. <u>CHANGE, DISCHARGE, TERMINATION, OR WAIVER</u>. No provision of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought. No failure on the part of the holder hereof to exercise and no delay by the holder hereof in exercising any right or remedy under this Note or under the law shall operate as a waiver thereof.

12. <u>ATTORNEYS' FEES</u>. If this Note is not paid when due or if any Event of Default occurs, Borrower promises to pay all reasonable and documented costs of enforcement and collection and preparation therefor, including but not limited to, reasonable attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)).

---

13. <u>SEVERABILITY</u>. If any provision of this Note is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.

14. <u>INTEREST RATE LIMITATION</u>. Borrower hereby agrees to pay an effective rate of interest that is the sum of the interest rate provided for herein, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan, including, any other fees to be paid by Borrower pursuant to the provisions of the Loan Documents. Lender and Borrower agree that none of the terms and provisions contained herein or in any of the Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the State of Arizona. In such event, if any holder of this Note shall collect monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of the maximum rate permitted to be charged by the laws of the State of Arizona, all such sums deemed to constitute interest in excess of such maximum rate shall, at the option of the holder, be credited to the payment of other amounts payable under the Loan Documents or returned to Borrower.

15. <u>NUMBER AND GENDER</u>. In this Note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa.

16. <u>HEADINGS</u>. Headings at the beginning of each numbered section of this Note are intended solely for convenience and are not part of this Note.

17. <u>INTEGRATION</u>. The Loan Documents contain the complete understanding and agreement of the holder hereof and Borrower and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

18. <u>BINDING EFFECT</u>. The Loan Documents will be binding upon, and inure to the benefit of, the holder hereof, Borrower, and their respective successors and assigns. Borrower may not delegate its obligations under the Loan Documents.

19. <u>SURVIVAL</u>. The representations, warranties, and covenants of the Borrower in the Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loan.

20. <u>GOVERNING LAW; JURISDICTION</u>.

(a) THIS NOTE HAS BEEN DELIVERED IN ARIZONA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES.

(b) Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender or any affiliate of the Lender in any way relating to this Note or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Arizona sitting in Maricopa County, and of the United States District Court of the District of Arizona , and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such Arizona State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note or in any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Note or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

21. <u>JURY WAIVER</u>. BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

22. <u>TIME OF THE ESSENCE</u>. Time is of the essence with regard to each provision of the Loan Documents as to which time is a factor.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first written above.

True Harvest Holdings, Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

# Exhibit 2

## AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1 (this "Amendment") to the ASSET PURCHASE AGREEMENT (the "Purchase Agreement"), made as of March 12, 2021, by and among True Harvest, LLC, an Arizona limited liability company ("Seller"), Greenrose Acquisition Corp, a Delaware corporation ("Parent"), and True Harvest Holdings, Inc., a Delaware corporation ("Buyer"), is entered into on July 2, 2021.  Terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

### WITNESSETH:

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to purchase from Seller, and Seller has agreed to sell to Buyer, on the terms and subject to the conditions set forth in the Purchase Agreement, the Purchased Assets, and Buyer has agreed to assume from Seller the Assumed Liabilities; and

WHEREAS, the Parties now desire to amend certain provisions of the Purchase Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchase Agreement is hereby amended as follows:

1. The table in Section 1.05(c) of the Purchase Agreement is hereby deleted and replaced in its entirety with the following table:

| 36 Month Price Point | |
|---|---|
| **Percentage of Earnout** | **Flower Production - average price** |
| 0% | <$2,199 |
| 20% | $2,200-$2,199 |
| 50% | $2,200-$2,499 |
| 80% | $2,500-$2,799 |
| 100% | $2,800+ |

2. A new Section 1.05.1 Hurdle Amount is hereby added to the Purchase Agreement, and shall read as follows:

(a)     Subject to the terms of this Section 1.05.1, and notwithstanding anything in this Agreement to the contrary, the Purchase Price will be adjusted based on the achievement of certain revenue targets set forth in Section 1.05.1(b) below (the "**Purchase Price Adjustments**), by the addition of (i) up to a maximum of Four Million Seven Hundred Thousand Dollars ($4,700,000) added to the principal amount of the Secured Note described in Section 1.04(b); and (ii) up to a maximum of One Million Four Hundred Thousand Dollars ($1,400,000) in additional debt assumed by Buyer pursuant to Section 1.04(c) (collectively, the "**Maximum Purchase Price Adjustments**"). The Purchase Price Adjustments will take place as follows:

(i)     If year-to-date revenue ("**YTD Revenue**") of the Business as of the Closing meets or surpasses the applicable Hurdle Amount for the relevant month, as further described below, the Maximum Purchase Price Adjustments shall be made. If YTD Revenue does not meet the applicable Hurdle Amount, then the Purchase Price Adjustments shall be reduced pursuant to Section 1.05.1(a)(iii) below. Calculations of YTD Revenue shall be made at the time of Closing for the most recent full calendar month prior to the Closing. By way of example only, if the Closing takes place on any day in the month of September, YTD Revenue will be calculated based on revenue achieved as of August 31. For the purposes of this Section 1.05.1, "revenue" shall include all completed sales as of the end of any calendar month that are shown as receivables on the financial statements of the Business with standard commercial terms, regardless of whether the Business has actually collected such revenue.

(ii)    If the Business has any products that place in the top three (3) slots of the 2021 High Times Cannabis Cup Arizona competition, scheduled to be announced on August 15, 2021, then the 75% Hurdle Amount, as defined below, shall apply to the calculation of the Purchase Price Adjustments. In all other events, the 80% Hurdle Amount, as defined below, shall apply to the calculation of the Purchase Price Adjustments, including if the Closing occurs prior to the announcement of the 2021 High Times Cannabis Cup Arizona competition results.

(iii)   If YTD Revenue does not meet the applicable Hurdle Amount, the Purchase Price Adjustments shall be reduced from the Maximum Purchase Price Adjustments by the percentage shortfall of the YTD Revenue from the applicable Hurdle Amount for the applicable period. By way of example only, if Closing occurs in September and the 75% Hurdle Amount applies, and YTD Revenue is $8,826,712.00 (or 80% of the applicable hurdle amount), then the Maximum Purchase Price Adjustments shall be reduced by the 20% shortfall, so that (i) Three Million Seven Hundred Sixty Thousand

Dollars ($3,760,000) would be added to the principal amount of the Secured Note; and (ii) Buyer would assume One Million One Hundred Twenty Thousand Dollars ($1,120,000) in additional debt.

(b)     The YTD Revenue, 80% Hurdle and 75% Hurdle will be determined in accordance with the following table:

| Month End | YTD Revenue | 80% Hurdle | 75% Hurdle |
|-----------|-------------|------------|------------|
| July | $12,293,258 | $9,834,606 | $9,219,944 |
| August | $14,711,187 | $11,768,949 | $11,033,390 |
| September | $17,643,503 | $14,114,802 | $13,232,627 |
| October | $21,090,206 | $16,872,165 | $15,817,655 |
| November | $24,698,916 | $19,759,133 | $18,524,187 |

3.  A new Section 6.02(i) is hereby added to the Purchase Agreement, and shall read as follows:

(i)     Seller and Buyer confirm that the Purchase Price Adjustments set forth in Section 2 of this Amendment are expressly conditioned upon fulfillment or waiver of this Section 6.02(i).  All eight (8) rooms slated for grow at the Business (collectively, "**Grow Rooms**") shall have been substantially constructed by Seller and shall be in a condition ready to accept plants for grow prior to Closing, without regard to whether such Grow Rooms actually contain plants at the Closing. Buyer shall inspect (or cause Buyer's designated representative to inspect) the Grow Rooms at a time mutually agreed with Seller during the first two weeks of August 2021 (the "**Inspection Period**") and, during or within two (2) business days of such inspection, shall notify Seller of any deficiencies with the Grow Rooms, which Seller shall then have the opportunity to cure prior to the Closing with mutually satisfactory changes. If Buyer (a) notes any deficiencies and Seller timely cures such deficiencies, or (b) does not note any deficiencies with the Grow Rooms during the Inspection Period, or (c) does not inspect the Grow Rooms during the Inspection Period, then, upon presentation to Buyer by Seller of a duly executed Certificate of Compliance on or prior to the Closing, the Grow Rooms shall be deemed to be complete and this Section 6.02(i) shall be deemed to be satisfied in full, provided, however, if the Closing occurs prior to August 31, 2021, then this condition shall be deemed satisfied in full, even if the Grow Rooms are not substantially constructed, without the requirement of delivery of a Certificate of Compliance by Seller.

4.  The "Drop Dead Date" set forth in Section 8.01(b)(i) of the Purchase Agreement is hereby amended to be "November 30, 2021".

5.  The Parties agree to cooperate in good faith and to take such further actions as may be reasonably required to give full force and effect to their mutual intent in connection with

entering into this Amendment and consummating the transactions contemplated hereby and by the Purchase Agreement (including, without limitation, by preparing and executing revised or additional Transaction Documents and/or updating applicable disclosure schedules).

6.   Except as amended hereby, the terms and provisions of the Purchase Agreement shall remain in full force and effect, and the Purchase Agreement is in all respects confirmed. On and after the date of this Amendment, each reference in the Purchase Agreement to the "Agreement", "hereinafter", "herein", "hereunder", "hereof", or words of similar import shall mean and be a reference to the Purchase Agreement as amended by this Amendment.

7.   This Amendment may be executed in one or more counterparts (including by means of facsimile signature pages or other electronic means), all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

SIGNATURE PAGE TO AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized representative effective as of the date first set forth above.

**SELLER**:

**TRUE HARVEST, LLC**

By: _____
Name:  Michael Macchiaroli
Title:   Manager

**PARENT:**

**GREENROSE ACQUISITION CORP**

By: _____
Name:  William F. Harley III
Title:   Chief Executive Officer

**BUYER:**

**TRUE HARVEST HOLDINGS, INC.**

By: _____
Name:  William F. Harley III
Title:   Chief Executive Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

<u>SIGNATURE PAGE TO AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT</u>

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized representative effective as of the date first set forth above.

**<u>SELLER</u>**:

**TRUE HARVEST, LLC**

By:  _____
Name:  Michael Macchiaroli
Title:   Manager

**<u>PARENT:</u>**

**GREENROSE ACQUISITION CORP**

By:  _____
Name:  William F. Harley III
Title:   Chief Executive Officer

**<u>BUYER:</u>**

**TRUE HARVEST HOLDINGS, INC.**

By:  _____
Name:  William F. Harley III
Title:   Chief Executive Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

# Exhibit 3

## AMENDMENT NO. 2 TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 2 (this "Amendment") to the ASSET PURCHASE AGREEMENT (the "Purchase Agreement"), made as of March 12, 2021, by and among True Harvest, LLC, an Arizona limited liability company ("Seller"), Greenrose Acquisition Corp, a Delaware corporation ("Parent"), and True Harvest Holdings, Inc., a Delaware corporation ("Buyer"), is entered into on October 28, 2021 (the "Effective Date"). Each of Seller, Parent and Buyer is referred to herein as a "Party" and collectively as the "Parties." Terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

### WITNESSETH:

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to purchase from Seller, and Seller has agreed to sell to Buyer, on the terms and subject to the conditions set forth in the Purchase Agreement, the Purchased Assets, and Buyer has agreed to assume from Seller the Assumed Liabilities; and

WHEREAS, the Parties now desire to amend certain provisions of the Purchase Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchase Agreement is hereby amended as follows:

1. Notwithstanding anything in Section 1.05.1 of the Purchase Agreement to the contrary, the Parties hereby agree that the Purchase Price Adjustment for the year 2021 shall be calculated using the cumulative year-to-date revenue of the Business as of September 30, 2021.

2. Each of (a) the Seller, and (b) Parent and the Buyer, acknowledge and agree that the actual year--to-date revenue of the Business as of September 30, 2021 was below the 75% Hurdle.

3. Prior to the Closing, except as otherwise provided in this Amendment or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall operate the Business in good faith in the ordinary course of business, using reasonable efforts to maintain and preserve intact the current Business and operations and to preserve the rights, goodwill and relationships of its employees, customers, lenders, vendors, and others having relationships with the Business

4. The Seller acknowledges that, as of the Effective Date, the amounts on deposit in the Trust Account, after taking into account the potential redemptions disclosed in Parent's public filings with the United States Securities and Exchange Commission as of the Effective Date, may be insufficient to satisfy the condition precedent set forth in Section 6.02(g) of the Agreement.

5. The Parties agree to cooperate in good faith and to take such further actions as may be reasonably required to give full force and effect to their mutual intent in connection with entering into this Amendment and consummating the transactions contemplated hereby and by the Purchase Agreement (including, without limitation, by preparing and executing revised or additional Transaction Documents and/or updating applicable disclosure schedules).

6. Except as amended hereby, the terms and provisions of the Purchase Agreement shall remain in full force and effect, and the Purchase Agreement is in all respects confirmed. On and after the date of this Amendment, each reference in the Purchase Agreement to the "Agreement", "hereinafter", "herein", "hereunder", "hereof", or words of similar import shall mean and be a reference to the Purchase Agreement as amended by this Amendment.

7. This Amendment may be executed in one or more counterparts (including by means of facsimile signature pages or other electronic means), all of which shall be considered one and the same agreement, and shall

<u>SIGNATURE PAGE TO AMENDMENT NO. 2 TO ASSET PURCHASE AGREEMENT</u>

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized representative effective as of the date first set forth above.

**SELLER:**

**TRUE HARVEST, LLC**

By:

Name: Michael Macchiaroli
Title:  Manager

**PARENT:**

**GREENROSE ACQUISITION CORP**

By:

Name: William F. Harley III
Title:  Chief Executive Officer

**BUYER:**

**TRUE HARVEST HOLDINGS, INC.**

By:

Name: William F. Harley III
Title:  Chief Executive Officer

[Signature Page to Amendment No. 2 to Asset Purchase Agreement]

# Exhibit 4

## AMENDMENT NO. 3 TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 3 (this "Amendment No. 3") to the ASSET PURCHASE AGREEMENT (the "Purchase Agreement"), made as of March 12, 2021, by and among True Harvest, LLC, an Arizona limited liability company ("Seller"), The Greenrose Holding Company Inc., a Delaware corporation formerly known as Greenrose Acquisition Corp ("Parent"), and True Harvest Holdings, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Buyer"), as amended by that certain Amendment No. 1 to Asset Purchase Agreement dated July 2, 2021, and that certain Amendment No. 2 to Asset Purchase Agreement dated October 28, 2021, is entered into on December [31], 2021.  Terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

## WITNESSETH:

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to purchase from Seller, and Seller has agreed to sell to Buyer, on the terms and subject to the conditions set forth in the Purchase Agreement, the Purchased Assets, and Buyer has agreed to assume from Seller the Assumed Liabilities; and

WHEREAS, the Parties now desire to amend certain provisions of the Purchase Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchase Agreement is hereby amended as follows:

1. Section 1.04 of the Purchase Agreement is hereby amended and restated in its entirety as follows:

   **Section 1.04       The Purchase Price and Earnout**. The purchase price to be paid by the Buyer to Seller for the Purchased Assets shall be Fifty-Seven Million Six Hundred Thousand and 00/100 Dollars ($57,600,000) (the "**Initial Payment Amount**" and together with the Earnout Payment, the "**Purchase Price**") payable in the following manner:

   (a)    Twelve Million Five Hundred Thousand and 00/100 Dollars ($12,500,000) in cash (the "**Initial Cash Amount**"), by wire transfer of immediately available funds in accordance with the wire instructions and other directions set forth on Schedule 1.04(a) of the Disclosure Schedules;

   (b)    Twenty-Three Million and 00/100 Dollars ($23,000,000) evidenced by a convertible promissory note issued by Buyer to Seller in the form attached to the Amendment No. 3 as Exhibit A (the "Convertible Promissory **Note**");

   (c)    Four Million Six Hundred Thousand and 00/100 Dollars ($4,600,000) which represents the amount of the assumed debt set forth on Schedule 1.03, as evidenced by unsecured promissory notes (the "Unsecured Promissory Notes") in the form attached hereto as Exhibit Cwhich shall be assumed by

1

delivering to Seller an Assignment and Assumption Agreement pursuant to Section 2.02(a)(ii); and

(d)  Seventeen Million Five Hundred Thousand and 00/100 Dollars ($17,500,000), which shall be paid by the issuance of  fully paid, and nonassessable shares of Parent Common Stock, unregistered and subject to registration rights as set forth in Section 6.03(f) hereof (the "**Initial Stock Issuance**") and the number of shares of Parent Common Stock to be issued shall be determined based on a purchase price of $3.95 per share of Parent Common Stock, provided, however, that 25% of the shares of Parent Common Stock issued in the Initial Stock Issuance shall be subject to forfeiture pursuant to clause (i) below.

(i)  Notwithstanding anything herein to the contrary, if during the first six months immediately following the Closing Date, the closing price for the Parent Common Stock in the over-the-counter market, or in any principal securities exchange or trading market where such security is listed or traded, as reported by Yahoo Finance, is $12.50 or higher per share of Parent Common Stock for 20 consecutive Trading Days, then 25% of the shares of Parent Common Stock issued in the Initial Stock Issuance shall automatically and without any further action by the parties hereto, be void and forfeit.

"**Trading Day**" means a day on which trading in the Parent Common Stock generally occurs on the principal U.S. national or regional securities exchange on which the Parent Common Stock is then listed or, if the Parent Common Stock is not then listed on a U.S. national or regional securities exchange, on the principal other market on which the Parent Common Stock is then listed or admitted for trading, except that if the Parent Common Stock is not so listed or admitted for trading, "Trading Day" means any day other than Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of Arizona are authorized or required by law or other governmental action to close.

2.  Sections 1.05(a), (g), and (j) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

(a)  Subject to the terms of this Section 1.05, Buyer will pay contingent consideration to Seller (the "**Earnout Payment**") of up to a maximum of Thirty-Five Million and 00/100 Dollars ($35,000,000) (the "**Maximum Earnout Amount**"), which shall be payable by issuance of unrestricted fully paid, and nonassessable shares of Parent Common Stock by Parent, unregistered and subject to registration rights as set forth in Section 6.03(f) hereof, and which payment shall be based on the Business attaining, within thirty-six (36) months after the Closing Date (the "**36 Month Price Point**"), a certain price point per pound as specified and mutually agreed by Buyer

2

and Seller in the Purchase Agreement of cannabis flower ("flower") as compared to total flower production, irrespective of the final form in which such flower is sold.  The number of shares of Parent Common Stock to be issued to Seller (the "**Earnout Stock**") shall be determined based on the average of the Closing Price for the Parent Common Stock over the prior 30 consecutive Trading Days.

(g)    In the event that Seller does not deliver the Earnout Dispute Notice, Buyer shall pay to Seller on the earlier of (i) January 15, 2025 or (ii) the date upon which Seller provides Buyer with written notices of its acceptance of the Earnout Payment Calculation, the Earnout Payment reflected on the Earnout Payment Calculation (if any) by issuance of the Earnout Stock to Seller as otherwise instructed in writing by Seller to Buyer.  If Parent fails to issue the Earnout Stock when due for any reason, the Earnout Payment shall be evidenced by a promissory note substantially in the form of Exhibit B attached to Amendment No. 3, which shall bear interest at an annual rate of 15% per annum, shall be fully amortized, and have a maturity date of twenty-four (24) months after issuance.

"**Amendment No. 3**" means that certain Amendment No. 3 to Asset Purchase Agreement, which amends this Agreement, dated December 31, 2021.

(j)    Reserved.

3.   Section 1.05.1 relating to the Earnout Payment of the Purchase Agreement is hereby deleted in its entirety.

4.   A new Section 2.02(a)(xii) is hereby added to the Purchase Agreement, and shall read as follows:

(xii)    the Registration Rights Agreement duly executed by Seller.

5.   A new Section 2.02(b)(viii) is hereby added to the Purchase Agreement, and shall read as follows:

(viii)    the Registration Rights Agreement duly executed by Parent.

6.   A new Section 6.02(j) is hereby added to the Purchase Agreement, and shall read as follows:

(j)    Buyer shall have received a Cultivation Services Agreement, duly executed by Gary P. Rexroad, Jr. ("**Shango**"), in form mutually agreeable to Buyer and Shango.

7. A new <u>Section 6.03(f)</u> is hereby added to the Purchase Agreement, and shall read as follows:

      (f)    Seller shall have received a Registration Rights Agreement, in form mutually agreeable to Seller and Parent, pursuant to which, among other things, Parent will agree to provide registration rights with respect to the certain securities of Parent under the Securities Act and the rules and regulations promulgated thereunder and applicable state securities laws in an amount sufficient to register the Initial Stock Issuance, the stock issuable under the Secured Note, and the Earnout Stock (the "**Registration Rights Agreement**"), duly executed by the Parent.

8. The first sentence of <u>Section 7.08</u> of the Purchase Agreement is hereby deleted and replaced with the following:

      In the event that Seller becomes obligated to Parent pursuant to an indemnification claim made by Parent against Seller under this Article VII or under any other sections of this Agreement, Parent shall have the right to: (i) first, satisfy such indemnification claim with cash received in respect of Seller's accounts receivables, and (ii) second, to the extent the cash received in respect of Seller's accounts receivable is at any time zero ($0.00), make offset against amounts due Parent under the Secured Note, provided, however, that Seller can avoid any such offset, at Seller's election, by making payment to Parent in cash of the full amount owed to Parent within five (5) days after receiving written notice from Parent that Parent intends to make such offset (the "Offset Notice").

9. Schedule 1.03 Assumption of Liabilities is hereby amended and restated in its entirety in the form attached to this Amendment No. 3. The Disclosure Schedules to the Agreement are updated where Seller believes and represents to be appropriate as reflected in any revised Disclosure Schedules attached hereto.

10. All references in the Purchase Agreement to the Security Agreement are hereby deleted in their entirety.

11. For the avoidance of doubt, (a) all references in the Purchase Agreement to the Secured Note shall mean the Secured Note attached as Exhibit A to this Amendment No. 3, which hereby supersedes and places the form of Secured Promissory Note attached to the Purchase Agreement as Exhibit A, and (b) all references in the Purchase Agreement to the Earnout Agreement shall mean the Earnout Agreement attached as Exhibit B to this Amendment No. 3, which hereby supersedes and places the form of Secured Promissory Note attached to the Purchase Agreement as Exhibit H.

12. The Parties agree to cooperate in good faith and to take such further actions as may be reasonably required to give full force and effect to their mutual intent in connection with entering into this Amendment and consummating the transactions contemplated hereby and by the Purchase Agreement (including, without limitation, by preparing and executing revised or additional Transaction Documents and/or updating applicable disclosure schedules).

13. Except as amended hereby, all terms, conditions and provisions of the Purchase Agreement shall remain in full force and effect, and the Purchase Agreement is in all respects confirmed. On and after the date of this Amendment, each reference in the Purchase Agreement to the "Agreement," "hereinafter," "herein", "hereunder", "hereof", or words of similar import shall mean and be a reference to the Purchase Agreement as amended by this Amendment.

14. This Amendment may be executed in one or more counterparts (including by means of electronic or digital transmission (e.g., .PDF or similar format)), all of which shall be considered one and the same agreement and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

## SIGNATURE PAGE TO AMENDMENT NO. 3 TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized representative effective as of the date first set forth above.

**SELLER**:

**TRUE HARVEST, LLC**

By: _Michael Macchiaroli_
Name: Michael Macchiaroli
Title: Manager

**PARENT:**

**THE GREENROSE HOLDING COMPANY INC.**

By: _Mickey Harley (Dec 31, 2021 10:31 EST)_
Name: William F. Harley III
Title: Chief Executive Officer

**BUYER:**

**TRUE HARVEST HOLDINGS, INC.**

By: _Mickey Harley (Dec 31, 2021 10:31 EST)_
Name: William F. Harley III
Title: Chief Executive Officer

[Signature Page to Amendment No. 3 to Asset Purchase Agreement]

4876-4096-8454.1

EXHIBIT A

Convertible Promissory Note

See attached.

EXHIBIT B

Earnout Agreement

See attached.

EXHIBIT C

Unsecured Promissory Note

See attached.

Schedule 1.03


[Assumed Liabilities <mark>To be inserted</mark>.]




[ANY OTHER UPDATED DISCLSOURE SCHEDULES]

# Exhibit 5

CONVERTIBLE PROMISSORY NOTE

$23,000,000                                                December 31, 2021

1.    <u>FUNDAMENTAL PROVISIONS</u>.

The following terms will be used as defined terms in this Convertible Promissory Note (as it may be amended, modified, extended and renewed from time to time, the "<u>Note</u>") and certain of the other Loan Documents (as hereinafter defined):

"<u>Borrower</u>" shall mean True Harvest Holdings, Inc., a Delaware corporation.

"<u>Common Stock</u>" shall mean (i) shares of Common Stock, par value $0.001 per share of the Parent, and (ii) any share capital into which such Common Stock shall be changed or any share capital resulting from a reclassification of such Common Stock.

"<u>Conversion Amount</u>" means the sum of (w) the portion of the outstanding principal to be converted as determined by Lender, and (x) all accrued and unpaid interest with respect to such portion of the principal amount.

"<u>Conversion Price</u>" means, as of any Conversion Date or other date of determination, $10.00, subject to adjustment as provided herein.

"<u>Conversion Time</u>" means the date on which Lender has elected to convert this Note in accordance with <u>Section 6</u>.

"<u>Default Interest Rate</u>" shall mean 10.00% per annum above the Interest Rate.

"<u>Guaranteed Obligations</u>" shall mean as defined in the Purchase Agreement.

"<u>Guaranty</u>" shall mean Parent's guaranty of the Guaranteed Obligations pursuant to Section 1.08 of the Purchase Agreement.

"<u>Indebtedness</u>" shall mean, with respect to any Person, without duplication, (a) any obligation of such Person for borrowed money, including, without limitation, (i) any obligation of such Person evidenced by bonds, debentures, notes or other similar debt instruments and (ii) any obligation for borrowed money which is non-recourse to the credit of such Person but which is secured by a Lien on any asset of such Person, (b) any obligation of such Person on account of deposits or advances, (c) any obligation of such Person for the deferred purchase price of any property or services, except trade accounts payable, (d) any obligation of such Person as lessee under a capitalized lease, (e) any indebtedness of another Person secured by a Lien on any asset of such first Person, whether or not such Indebtedness is assumed by such first Person, (f) all guaranties of such Person, and (g) all other items that are liabilities on a balance sheet of such Person prepared in accordance with GAAP.  For all purposes of this Agreement, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer.

"<u>Interest Rate</u>" shall mean a fixed rate of interest at all times equal to 8.00% per annum.

"<u>Lender</u>" shall mean True Harvest, LLC, an Arizona limited liability company.

"<u>Lien</u>" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"<u>Loan</u>" shall mean the seller carryback loan from Lender to Borrower in the Loan Amount and evidenced by this Note.

"<u>Loan Amount</u>" shall mean $23,000,000, subject to reduction for Parent's right to offset pursuant to Section 7.08 of the Purchase Agreement.

"<u>Loan Documents</u>" shall mean, collectively, this Note and any other documents evidencing the Loan or securing the repayment of the Note.

"<u>Maturity Date</u>" shall mean the date that is three (3) years from the date of issuance of this Note.

"<u>Parent</u>" shall mean The Greenrose Holding Company Inc., a Delaware corporation.

"<u>Purchase Agreement</u>" shall mean that certain Asset Purchase Agreement dated March 12, 2021, by and between Lender, as seller, Parent, and Borrower, as buyer, as amended to date.

2.      <u>PROMISE TO PAY</u>. For value received, Borrower promises to pay, in accordance with <u>Paragraph 3(b)</u> below, to the order of Lender at such place as the holder hereof may from time to time designate in writing, the Loan Amount, together with accrued interest from the date of disbursement on the unpaid principal balance at the Interest Rate.  Lender and Borrower hereby acknowledge that this Note is the "Secured Note" under the Purchase Agreement.

3.      <u>INTEREST; PAYMENTS</u>.

        (a)     Absent an Event of Default hereunder or under any of the Loan Documents, each advance made hereunder shall bear interest at the Interest Rate in effect from time to time.

        (b)     Commencing on March 31, 2022, and continuing on the corresponding day of each calendar quarter thereafter, Borrower shall make consecutive quarterly payments of all accrued, unpaid interest.  On the Maturity Date, Borrower shall make a final "balloon" payment of all unpaid principal, accrued unpaid interest, and any other amounts due hereunder due and payable.

4.      <u>PREPAYMENT</u>.  Borrower may prepay the Loan, in whole or in part, at any time without penalty or premium. If Borrower prepays the Loan in full, Borrower shall simultaneously with such prepayment pay all accrued unpaid interest on the principal amount prepaid.

5.      <u>LAWFUL MONEY</u>.  Principal and interest are payable in lawful money of the United States of America.

6.    <u>CONVERSION</u>.

(a)    <u>Conversion Right</u>.  At any time after the date hereof and prior to the Maturity Date while this Note remains outstanding, Lender shall have the option to convert all or any portion of the outstanding and unpaid principal and accrued interest on this Note into unrestricted, fully paid and nonassessable shares of Common Stock in accordance with this <u>Section 6</u> calculated as follows.  The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to this <u>Section 6</u> shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "<u>Conversion Rate</u>"). The Parent shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Parent shall round such fraction of a share of Common Stock up to the nearest whole share. The Parent shall pay any and all transfer, stamp and similar taxes, costs and expenses (including, without limitation, fees and expenses of the transfer agent of the Parent) that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount.  In connection with a conversion pursuant to this <u>Section 6</u>, the Lender shall deliver to the Parent or its transfer agent this Note duly endorsed, or a notice that this Note has been lost, stolen, or destroyed and an agreement reasonably satisfactory to the Parent to indemnify the Parent from any loss incurred by it in connection with the loss, theft, or destruction of this Note.  Upon conversion of this Note in accordance with this <u>Section 6</u>, and subject to receipt by Parent of this Note, or the notice and indemnification agreement in lieu thereof, the Parent shall promptly issue and deliver to the Lender a certificate or certificates for the shares of Common Stock to be issued upon conversion of this Note (the "<u>Conversion Shares</u>") to which the Lender shall be entitled, and, if the Lender has not converted the entire available Conversion Amount, shall cause Borrower to deliver a new convertible promissory note in the same form as the Note for the remaining outstanding amount.  The Lender shall be treated for all purposes as the record holder of such Conversion Shares as of the Conversion Time.

(b)    <u>Adjustments</u>.  If at any time prior to conversion of the Note, any of the outstanding shares of the capital stock of the Parent are changed into, or exchanged for, a different number or kind of shares or securities of the Parent through reorganization, merger, recapitalization, reclassification, or otherwise, or if the number of such outstanding shares is changed through a stock split, reverse stock split, stock dividend, stock consolidation, or similar capital adjustment, or if the Parent makes a distribution in partial liquidation or any other comparable extraordinary distribution with respect to any of its shares of capital stock, an appropriate adjustment shall be made in the number, kind, or conversion price of shares into which the Note is convertible.

7.    <u>APPLICATION OF PAYMENTS/DEFAULT INTEREST</u>.

(a)    Absent the occurrence of an Event of Default hereunder or under any of the other Loan Documents, any payments received by the holder hereof pursuant to the terms hereof shall be applied first to the payment of all interest accrued to the date of such payment, next to principal, and the balance, if any, to the payment of sums, other than principal and interest, due Lender pursuant to the Loan Documents. Any payments received by the holder hereof after the occurrence of an Event of Default hereunder or under any of the Loan Documents, shall be applied to the amounts specified in this <u>Paragraph 6(a)</u> in such order as the holder hereof may, in its reasonable discretion, elect.

(b)     If any payment of interest and/or principal is not received by the holder hereof when such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to Paragraph 9 hereof and the other Loan Documents, the amount due and unpaid (including, without limitation, the late charge, if any) shall bear interest at the Default Interest Rate, computed from the date on which the amount was due and payable until paid, regardless of any notice and cure periods.

8.     <u>EVENT OF DEFAULT</u>.  The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note and the other Loan Documents:

(a)     Failure by Borrower or Parent to pay any monetary amount when due under any Loan Document;

(b)     The occurrence of any "Event of Default" as defined in the senior secured credit agreement, as in effect on the date hereof, by and between Parent and DXR Finance, LLC, as agent, and DXR-GL HOLDINGS I, LLC, DXR-GL HOLDINGS II, LLC, and DXR-GL HOLDINGS III, LLC, as lenders thereto;

(c)     Failure by Borrower or Parent to pay any monetary amount (i) within ten (10) days of when due and payable, if such amount is due with respect to an employee contract or other arrangement for the payment of employees of Borrower or Parent, (ii) within ten (10) days of when due and payable, if such amount is due with respect to a regular monthly, quarterly or annual payment of rent, and (iii) within sixty (60) days of when due and payable, with respect utility payments;

(d)     Failure by Borrower or Parent to comply with any term or condition applicable to Borrower or Parent under any Loan Document and the expiration of sixty (60) days after written notice of such failure by Lender to Borrower;

(e)     Any representation or warranty by Borrower or Parent in any Loan Document is materially false, incorrect, or misleading as of the date made; and.

(f)     All or any material part of the property of Borrower or Parent is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within ninety (90) days of the date thereof.

9.     <u>REMEDIES</u>.  Upon the occurrence of an Event of Default, then at the option of Lender, the entire balance of principal together with all accrued interest thereon, and all other amounts payable by Borrower under the Loan Documents shall, without demand or notice, immediately become due and payable. Upon the occurrence of an Event of Default (and so long as such Event of Default shall continue), all amounts due and payable by Borrower under the Loan Documents shall bear interest at the Default Interest Rate, subject to the limitations contained in Paragraph 14 hereof. No delay or omission on the part of the holder hereof in exercising any right under this Note or under any of the other Loan Documents hereof shall operate as a waiver of such right.

10.     <u>WAIVER</u>.  Borrower, endorsers, guarantors, and sureties of this Note hereby waive diligence, demand for payment, presentment for payment, protest, notice of nonpayment, notice

of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and notice of nonpayment, and all other notices or demands of any kind (except notices specifically provided for in the Loan Documents) and expressly agree that, without in any way affecting the liability of Borrower, endorsers, guarantors, or sureties, the holder hereof may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify the Loan Documents, accept additional security, release any Person liable, and release any security or guaranty. Borrower, endorsers, guarantors, and sureties waive, to the full extent permitted by law, the right to plead any and all statutes of limitations as a defense.

11.   <u>CHANGE, DISCHARGE, TERMINATION, OR WAIVER</u>.   No provision of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought. No failure on the part of the holder hereof to exercise and no delay by the holder hereof in exercising any right or remedy under this Note or under the law shall operate as a waiver thereof.

12.   <u>ATTORNEYS' FEES</u>.   If this Note is not paid when due or if any Event of Default occurs, Borrower promises to pay all reasonable and documented costs of enforcement and collection and preparation therefor, including but not limited to, reasonable attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)).

13.   <u>SEVERABILITY</u>.   If any provision of this Note is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.

14.   <u>INTEREST RATE LIMITATION</u>.   Borrower hereby agrees to pay an effective rate of interest that is the sum of the interest rate provided for herein, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan, including, any other fees to be paid by Borrower pursuant to the provisions of the Loan Documents. Lender and Borrower agree that none of the terms and provisions contained herein or in any of the Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the State of Arizona. In such event, if any holder of this Note shall collect monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of the maximum rate permitted to be charged by the laws of the State of Arizona, all such sums deemed to constitute interest in excess of such maximum rate shall, at the option of the holder, be credited to the payment of other amounts payable under the Loan Documents or returned to Borrower.

15.   <u>NUMBER AND GENDER</u>.   In this Note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa.

16.   <u>HEADINGS</u>.   Headings at the beginning of each numbered section of this Note are intended solely for convenience and are not part of this Note.

17.  <u>INTEGRATION</u>.   The Loan Documents contain the complete understanding and agreement of the holder hereof and Borrower and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

18.  <u>BINDING EFFECT</u>.  The Loan Documents will be binding upon, and inure to the benefit of, the holder hereof, Borrower, and their respective successors and assigns. Borrower may not delegate its obligations under the Loan Documents.

19.  <u>SURVIVAL</u>.  The representations, warranties, and covenants of the Borrower in the Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loan.

20.  <u>GOVERNING LAW; JURISDICTION</u>.

(a)   THIS NOTE HAS BEEN DELIVERED IN ARIZONA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES.

(b)   Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender or any affiliate of the Lender in any way relating to this Note or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Arizona  sitting in Maricopa County, and of the United States District Court of the District of Arizona , and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such  courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such Arizona  State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Note or in any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Note or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

21.  <u>JURY WAIVER</u>.  BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

22.  <u>TIME OF THE ESSENCE</u>.  Time is of the essence with regard to each provision of the Loan Documents as to which time is a factor.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower and Parent have each executed this Note as of the date first written above.

True Harvest Holdings, Inc., a Delaware corporation

By:_____
Name: William F. Harley III
Title:   CEO


THE GREENROSE HOLDING COMPANY INC.,
a Delaware corporation

By:_____
Name:  William F. Harley III
Title:   Chief Executive Officer

# Exhibit 6

# PROMISSORY NOTE

| | |
|---|---|
| $4,070,159.00 | Phoenix, Arizona<br>December 31, 2021 |

FOR VALUE RECEIVED, True Harvest Holdings, Inc., a Delaware corporation (the "**Borrower**") hereby unconditionally promises to pay to the order of Next Step Advisors, LLC (the "**Noteholder**") the principal amount of Four Million Seventy Thousand One Hundred Fifty-Nine Dollars and Zero Cents ($4,070,159.00) (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**"). This Note is being issued in respect of assumed indebtedness of the Noteholder to by Borrower.

1. <u>Payment Dates</u>.

(a) <u>Payment Dates</u>. The Loan shall be payable in twenty-four (24) equal consecutive monthly installments beginning on January 15, 2022 and every month thereafter until January 15, 2024. On January 15, 2024, all amounts then outstanding under this Note, including principal, accrued and unpaid interest, and any unpaid fees, shall be due and payable.

(b) <u>Prepayment</u>. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2. <u>Interest</u>.

(a) <u>Interest Rate</u>. Except as provided in Section 2(b), principal amounts outstanding under this Note shall bear interest at twelve percent (12%) per annum (the "**Interest Rate**").

(b) <u>Default Interest</u>. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus four percent (4%) (the "**Default Rate**").

(c) <u>Computation of Interest</u>. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(d) <u>Interest Rate Limitation</u>. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.     <u>Payment Mechanics</u>.

(a)     <u>Manner of Payment</u>. All payments of principal and interest shall be made in US dollars no later than 12:00 PM on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)     <u>Application of Payments</u>. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c)     <u>Business Day</u>. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

(d)     <u>Evidence of Debt</u>. The Borrower authorizes the Noteholder to record on the grid attached as <u>Exhibit A</u> the Loan made to the Borrower and the date and amount of each payment or prepayment of the Loan. The entries made by the Noteholder shall be *prima facie* evidence of the existence and amount of the obligations of the Borrower recorded therein in the absence of manifest error. No failure to make any such record, nor any errors in making any such records, shall affect the validity of the Borrower's obligation to repay the unpaid principal of the Loan with interest in accordance with the terms of this Note.

4.     <u>Representations and Warranties</u>. The Borrower represents and warrants to the Noteholder as follows:

(a)     <u>Existence</u>. The Borrower is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of its organization. The Borrower has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)     <u>Compliance with Law</u>. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower, its property, and business.

(c)     <u>Power and Authority</u>. The Borrower has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)     <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with applicable law. The Borrower has duly executed and delivered this Note.

5.      <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a)      <u>Failure to Pay</u>. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b)      <u>Breach of Representations and Warranties</u>. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made; *provided*, *however*, no Event of Default shall be deemed to have occurred pursuant to this Section 5(b) if, within thirty (30) days of the date on which the Borrower receives notice (from any source) of such untrue or misleading statement, Borrower shall have addressed the adverse effects of such untrue or misleading statement to the reasonable satisfaction of the Noteholder.

(c)      <u>Bankruptcy; Insolvency</u>.

(i)      The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii)      An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii)      The Borrower makes a general assignment for the benefit of its creditors.

(iv)      The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v)      A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d)      <u>Failure to Give Notice.</u> The Borrower fails to give the notice of Event of Default specified in Section 6.

6.      <u>Notice of Event of Default</u>. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.      <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other

amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.      Expenses. The Borrower shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.      Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

      (a)     If to the Borrower:

         [ADDRESS]

         Attention:

         E-mail: [E-MAIL ADDRESS]

      (b)     If to the Noteholder:

         [ADDRESS]

         Attention: Dieter Gable, Manager

         E-mail: dgable@tbconsulting.com

10.     Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Arizona.

11.     Disputes.

      (a)     Submission to Jurisdiction.

         (i)     The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Arizona sitting in Maricopa County, and in the United States District Court for the District of Arizona, and (B) submits to the

4

jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)     Nothing in this Section 11(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii)    Nothing in this Section 11(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b)     Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)     Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.    Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

14.    Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.    No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

16.    <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.    <u>Counterparts</u>. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

18.    <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq*.), and any other similar state laws based on the Uniform Electronic Transactions Act.

19.    <u>SUBORDINATION</u>.    OBLIGOR'S OBLIGATIONS HEREUNDER ARE SUBORINDATE TO ITS OBLIGATIONS TO THE LENDERS UNDER THAT CERTAIN CREDIT AGREEMENT DATED NOVEMBER 26, 2021, AS AMENDED FROM TIME TO TIME.

IN WITNESS WHEREOF, the Borrower has executed this Note as of December 31, 2021.

True Harvest Holdings, Inc.

By _____
   Mickey Harley (Dec 31, 2021 10:04 EST)

Name:   Mickey Harley

Title:    CEO

ACKNOWLEDGED AND ACCEPTED BY

NOTEHOLDER

By _____
   Dieter Gable
   050A34F93E43471...

Name: Dieter Gable

Title: Manager

**EXHIBIT A**

**PAYMENTS ON THE LOAN**

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------------------|--------------------------|-------------------------------|
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |

# Exhibit 7

# PROMISSORY NOTE

| $360,879.00 | Phoenix, Arizona<br>December 31, 2021 |
| --- | --- |

FOR VALUE RECEIVED, True Harvest Holdings, Inc., a Delaware corporation (the "**Borrower**") hereby unconditionally promises to pay to the order of M. Sipolt Marketing, LLC (the "**Noteholder**") the principal amount of Three Hundred Sixty Thousand Eight Hundred Seventy-Nine Dollars and Zero Cents ($360,879.00)  (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**"). This Note is being issued in respect of assumed indebtedness of the Noteholder to by Borrower.

1.  <u>Payment Dates</u>.

(a)  <u>Payment Dates</u>. The Loan shall be payable in twenty-four (24) equal consecutive monthly installments beginning on January 15, 2022 and every month thereafter until January 15, 2024. On January 15, 2024, all amounts then outstanding under this Note, including principal, accrued and unpaid interest, and any unpaid fees, shall be due and payable.

(b)  <u>Prepayment</u>. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2.  <u>Interest</u>.

(a)  <u>Interest Rate</u>. Except as provided in Section 2(b), principal amounts outstanding under this Note shall bear interest at twelve percent (12%) per annum (the "**Interest Rate**").

(b)  <u>Default Interest</u>. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus four percent (4%) (the "**Default Rate**").

(c)  <u>Computation of Interest</u>. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(d)  <u>Interest Rate Limitation</u>. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.      Payment Mechanics.

(a)      Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 12:00 PM on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)      Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c)      Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

(d)      Evidence of Debt. The Borrower authorizes the Noteholder to record on the grid attached as Exhibit A the Loan made to the Borrower and the date and amount of each payment or prepayment of the Loan. The entries made by the Noteholder shall be *prima facie* evidence of the existence and amount of the obligations of the Borrower recorded therein in the absence of manifest error. No failure to make any such record, nor any errors in making any such records, shall affect the validity of the Borrower's obligation to repay the unpaid principal of the Loan with interest in accordance with the terms of this Note.

4.      Representations and Warranties. The Borrower represents and warrants to the Noteholder as follows:

(a)      Existence. The Borrower is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of its organization. The Borrower has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)      Compliance with Law. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower, its property, and business.

(c)      Power and Authority. The Borrower has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)      Authorization; Execution and Delivery. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with applicable law. The Borrower has duly executed and delivered this Note.

2

5.      Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a)      Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b)      Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made; *provided, however*, no Event of Default shall be deemed to have occurred pursuant to this Section 5(b) if, within thirty (30) days of the date on which the Borrower receives notice (from any source) of such untrue or misleading statement, Borrower shall have addressed the adverse effects of such untrue or misleading statement to the reasonable satisfaction of the Noteholder.

(c)      Bankruptcy; Insolvency.

(i)      The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii)      An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii)      The Borrower makes a general assignment for the benefit of its creditors.

(iv)      The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v)      A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d)      Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6.      Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.      Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other

3

amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.    <u>Expenses</u>. The Borrower shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.    <u>Notices</u>. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a)    If to the Borrower:

[ADDRESS]

Attention: [NAME]

E-mail: [E-MAIL ADDRESS]

(b)    If to the Noteholder:

[ADDRESS]

Attention: Marcus Sipolt, Manager

E-mail: msipolt@blindsidebc.com

10.    <u>Governing Law</u>. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Arizona.

11.    <u>Disputes</u>.

(a)    <u>Submission to Jurisdiction</u>.

(i)    The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Arizona sitting in Maricopa County, and in the United States District Court for the District of Arizona, and (B) submits to the

4

jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)     Nothing in this Section 11(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii)     Nothing in this Section 11(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b)     Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)     Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.     Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.     Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

14.     Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.     No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

4864-6542-8488

16.   <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.   <u>Counterparts</u>. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

18.   <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq*.), and any other similar state laws based on the Uniform Electronic Transactions Act.

19.   <u>SUBORDINATION</u>.  OBLIGOR'S OBLIGATIONS HEREUNDER ARE SUBORINDATE TO ITS OBLIGATIONS TO THE LENDERS UNDER THAT CERTAIN CREDIT AGREEMENT DATED NOVEMBER 26, 2021, AS AMENDED FROM TIME TO TIME.

4864-6542-8488

IN WITNESS WHEREOF, the Borrower has executed this Note as of December 31, 2021.

True Harvest Holdings, Inc.

By _____

Name:   William F. Harley III

Title:    CEO


ACKNOWLEDGED AND ACCEPTED BY

NOTEHOLDER

By _____

Name: Marcus Sipolt

Title: Manager

## EXHIBIT A

## PAYMENTS ON THE LOAN

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------------------|--------------------------|-------------------------------|
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |
|      |                      |                          |                               |

4864-6542-8488

# Exhibit 8

# PROMISSORY NOTE

| | |
|---|---|
| $168,962.00 | Phoenix, Arizona<br>December 31, 2021 |

FOR VALUE RECEIVED, True Harvest Holdings, Inc., a Delaware corporation (the "**Borrower**") hereby unconditionally promises to pay to the order of Sabertooth Investments, LLC (the "**Noteholder**") the principal amount of One Hundred Sixty-Eight Thousand, Nine Hundred Sixty-Two Dollars and Zero Cents ($168,962.00)  (the "**Loan**"), together with all accrued interest thereon, as provided in this Promissory Note (this "**Note**").  This Note is being issued in respect of assumed indebtedness of the Noteholder to by Borrower.

1.    Payment Dates.

(a)    Payment Dates. The Loan shall be payable in twenty-four (24) equal consecutive monthly installments beginning on January 15, 2022 and every month thereafter until January 15, 2024. On January 15, 2024, all amounts then outstanding under this Note, including principal, accrued and unpaid interest, and any unpaid fees, shall be due and payable.

(b)    Prepayment. The Borrower may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2.    Interest.

(a)    Interest Rate. Except as provided in Section 2(b), principal amounts outstanding under this Note shall bear interest at twelve percent (12%) per annum (the "**Interest Rate**").

(b)    Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at the Interest Rate plus four percent (4%) (the "**Default Rate**").

(c)    Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365/366 days, as the case may be, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(d)    Interest Rate Limitation. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.     <u>Payment Mechanics</u>.

(a)     <u>Manner of Payment</u>. All payments of principal and interest shall be made in US dollars no later than 12:00 PM on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Borrower from time to time.

(b)     <u>Application of Payments</u>. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c)     <u>Business Day</u>. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Phoenix, Arizona are authorized or required by law to close.

(d)     <u>Evidence of Debt</u>. The Borrower authorizes the Noteholder to record on the grid attached as <u>Exhibit A</u> the Loan made to the Borrower and the date and amount of each payment or prepayment of the Loan. The entries made by the Noteholder shall be *prima facie* evidence of the existence and amount of the obligations of the Borrower recorded therein in the absence of manifest error. No failure to make any such record, nor any errors in making any such records, shall affect the validity of the Borrower's obligation to repay the unpaid principal of the Loan with interest in accordance with the terms of this Note.

4.     <u>Representations and Warranties</u>. The Borrower represents and warrants to the Noteholder as follows:

(a)     <u>Existence</u>. The Borrower is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of its organization. The Borrower has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)     <u>Compliance with Law</u>. The Borrower is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Borrower, its property, and business.

(c)     <u>Power and Authority</u>. The Borrower has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)     <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all necessary corporate action in accordance with applicable law. The Borrower has duly executed and delivered this Note.

4889-7394-9960

5.　　Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a)　　Failure to Pay. The Borrower fails to pay (i) any principal amount of the Loan when due; (ii) any interest on the Loan within five (5) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b)　　Breach of Representations and Warranties. Any representation or warranty made by the Borrower to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made; *provided*, *however*, no Event of Default shall be deemed to have occurred pursuant to this Section 5(b) if, within thirty (30) days of the date on which the Borrower receives notice (from any source) of such untrue or misleading statement, Borrower shall have addressed the adverse effects of such untrue or misleading statement to the reasonable satisfaction of the Noteholder.

(c)　　Bankruptcy; Insolvency.

(i)　　The Borrower institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii)　　An involuntary case is commenced seeking the liquidation or reorganization of the Borrower under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii)　　The Borrower makes a general assignment for the benefit of its creditors.

(iv)　　The Borrower is unable, or admits in writing its inability, to pay its debts as they become due.

(v)　　A case is commenced against the Borrower or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d)　　Failure to Give Notice. The Borrower fails to give the notice of Event of Default specified in Section 6.

6.　　Notice of Event of Default. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Borrower shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.　　Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Borrower declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other

3

amounts payable hereunder immediately due and payable; *provided*, *however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.    <u>Expenses</u>. The Borrower shall reimburse the Noteholder on demand for all reasonable and documented out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.    <u>Notices</u>. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by facsimile or e-mail properly addressed (with written acknowledgment from the intended recipient such as "return receipt requested" function, return e-mail, or other written acknowledgment); or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a)    If to the Borrower:

[ADDRESS]

Attention: [NAME]

E-mail: [E-MAIL ADDRESS]

(b)    If to the Noteholder:

[ADDRESS]

Attention: Brad Cooke, Manager

E-mail: brad@dymatize.com

10.    <u>Governing Law</u>. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Arizona.

11.    <u>Disputes</u>.

(a)    <u>Submission to Jurisdiction</u>.

(i)    The Borrower irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Arizona sitting in Maricopa County, and in the United States District Court for the District of Arizona, and (B) submits to the

4

jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Borrower in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(ii)     Nothing in this Section 11(a) shall affect the right of the Noteholder to bring any action, suit, or proceeding relating to this Note against the Borrower or its properties in the courts of any other jurisdiction.

(iii)     Nothing in this Section 11(a) shall affect the right of the Noteholder to serve process upon the Borrower in any manner authorized by the laws of any such jurisdiction.

(b)     Venue. The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)     Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.     Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.     Integration. This Note constitutes the entire contract between the Borrower and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto.

14.     Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Borrower and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.     No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

4889-7394-9960

16.    Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.    Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

18.    Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Note shall be deemed to include electronic and digital signatures and the keeping of records in electronic form, each of which shall be of the same effect, validity, and enforceability as manually executed signatures and paper-based recordkeeping systems, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. § 7001 *et seq*.), and any other similar state laws based on the Uniform Electronic Transactions Act.

19.    SUBORDINATION.    OBLIGOR'S OBLIGATIONS HEREUNDER ARE SUBORINDATE TO ITS OBLIGATIONS TO THE LENDERS UNDER THAT CERTAIN CREDIT AGREEMENT DATED NOVEMBER 26, 2021, AS AMENDED FROM TIME TO TIME.

6

IN WITNESS WHEREOF, the Borrower has executed this Note as of December 31, 2021.

True Harvest Holdings, Inc.

By _____

Name:  William F. Harley III

Title:   CEO

ACKNOWLEDGED AND ACCEPTED BY

NOTEHOLDER

By _____

Name: Brad Cooke

Title: Manager

**EXHIBIT A**

**PAYMENTS ON THE LOAN**

| Date | Principal Amount Paid | Unpaid Principal Balance | Name of Person Making Notation |
|------|------------------------|---------------------------|--------------------------------|
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |
|      |                        |                           |                                |

4889-7394-9960